United States District Court
Southern District of Texas

**ENTERED**

March 22, 2021

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SCOTT EASOM, *et al.*, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-20-2995 |
| | § | |
| US WELL SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER ON SUMMARY JUDGMENT, DENYING
RECONSIDERATION, AND CERTIFYING FOR INTERLOCUTORY APPEAL**

After the court denied cross-motions for summary judgment in this Worker Retraining and
Notification Act dispute, the plaintiffs moved for reconsideration and moved in the alternative to
certify questions for an interlocutory appeal.  (Docket Entry No. 35).  The defendant filed a
response.  (Docket Entry No. 36).  This court's prior memorandum and order, (Docket Entry No.
33), is withdrawn and the following memorandum and order is substituted in its place.  This
memorandum opinion and order addresses new arguments raised in the plaintiffs' motion for
reconsideration and alternative motion to certify questions for interlocutory appeal.  (Docket Entry
No. 35).

It's been a bad year for the oil business.  In early March 2020, a price war between Saudi
Arabia and Russia drove oil prices down, decreasing the demand for oil-field fracking services.
US Well Services, Inc. felt these effects and began cutting costs and laying off employees.  Less
than two weeks later, the COVID-19 pandemic was declared a national emergency.  Air travel
steeply declined.  Manufacturing plants reduced production.  Many people worked from home or
lost their jobs, emptying downtown business districts.  Oil prices declined, reflecting the drop in
demand for petroleum products to fly planes, run factories, and power cars for people commuting

to and from work each day.  Fracking became even more economically unfeasible.  On March 18, 2020, US Well Services laid off many of its employees.

Before these layoffs, US Well Services employees Scott Easom, John Nau, and Adrian Howard were working on oil-drilling sites in Texas.  When they finished their work and returned from the field on March 18, 2020, they received verbal and written notice that their employment was terminated.  They sued US Well Services, alleging that it violated the Worker Adjustment and Retraining Notification (WARN) Act by failing to give them 60-days' notice before terminating them as part of the mass layoff.  Less than three months later, US Well Services moved for summary judgment, arguing that it was not required to give employees prior notice of the layoffs because the WARN Act provides an exception for mass layoffs caused by a natural disaster.  US Well Services argues that the COVID-19 pandemic excuses it from the 60-day notice requirement.

Few cases have interpreted the WARN Act's natural-disaster exception.  There is little authority on the definition of natural disaster; whether the natural disaster must be the but-for or proximate cause of the layoff; whether some kind of notice is required under this exception; and, if so, what kind of notice suffices.  This legal uncertainty is compounded by the factual uncertainty on this thin record over what events, together or separately, caused the company's mass layoffs during the first quarter of 2020.  The price war between Russia and Saudi Arabia and the COVID-19 pandemic both impacted the demand for oil, spot oil prices, and the demand for fracking.  But the causal links between COVID-19, the decline in oil prices, and the US Well Services layoffs are unclear.  Because a fuller record is needed to answer these questions reliably and accurately, the court denies both parties' motions for summary judgment and denies the plaintiffs' motion for reconsideration.  The court grants the plaintiffs' motion to certify questions for interlocutory appeal.  The reasons for this ruling are explained below.

## I.     Background

US Well Services is a hydraulic fracturing company.  (Docket Entry No. 21-1 at 1).  Oil producers hire US Well Services to frack well sites that have already been drilled.  (*Id.* at 2).  The crews fracking at well sites typically include equipment operators, electronics technicians, a crew supervisor, an engineer, and mechanics to maintain the fracking machinery.  (*Id.*).  Once a fracking job is complete, the crews spend two to three days taking down the equipment to use at another site.  (*Id.*).

When spot prices for oil drop below a level at which fracking is commercially viable, oil producers typically discontinue significant aspects of their work and do not demand fracking services from companies like US Well Services.  (*Id.*).  In January and February 2020, oil prices were between $45.00 and $60.00 per barrel.  (Docket Entry No. 21 at 7).  Fracking was viable at those prices.  (*Id.* at 3).  Some sources predicted oil prices would continue to increase in 2020.  (*Id.* at 87–89).  US Well Services increased its workforce in January and February 2020.  (*Id.* at 3).

On March 9, 2020, the price of oil dropped to $31.05 per barrel.  (*Id.* at 4).  Eleven days later, the price dropped below $20.00 per barrel.  (*Id.* at 7).  On March 18, 2020, the plaintiffs returned from the field and were told not to come back.  (*Id.* at 96–98). In April 2020, oil prices dropped below $0 per barrel before recovering to roughly $30.00 four weeks later.  (*Id.* at 7).

The parties dispute the primary cause of the decline in oil prices and the link to the layoffs. US Well Services points to sources from the International Energy Agency stating that the COVID-19 pandemic was responsible for the "sharp downgrade" in the demand for oil in early March 2020 and after.  (Docket Entry No. 21-1 at 92).  US Well Services points to other oil services companies that filed for bankruptcy because of "a severe cut in demand and cash crunch due to the coronavirus pandemic."  (*Id.* at 95).

3

The plaintiffs submitted evidence showing that the drop in oil prices began on March 9, 2020, shortly before the President declared the COVID-19 pandemic a national emergency. The plaintiffs argue that the decline was initially caused by "a price war," beginning on March 8, 2020, between Saudi Arabia and Russia. (Docket Entry No. 23-3). The plaintiffs also point to public statements from the president and CEO of US Well Services on March 20, 2020, that mentioned layoffs as a cost-saving measure but did not refer to the COVID-19 pandemic as playing a role. (Docket Entry No. 23-5). The plaintiffs submitted other reports, dated before March 2020, predicting that the COVID-19 pandemic would cause only a small drop in oil prices. (Docket Entry No. 23-7).

In early March 2020, some US Well Services customers began discontinuing fracking orders at their well sites. (*Id.* at 4). US Well Services crew members who were working at these well sites stopped fracking, shut down their field operations, and packed up the fracking equipment. (*Id.* at 5). US Well Services could not find other customers for fracking services. (*Id.* at 4–5). During this period, US Well Services terminated several high-ranking management officials and administrative staff and reduced pay across the board for its employees. (*Id.* at 5).

The plaintiffs—Scott Easom, John Nau, and Adrian Howard—were working at different facilities in Texas. On March 18, 2020, US Well Services informed them, verbally and in writing, that they were laid off. (*Id.* at 5, 96–98). US Well Services told the plaintiffs that the layoffs were "due to unforeseeable business circumstances resulting from a lack of available customer work caused by the significant drop in oil prices and the unexpected adverse impact that the Coronavirus has caused." (*Id.* at 96, 97, 98).

In August 2020, Easom, Nau, and Howard, representing themselves and seeking to represent a class of similarly situated employees, sued US Well Services for alleged violations of

the WARN Act.  (Docket Entry No. 1, 10).  In November 2020, US Well Services moved for summary judgment, arguing that it qualified for the WARN Act's natural-disaster exception because the COVID-19 pandemic caused the layoffs.  (Docket Entry No. 21).  The plaintiffs opposed the motion for summary judgment and filed what closer inspection revealed to be a cross-motion, arguing that US Well Services did not qualify for the natural-disaster exception.  (Docket Entry No. 23).

This court denied both parties' motions for summary judgment.  (Docket Entry No. 33).  The plaintiffs filed a motion for reconsideration, raising new arguments not included in their original summary judgment motion.  The court's substituted opinion addresses these new arguments.

## II.    The Legal Standards and the Summary Judgment Record

### A.    Motion for Summary Judgment

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (per curiam) (quotation marks omitted); Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party."  *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020).  The moving party "bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact," *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (citation omitted), and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent

summary judgment proof that there is an issue of material fact warranting trial." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301–02 (5th Cir. 2020) (citation and quotation marks omitted). While the party moving for summary judgment must demonstrate the absence of a genuine and material factual dispute, it does not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., LP*, 864 F.3d 326, 335 (5th Cir. 2017) (per curiam) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). "[A] fact is 'material' if its resolution could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (citation and quotation marks omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014) (quotation marks omitted).

When the moving party has met its burden, "the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation and quotation marks omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018), *cert. denied sub. nom. City of Fort Worth, Tex. v. Darden*, 139 S. Ct. 69 (2018).

## B.      The WARN Act

The WARN Act prohibits an employer from closing a plant or ordering a mass layoff unless the employer provides affected employees with 60-days' notice of the closing or layoff.  29 U.S.C. § 2102(a); *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 382 (5th Cir. 2000).  The notice period gives those affected time "to adjust to the prospective loss of employment, to seek and obtain alternative jobs and . . . to enter skill training or retraining that will allow [them] to successfully compete in the job market."  20 C.F.R. § 639.1(a).  Employers who violate the notice provision are required to provide "back pay for each day of violation."  29 U.S.C. § 2104(a)(1)(A).

To prove a WARN Act violation, a plaintiff must show that: (1) the defendant was "an employer"; (2) the defendant ordered a "plant closing" or "mass layoff"; (3) the defendant failed to give employees 60-days' notice before the closing or layoff; and (4) the plaintiff is an "aggrieved" or "affected" employee.  29 U.S.C. §§ 2102, 2104.  If a plaintiff makes these showings, the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the Act's three exceptions: the "faltering company" exception; the "unforeseen business circumstances" exception; or the "natural disaster" exception.  29 U.S.C. § 2102; 20 C.F.R. § 639.9; *In re TWL Corp.*, 712 F.3d 886, 897–98 (5th Cir. 2013).  The natural-disaster exception is relevant here:

> No notice under [the WARN Act] shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.

29 U.S.C. § 2102(b)(2)(B).  In regulations interpreting this exception, the Department of Labor addressed the notice required when an employer closes a plant or orders a mass layoff due to a natural disaster:

> While a disaster may preclude full or any advance notice, such notice as is practicable, containing as much of the information required under § 639.7 as is

7

available in the circumstances of the disaster still must be given, whether in advance
or after the fact or an employment loss caused by a natural disaster.

20 C.F.R. § 639.9(c)(3). The regulations also clarified that "[f]loods, earthquakes, droughts, storms, tidal waves or tsunamis and similar effects of nature are natural disasters under" the WARN Act. 20 C.F.R. § 639.9(c).

The WARN Act's exceptions, including the natural-disaster exception at issue, are affirmative defenses. The employer has the burden to prove that an exception applied to the layoffs. *See* 20 C.F.R. § 639.9; *see also Jurcev v. Cent. Comty. Hosp.*, 7 F.3d 618, 625 (7th Cir. 1993).

### C.    The Summary Judgment Record

The parties filed the following summary judgment evidence:

- an affidavit by Matt Bernard, Chief Administrative Officer for US Well Services, (Docket Entry No. 21-1);

- a chart listing the daily spot price of oil in 2020 by the U.S. Energy Information Administration, (*id.*);

- *Oil Market Report – January 2020* by the International Energy Association, (*id.*);

- *Oil Demand to Rebound in 2020* by Petroleum Economist, (*id.*);

- *Global Oil Demand to Decline in 2020 as Coronavirus Weighs Heavily on Markets* by the International Energy Association, (*id.*);

- termination letters sent to Scott Easom, John Nau, and Adrian Howard, (*id.*);

- a declaration by Gabriel Assaad, an attorney for the plaintiffs, (Docket Entry No. 23-1);

- US Well Services 10-K Report from September 30, 2020, (Docket Entry No. 23-2);

- *Oil Crashes by Most Since 1991 as Saudi Arabia Launches Price War* by CNN Business, (Docket Entry No. 23-3);

- WARN Act notices submitted to the Texas Workforce Commission, (Docket Entry No. 23-4);

- a press release by US Well Services from March 20, 2020, (Docket Entry No. 23-5);

- *Outbreak of Pneumonia of Unknown Etiology (PUE) in Wuhan, China* by the Center for Disease Controls, (Docket Entry No. 23-6);

- *China Virus Could Hit Oil Price by $3 Billion* by Reuters, (Docket Entry No. 23-7);

- *Coronavirus Fear Hits Oil, Prices Drop Most Since May* by CNBC (Docket Entry No. 23-8);

- *Why the Coronavirus Is a Real Threat to the Oil Markets* by OilPrice.com, (Docket Entry No. 23-9);

- Executive Order GA-14 from the State of Texas, (Docket Entry No. 23-10);

- *Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response Version 2.0* by the Cybersecurity and Infrastructure Security Agency, (Docket Entry No. 23-11); and

- discovery requests from Easom, (Docket Entry No. 23-12).

## III.   Analysis

### A.   The Motions for Summary Judgment

The parties raise three disputes relevant to determining whether US Well Services qualifies for the WARN Act's natural-disaster exception.[1]  First, they dispute whether any prior notice of a layoff is required if the natural-disaster exception applies.[2]  (Docket Entry No. 21 at 10; Docket Entry No. 23 at 15).  Second, they dispute whether the COVID-19 pandemic qualifies as a natural

---

[1] US Well Services does not contest that it is a covered employer, that the named plaintiffs were affected employees, or that the named plaintiffs were terminated as part of a mass layoff.  *See* 29 U.S.C. § 2101(a)(1), (3).

[2] The parties made clear at oral argument that their motions do not address the unforeseen-business-circumstances exception, which might also apply.  Among the issues not addressed in this memorandum and order are the requirements of the unforeseen-business-circumstances exception, the form of notice that is required under that exception, and whether the notice US Well Services gave to its employees complied with those requirements.

disaster under the Act.  (Docket Entry No. 21 at 11–12; Docket Entry No. 23 at 13).  Third, they dispute whether the COVID-19 pandemic caused US Well Services to lay off the plaintiffs and other similarly situated employees.  (Docket Entry No. 21 at 13; Docket Entry No. 23 at 13–15). Each dispute is addressed below.

### 1.     Notice

Section 2102(b)(2)(B) of the WARN Act makes clear that "[n]o notice" is required if a mass layoff is due to a natural disaster.  29 U.S.C. § 2102(b)(2)(B).  Courts referring to the natural-disaster exception have noted that it "dispenses with the [WARN Act's] notice requirement altogether in the event of a natural disaster." *See In re Dewey & LeBoeuf LLP*, 507 B.R. 522, 531 n.10 (Bankr. S.D.N.Y. 2014); *see also Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1285 (11th Cir. 2013) (reading the natural-disaster exception to "entirely eliminate the requirement for notice," unlike "the unforeseeable business circumstances defense"); *Torres v. Niche, Inc.*, No. 12-CV-12059, 2013 WL 6655415, at *2 (D. Mass. Dec. 18, 2013) ("The WARN Act gives an employer a complete exception in the event of a natural disaster.").

This reading is bolstered by the faltering-company and unforeseen-business-circumstances exceptions, which contain different language on notice.  29 U.S.C. § 2102(b)(2)(A).  Congress differentiated between layoffs resulting from natural disasters, which require no notice, and layoffs resulting from a company faltering or suffering unforeseen business circumstances, both of which require "as much notice as is practicable."  29 U.S.C. § 2102(b)(2), (3).  Had Congress intended to require "as much notice as is practicable" for layoffs caused by a natural disaster, the "separate subparagraph listing no-notice-required circumstances would be superfluous."  *Sides, Inc.*, 725 F.3d at 1285.

Despite the unambiguous statutory language, the plaintiffs argue that the natural-disaster exception requires at least some form of notice.  They rely on the Department of Labor's regulation interpreting the natural-disaster exception:

> While a disaster may preclude full or any advance notice, such notice as is practicable, containing as much of the information required under § 639.7 as is available in the circumstances of the disaster still must be given, whether in advance or after the fact or an employment loss caused by a natural disaster.

20 C.F.R. § 639.9(c)(3).

When, as here, a regulation conflicts with the unambiguous language of a statute, the statute controls.  *See Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1156 (10th Cir. 2019) ("[W]hen a statute and a regulation are in conflict, the statute renders the regulation which is in conflict with it void and unenforceable." (citation and quotation marks omitted)); *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013) ("[A] valid statute always prevails over a conflicting regulation, and a regulation can never trump the plain meaning of a statute." (citations and quotation marks omitted)).  The court is bound by the WARN Act, not by the Department of Labor's regulations, to the extent they conflict.

The WARN Act unambiguously states that employers are not required to give affected employees notice of a plant closing or mass layoff resulting from a natural disaster.  *See Lions Health Svcs., Inc. v. Sebelius*, 635 F.3d 693, 699–700 (5th Cir. 2011) ("Under [the *Chevron*] test, we first ask 'whether Congress has directly spoken to the precise question at issue.'  If so, we 'must give effect to the unambiguously expressed intent of Congress.'" (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–843 (1984)).  The natural-disaster exception, unlike the faltering-company and unforeseen-business-circumstances exceptions, dispenses with the WARN Act's notice requirement.  The regulation requiring some notice conflicts with the WARN Act's clear "no notice" language.

11

In their reconsideration motion, the plaintiffs argue that the "no notice" language is ambiguous, relying on legislative history and the § 2102(b) section heading, entitled "Reduction of Notification Period."  (Docket Entry No. 35 at 11).  These arguments are unpersuasive.  Section headings and legislative history are useful to clarify ambiguous text, but they do not create ambiguities.  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) ("We should prefer the plain meaning since that approach respects the words of Congress. In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history."); *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947) ("[T]he wise rule [is] that the title of a statute and the heading of a section cannot limit the plain meaning of the text.").  The WARN Act's "no notice" language is not ambiguous.

If US Well Services proves the other elements of the natural-disaster exception, there was no duty to provide WARN Act notice to employees.

### 2.      A Natural Disaster

Under the WARN Act, an employer is not required to give employees notice "if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States."  29 U.S.C. § 2102(b)(2)(B).  The Department of Labor regulations clarify that "[f]loods, earthquakes, droughts, storms, tidal waves or tsunamis and similar effects of nature are natural disasters under" the WARN Act.  20 C.F.R. § 639.9(c).  Disease is not separately named.  The parties dispute whether COVID-19 is a natural disaster under the WARN Act.

Only two courts so far have addressed the WARN Act's natural-disaster exception.  One court assumed, without deciding, that COVID-19 is a natural disaster.  *See Benson, et al. v. Enter.*

*Leasing Co. Fla., LLC*, No. 6:20-CV-00891, slip op. at 10 (M.D. Fla. Jan. 4, 2021) ("COVID-19 may be a natural disaster within the meaning of the WARN Act.").

The other court found that coal fires in a mine were not natural disasters. In *Carver v. Foresight Energy LP*, No. 3:16-CV-3013, 2016 WL 3812376, at *1 (C.D. Ill. July 12, 2016), a mining company had fired all of its mining employees after coal fires prevented them from working in the mine. The court began with the dictionary definition of "natural": something "[e]xisting in or caused by nature; not made or caused by humankind." *Id.* at *4. The court noted that coal fires are "a form of spontaneous combustion which can occur when coal is exposed to oxygen and oxidizes, causing the coal to smolder and release carbon monoxide." *Id.* at *2. The court also noted that coal fires can "be fueled by poor underground housekeeping, such as failure to properly clean up spilled oil and grease" and, as the plaintiffs argued, a poor "ventilation system." *Id.* While the coal fires at issue were the "result of an interaction between oxygen and coal, both of which exist in nature," the court found that the fires were not "natural" because oxygen and coal in the mines were "combined by human intervention," and this "human involvement in the origins of the combustion events would seem to preclude the events from being considered a natural disaster." *Id.* at *4.

Outside the WARN Act context, courts have followed similar reasoning in determining whether COVID-19 is a natural disaster. In *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, the court addressed whether COVID-19 was a natural disaster under a *force majeure* clause in an insurance policy. No. 20-CV-4370, 2020 WL 7405262, at *7 n.7 (S.D.N.Y. Dec. 16, 2020). The court, like the court in *Carver*, first looked to the dictionary definition. BLACK'S LAW DICTIONARY defined "natural" as "[b]rought about by nature as opposed to artificial means," and "disaster" as "[a] calamity; a catastrophic emergency." *Id.* (quoting *Natural, Disaster*, BLACK'S

13

LAW DICTIONARY (11th ed. 2019)).  The OXFORD ENGLISH DICTIONARY defined "natural disaster" as "[a] natural event that causes great damage or loss of life such as a flood, earthquake, or hurricane."  *Id.*; *see also Natural*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 774 (10th ed. 1997) (defining "natural" as "growing without human care . . . existing in or produced by nature: not artificial").  The court held that, "[b]y any measure, the COVID-19 pandemic fits those definitions," and that it could not "be seriously disputed that the COVID-19 pandemic is a natural disaster."  *Id.*

Other courts have reached similar conclusions.  *See, e.g.*, *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, No. 20-CV-0310, 2020 WL 7024929, at *58 (Del. Ch. Nov. 30, 2020) ("The COVID-19 pandemic arguably fits this definition [of natural disaster]" under a purchase and sale agreement); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster" under a Pennsylvania statute); *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) ("The COVID-19 pandemic is, by all definitions, a natural disaster" under a Pennsylvania statute).

COVID-19 qualifies as a disaster under the WARN Act.  COVID-19 is clearly a "disaster." *See Disaster*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] calamity; a catastrophic emergency"); *Natural Disaster*, OXFORD ENGLISH DICTIONARY ("[a] natural event that causes great damage or loss of life").  In a year, two million people lost their lives, and over one hundred million people were diagnosed with infections.  *See AB Stable VIII LLC*, 2020 WL 7024929, at *58 ("[The COVID-19 pandemic] is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths."); *Coronavirus World Map: Tracking the Global Outbreak*, N.Y. TIMES (Feb. 10, 2021, 7:37 AM) (tracking

nationwide       and       global       deaths       due       to       COVID-19),
https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html.

COVID-19 also qualifies as a "natural" disaster because human beings were not responsible for starting or consciously spreading the virus.  Unlike coal fires, which did not occur in *Carver* without humans digging mines and introducing coal to oxygen, COVID-19, like other viruses, did not require conscious human effort to appear or spread, as individuals without symptoms infected others.  *See* Angela L. Rasmussen, *On the Origins of SARS-CoV-2*, 27 NATURE MEDICINE 9, 9 (2021) ("[A]ll indications suggest that, like SARS-CoV and MERS-CoV, this virus probably evolved in a bat host until an unknown spillover event into humans occurred."); Murat Seyran, *et al.*, *Questions Concerning the Proximal Origin of SARS CoV-2*, JOURNAL OF MEDICAL VIROLOGY 1, 1 (2020) ("There is a consensus that severe acute respiratory syndrome coronavirus (SARS-CoV-2) originated naturally from bat coronaviruses (CoVs), in particular RaTG13."); *see also AB Stable VIII LLC*, 2020 WL 7024929, at *58 n.214 ("The record in this case does not support a finding that the virus was anything other than a natural product of germ evolution."). While humans can take precautions to slow the spread of COVID-19 or engage in behavior that fosters contagion, the possibility of slowing the virus spread does not suggest that humans caused the pandemic.[3]

---

[3] In their reconsideration motion, the plaintiffs argue that the court held that humans have "no effect" on the spread of COVID-19.  (Docket Entry No. 35 at 22).  They misread the court's opinion.  In distinguishing COVID-19 from the coal fires in *Carver*, the court noted that human beings are "not responsible for *starting* or *consciously spreading* the virus."  Because human beings did not start COVID-19, it qualifies as "natural" under *Carver*'s reasoning.  The plaintiffs seem to agree that humans are not responsible for creating or starting the spread of the COVID-19 virus, making it "natural."  (Docket Entry No. 35 at 22). The plaintiffs' argument would mean that, for example, because human actors cause climate changes, which in turn make hurricanes and storms more frequent and severe, those storms are not "natural."

The plaintiffs now argue that humans must be incapable of stopping a disaster for it to be "natural."  Their argument is unconvincing.  First, a natural disaster may be slowed or altered by human intervention and still be a natural disaster.  Examples include measures to reduce avalanches or to control or stop wildfires. Second, human beings must interact with a natural disaster for it to affect them.  For example, a drought

Courts have consistently noted, in different contexts, that a disease outbreak is a natural disaster. *See Meyer v. Conlon*, 162 F.3d 1264, 1266 (10th Cir. 1998) ("The Federal Crop Insurance Act ('FCIA') established the Federal Crop Insurance Corporation ('FCIC') to encourage farmers to purchase multiple peril crop insurance, which protects farmers against loss from natural disasters, such as hail and disease."); *Badgley v. Varelas*, 729 F.2d 894, 902 (2d Cir. 1984) ("natural disaster such as fire or disease"). Other courts have suggested that virus epidemics could be natural disasters. *See Nat. Res. Def. Council v. EPA*, 896 F.3d 459, 464 (D.C. Cir. 2018) ("And an ordinary reading of 'natural event' summons images of natural disasters such as tornados and volcanic eruptions; cosmic episodes, such as comets and harvest moons; and organic processes, such as viral epidemics and seasonal changes.").

The plaintiffs argue that the WARN Act uses a specific definition of "natural disaster" that is limited to events that are both catastrophic and sudden, surprising, or swift, like earthquakes and floods, that quickly destroy an employer's place or means of doing business.[4]  (Docket Entry No. 23 at 12).  The court does not find this limit in the statute.  The WARN Act's natural-disaster exception is triggered by "*any form* of natural disaster."  29 U.S.C. § 2102(b)(2)(B) (emphasis added).  Congress was broad, if unspecific, and did not impose a "suddenness" requirement.  The WARN Act provides three examples of natural disasters, "flood, earthquake, or the drought

---

does not affect a farmer unless he or she farms in a place with drought; a flood may not affect an employer if its business is outside the flooded area; and an earthquake typically cannot harm an employer if all upstream and downstream contributors to its business are far from the epicenter.  The plaintiffs' argument, if adopted, would effectively eliminate the natural-disaster exception by requiring no human involvement with the disaster.

[4] This argument also targets the causal link between COVID-19 and the US Well Services layoffs.  For example, a natural disaster, such as an earthquake or tornado, that destroys an employer's only factory has both an immediate and direct causal link to the layoff of all factory employees.  By contrast, rampant mold after a flood, or a natural disaster that destroys an employer's only customer and reduces that customer's demand for the employer's products, is both slower in time and more indirect in effect than a natural disaster that destroys the employer's factory.  The WARN Act's causation requirement is discussed below.

currently ravaging the farmlands of the United States."[5]  *Id.*  The phrase "such as," which precedes

these examples, signals that these three are illustrative, not exhaustive.[6]  *See Bragdon v. Abbott*,

524 U.S. 624, 639 (1998) ("As the use of the term 'such as' confirms, the list is illustrative, not

exhaustive.").  And the inclusion of drought, which is usually prolonged but neither sudden nor

surprising, undermines reading in a limit to suddenly occurring natural disasters.[7]  *See AB Stable*

*VIII LLC*, 2020 WL 7024929, at *58 ("A natural disaster need not be sudden—drought conditions

develop and persist over years, and the ultimate natural disaster of climate change has developed

over decades.").

The plaintiffs also argue that the court should apply the statutory canons of *ejusdem generis*

and *noscitur a sociis*, limiting "natural disaster" to events similar to floods, earthquakes, or

droughts.  (Docket Entry No. 35 at 19–21).  Under *ejusdem generis*, "where general words follow

specific words in a statutory enumeration, the general words are [usually] construed to embrace

---

[5] Congress passed the WARN Act during the drought of 1988, one of the worst since the Dust Bowl of the 1930s.  The drought, which began in April 1988 and continued into 1989, placed roughly 40% of the lower 48 states in extreme drought.  Crop yields were cut by at least a third.  *See generally* U.S. Dep't of Commerce, The Drought of 1988 and Beyond (Oct. 18, 1988), https://repository.library.noaa.gov/view/noaa/10952/noaa_10952_DS1.pdf.  Estimates of the drought's cost exceed $40 billion.  *See* Homeland Security Digital Library, The 1988 Drought/Heatwave, https://www.hsdl.org/c/tl/1988-u-s-droughtheatwave/.

[6] The Department of Labor recently issued a Frequently Asked Questions guidance on the WARN Act and COVID-19.  U.S. Dep't of Lab., *WARN Act COVID-19 Frequently Asked Questions*, https://www.dol.gov/sites/dolgov/files/ETA/Layoff/pdfs/WARN%20FAQ%20for%20COVID19.pdf.  The FAQs suggest that employers may be able to claim the unforeseen-business-circumstances exception, but the FAQs do not mention the natural-disaster exception.  *Id.* at 3.  One court found the lack of reference to the natural-disaster exception to be "a deafening silence."  *Benson*, No. 6:20-CV-00891, slip op. at 11.

The court does not find the Department of Labor's FAQs helpful.  The FAQS did not consider whether COVID-19 fits the definition of natural disaster.  The FAQs also make clear that they are "not binding on courts" and disputes "regarding the interpretation of the Act" are "determined on a case-by-case basis" by the courts.

[7] The Department of Labor's regulations interpreting the unforeseen-business-circumstances exception state that suddenness might make a business circumstance unforeseeable: "An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control."  20 C.F.R. § 639.9(b)(1).

only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dept. Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003). Under *noscitur a sociis*, "a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). Both canons are typically used to limit a general term that follows more specific terms. They are not helpful here.[8]

First, these canons help courts avoid "giving unintended breadth to Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation and quotation marks omitted). The phrase "any form of natural disaster," however, signals intentional breadth. As the Supreme Court has noted on at least two occasions, statutory canons that restrict normal meaning typically do not apply when a generic term is preceded by "any." *See Ali v. Fed. Bureau Prisons*, 552 U.S. 214, 218–19 (2008) (the canons of *ejusdem generis* and *noscitur a sociis* did not apply to the phrase "any other law enforcement officer" because "[r]ead naturally, the word 'any' has an expansive meaning" (citation omitted)); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588–89 (1980) (*ejusdem generis* did not apply to the phrase "any other final action" because this "expansive language offer[ed] no indication whatever that Congress intended [a] limiting construction"). When, as

---

[8] It is unclear that *ejusdem generis* applies when, as here, a general term precedes an illustrative list of examples. Courts typically apply *ejusdem generis* when a general term "follow[s] specific ones." *Gooch v. United States*, 297 U.S. 124, 128 (1936); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012) ("The ejusdem generis canon applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics."); *United States v. Koutsostamatis*, 956 F.3d 301, 308 (5th Cir. 2020) ("That is, when a list of specific X's is followed by the catchall phrase 'other X's,' *ejusdem generis* 'implies the addition of similar after the word other.'").

Some scholars have argued that *ejusdem generis* does not apply when a general term precedes specific terms, because this formulation introduces the general term without limitation, and the general term is more naturally read "at its broadest face value." Scalia & Garner, *supra*, at 204–205; *but see* Gregory R. Englert, *The Other Side of Ejusdem Generis*, 11 Scribes J. Leg. Writing 51 (2007) (disagreeing with Scalia and Garner and surveying disagreement in the courts). Some courts have suggested that illustrative examples following a general term are meant to *expand* the scope of the general term, not limit it. *See Brown v. Azar*, No. 1:20-CV-03702, 2020 WL 6364310, at *9 (N.D. Ga. Oct. 29, 2020) ("[T]he specific terms are preceded by the word 'including,' which signifies a more expansive, non-exhaustive list.").

here, specific examples follow a general term, the examples signal intentional breadth and serve as "an illustrative application of the general principle." *Fed. Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); *see also* Scalia & Garner, *supra* note 9, at 204 ("Following the general term with specifics can serve the function of making doubly sure that the broad . . . general term is taken to include the specifics. Some formulations suggest or even specifically provide this belt-and-suspenders function by introducing the specifics with a term such as including.").

Second, these canons would apply here only if the court finds that floods, earthquakes, and droughts have a "common attribute." *See Ali*, 552 U.S. at 225. The only common attribute appears to be that they are natural disasters. An earthquake is a geological disaster; a drought is meteorological; and a flood is partially hydrological and partially meteorological. The WARN Act regulations include "storms, tidal waves," and "tsunamis." 20 C.F.R. § 639.9(c). While not listed, the WARN Act would also seem to include space-related natural disasters (meteorites), as well as natural disasters that do not fall into any of the listed groups, such as wildfires or avalanches.[9] Some of these natural disasters cause property damage, some cause loss of life, and some cause both. The court does not see an obvious reason for excluding biological natural disasters, such as infectious disease outbreaks, epidemics, or pandemics. *See AB Stable VIII LLC*, 2020 WL 7024929, at *58.

When Congress passed the WARN Act, it was particularly concerned with a drought that had decimated crop yields across the country. A plague of locusts that decimates crops, or a pandemic in cattle that greatly reduces beef or dairy "crops," would cause similar damage. The

[9] The plaintiffs also argue that a viral pandemic does not qualify as a natural disaster because it is not specifically mentioned in the WARN Act. (Docket Entry No. 35 at 22–23). Neither is a typhoon. But, as the plaintiffs agree, a typhoon would qualify as a natural disaster. (*Id.* at 21 n.6). So would other natural disasters that are not specifically enumerated.

human-centered effect of COVID-19 is not a reason for finding that viral or bacterial pandemics are not natural disasters under the WARN Act.

In sum, the WARN Act does not exclude a virus outbreak from the natural-disaster exception. The dictionary definition of natural disaster, other court decisions, and the statutory language support the conclusion that the COVID-19 pandemic is a natural disaster under the WARN Act.

### 3.     Causation

The WARN Act eliminates the need for notice if a plant closing or mass layoff is "due to" a natural disaster. 29 U.S.C. § 2102(b)(2)(B). The parties dispute whether the WARN Act requires but-for causation or proximate causation.[10] They also dispute whether the US Well Services layoffs were "due to" COVID-19 or to a combination of factors besides a natural disaster.

### a.     The "Due To" Causation Requirement

"Due to" means "because of." *U.S. Postal Serv. v. Postal Regul. Comm'n*, 640 F.3d 1263, 1267 (D.C. Cir. 2011) (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 699 (1993)); *see also New York v. U.S. Dep't of Labor*, 477 F. Supp. 3d 1, 7 (S.D.N.Y. 2020) (equating the terms "because" and "due to"); *Progressive Cas. Ins. Co. v. FDIC*, 80 F. Supp. 3d 923, 955–56 (N.D. Iowa 2015) ("due to" means "owing to," "in consequence of, on account of, because of"). The Supreme Court has held that "because of" "incorporates the 'simple' and 'traditional' standard of but-for causation." *Bostock*, 140 S. Ct. at 1739 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013)); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64, n.14 (2007)

---

[10] But-for causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1739 (2020). Proximate causation generally "refers to the basic requirement that . . . there must be some direct relation between the [outcome] and the [purported cause]." *Paroline v. United States*, 572 U.S. 434, 444 (2014) (citation and quotation marks omitted).

("because of" means "based on" and "'based on' indicates a but-for causal relationship"). Courts assume that but-for causation "is one of the traditional background principles against which Congress legislate[s]," and that a phrase such as "due to" or "because of" "imposes a requirement of but-for causation." *Burrage v. United States*, 571 U.S. 204, 214 (2014) (citations and quotation marks omitted). The WARN Act's phrase "due to" means but-for causation.[11]

The plaintiffs argue that but-for causation is the wrong standard and that the WARN Act requires a natural disaster to be the direct, meaning proximate, cause of a mass layoff, relying on the Department of Labor regulations. These regulations interpret the natural-disaster exception to require an employer to "demonstrate that its plant closing or mass layoff is a *direct result* of a natural disaster." 20 C.F.R. § 639.9(c)(2) (emphasis added). The Department of Labor explained that the "direct result" regulatory requirement stemmed from the "floor debates demonstrat[ing] Congressional intent that an employment action that was a direct result would fall under this exception, while one that was caused as an indirect result of a natural disaster would not be covered." Worker Adjustment and Retraining Notification; Interim Interpretive Rule, 53 F. Reg. 48884, 48889 (Dec. 2, 1988).

The legislative history is not so clear. The original proposed language in the WARN Act allowed an employer to claim the natural-disaster exception if a plant closing or mass layoff was "due, *directly or indirectly*, to any form of natural disaster." 134 Cong. Rec. S8686–89, 358 (daily ed. June 28, 1988) (emphasis added). Some members of Congress expressed concern over the word "indirectly" because it is "amorphous" and hard to "tie it down." *Id.* at 360; *see also id.* at 360 ("I think you could make a lot of ludicrous cases out as to what impact the drought or flood

---

[11] The plaintiffs argue that US Well Services did not argue for but-for causation, but it clearly argued for but-for causation at oral argument. The court substitutes this memorandum opinion and order to fully consider the parties' arguments.

or earthquake has."). Others expressed concern that the term "directly" would not protect those "downstream" from producers immediately affected by a natural disaster. *Id.* ("[W]hat we are concerned about is somebody who may be downstream, somebody who may not be in the direct line [of] selling services or products to the farmer but in any event has the same economic difficulties because of the drought."); *id.* at 363 ("Now [causation] is going to be a matter of proof . . . It may not be just those who serve the farmer. It might be somebody downstream. It might be a barge operator. It might be someone else . . . bakeries, for example, elevators—go up and down the line—meatpacking plants, ethanol plants, all of these are going to be impacted if this drought persists."). Congress ended up removing both "directly" and "indirectly" from the statute.[12] *Id.* at 362–63; 29 U.S.C. § 2102(b)(2)(B).

"Congress' rejection of" the term "directly" "weighs heavily against" an interpretation that would impose that term.[13] *Hamdan v. Rumsfeld*, 548 U.S. 557, 579–80 (2006). The fact that Congress rejected the word "directly" not only cuts against the Department of Labor's regulations, it cuts against proximate causation as the standard. The Supreme Court and Fifth Circuit have equated direct causation to proximate causation. *See Paroline*, 572 U.S. at 444 (proximate causation requires a "direct relation between the [outcome] and the [purported cause]"); *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 13–14 (2010) (equating "proximate" and "direct" causation); *Molina-Aranda v. Black Magic Enters., LLC*, 983 F.3d 779, 784 (5th Cir. 2020) (equating proximate causation and direct causation under RICO); *Dixie Pine Prod. Co. v. Md. Cas.*

---

[12] Other courts have looked to the WARN Act's legislative history to interpret its requirements. *See, e.g.*, *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 181 (3d Cir. 1999) (analyzing the WARN Act's legislative history to determine if a government-ordered closing qualifies as a "plant closing").

[13] The court in *Benson* relied on the Department of Labor's regulations to impose a direct result requirement, but the court did not consider the WARN Act's legislative history or whether the regulations are a reasonable interpretation of the WARN Act. No. 6:20-CV-00891, slip op. at 10.

*Co.*, 133 F.2d 583, 585 (5th Cir. 1943) ("It is well settled that the words 'direct cause' ordinarily are synonymous in legal intendment with 'proximate cause.'").  Because Congress rejected direct causation, it seemingly rejected proximate causation as well.[14]  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) ("Congress, we assume, is familiar with the common-law rule and does not mean to displace it sub silentio.").

By contrast, but-for causation asks whether an effect would have occurred in the absence of particular factor or event, not whether that factor or event directly or exclusively caused the effect. *See United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019) ("A proximate-cause inquiry would ask how *directly* each cause affected the final outcome, but the but-for causation standard asks simply whether the outcome would have occurred in the absence of the action." (emphasis in original)); *United States v. Ramos-Delgado*, 763 F.3d 398, 402 (5th Cir. 2014) ("As long as the defendants' actions were a but-for cause of the ultimate harm, it does not matter whether the initial action directly resulted in the harm but only that the harm would not have occurred but-for the initial action.").

This result is consistent with cases in which the Supreme Court has held that a statute does not eliminate proximate cause without a clear indication that Congress intended to do so.  *See, e.g.*, *Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–346 (2005); *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268–70 (1992); *Associated Gen. Contractors Cal., Inc. v. Carpenters*, 459 U.S. 519, 529–35 (1983).  First, Congress signaled its intention to eliminate proximate causation by the using

---

[14] Some courts have held that the phrase "due to" is ambiguous, giving agencies discretion to interpret that phrase. *See All. of Nonprofit Mailers v. Postal Regul. Comm'n*, 790 F.3d 186, 193 (D.C. Cir. 2015) ("[T]he scope of the Accountability Act's 'due to' causation standard is ambiguous."). In light of *Bostock*, 140 S. Ct. at 1739, which did not find the phrase "because of" ambiguous, these cases are questionable. Even if the phrase "due to" is ambiguous, the Department of Labor's use of the term "direct result" is still an unreasonable interpretation of that phrase since Congress explicitly rejected the term "directly." *See United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 494 (2012) (Scalia, J., concurring in part) ("It does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple.'").

the words "due to" rather than "directly due to."   Second, in those cases, the Supreme Court addressed statutes that raised concerns about a plaintiff recovering from a range of parties, including those who did not proximately cause the plaintiff's harm.  *See Pharms., Inc.*, 544 U.S. at 342–346 (securities fraud); *Holmes*, 503 U.S. at 268–70 (Racketeer Influenced and Corrupt Organizations Act); *Associated Gen. Contractors Cal., Inc.*, 459 U.S. at 529–35 (Clayton Act); *see also Lexmark Int'l*, 572 U.S. at 132 ("[I]n all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause.").   That concern is not present here.  Because the natural-disaster exception is an affirmative defense, proximate cause serves no liability-limiting function.

The Supreme Court has also held that the phrase "because of" showed Congress's intention to incorporate but-for causation and cautioned courts against reading more stringent causation requirements into statutes that impose only but-for causation.  *See Bostock*, 140 S. Ct. at 1739 ("Congress could have taken a more parsimonious approach.  As it has in other statutes, it could have added 'solely' to indicate that actions taken 'because of' the confluence of multiple factors do not violate the law."); *Burrage*, 571 U.S. at 216 ("Congress could have . . . adopted a modified causation test tailored to cases involving concurrent causes, . . . [but] chose instead to use language that imports but-for causality.").

The unforeseen-business-circumstances exception further suggests that Congress did not intend to use proximate causation in the natural-disaster exception.  The unforeseen-business-circumstances exception requires an employer to show that a "mass layoff is *caused by* business circumstances that were not reasonably foreseeable."   29 U.S.C. § 2102(b)(2)(A) (emphasis added).  Numerous courts, including the Supreme Court, have interpreted "caused by" to impose a proximate-causation requirement.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995) ("The Act uses the phrase 'caused by,' which more than one Court

of Appeals has read as requiring what tort law has traditionally called 'proximate causation.'");

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)

(interpreting "caused by" to require proximate causation).   While not explicitly mentioning

proximate causation, courts interpreting "caused by" in WARN Act cases have generally required

defendants to show that an unforeseen business circumstance was the immediate cause of a mass

layoff.[15]   *See Gross*, 554 F.3d at 877–78 ("[The defendant's] decision to shut down came in the

immediate wake of [its partner's] withdrawal . . . [even though] it had been suffering from financial

troubles for months."); *see also In re Jevic Holding Corp.*, 496 B.R. 151, 164–65 (Bankr. D. Del.

2013) ("[T]he 'immediate precipitant of the decision to terminate employees' was [the lender's]

refusal to extend forbearance," even though there were "other reasons" for the lender's refusal and

the employer's financial difficulties).

The use of the phrase "caused by" in the unforeseen-business-circumstances exception, but

not in the natural-disaster exception, suggests that Congress intended to impose but-for, not

proximate, causation in the natural-disaster exception.  *See Keene Corp. v. United States*, 508 U.S.

200, 208 (1993) ("'[W]here Congress includes particular language in one section of a statute but

omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in

the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

At least one other court has followed similar reasoning in noting the different causation

requirements between the unforeseen-business-circumstances exception in § 2102 and the strike

exemption in § 2103.  *See Teamsters Nat. Freight Indus. Negot. Comm. ex rel. Howe v. Churchill*

---

[15] Courts applying the unforeseen-business-circumstances causation requirement to layoffs occurring after multiple causes have typically held that the unforeseen business circumstances do not need to be the sole cause of a plant closing or mass layoff, but they must be the "straw that broke the camel's back."  *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 877–78 (10th Cir. 2009); *see also Jones v. Kayser-Roth Hosiery, Inc.*, 748 F. Supp. 1276, 1285 (E.D. Tenn. 1990) (an employer's loss of its largest customer was the "last straw" that made it economically infeasible to continue operating the plant).

*Truck Lines, Inc.*, 935 F. Supp. 1021, 1026 (W.D. Mo. 1996) ("In contrast to the 'business circumstance' exception, the 'strike exemption' appears to place a less onerous burden upon the employer who need only prove that the closing 'related' to the strike, to be exempted from the sixty-day notice requirement. Foreseeability and direct causation are not at issue.").

In sum, the WARN Act's language, structure, and legislative history, as well as case law interpreting similar statutory language, support finding that the natural-disaster exception uses but-for causation standards.  The COVID-19 pandemic need not be the direct or sole cause of the layoffs for the natural-disaster exception to apply.[16]

### b.    Economic Downturn in the Oil Industry

The parties agree that an economic downturn in the oil business caused US Well Services to order a mass layoff on March 18, 2020, but they sharply dispute whether the but-for cause of that economic downturn was the COVID-19 pandemic.  The current record presents genuine factual disputes material to answering that question.

But-for causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock*, 140 S. Ct. at 1739.  The "but-for test directs us to change one thing at a time and see if the outcome changes"; "[i]f it does, we have found a but-for cause." *Id.*  For example, "if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision." *Id.* (emphasis in original); *see also Burrage*, 571 U.S. at 211 ("Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if

---

[16] In their reconsideration motion, the plaintiffs argue that the court's opinion effectively reads "indirectly" back into the statute.  Congress removed the words "directly" and "indirectly" from the statute.  But-for causation, unlike proximate causation, matches this change because "but-for" causation does not specifically address "directness."  The plaintiffs' argument also glosses over the other grounds for finding that the natural-disaster exception imposes but-for causation.  The WARN Act's text, legislative history, and structure all support but-for causation as the correct choice.

those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived.").

The record does not clearly show that the COVID-19 pandemic was or was not the but-for cause of the economic downturn in the oil industry as of March 18, 2020.  Oil prices were dropping before the COVID-19 pandemic from a price war between Saudi Arabia and Russia.  (Docket Entry No. 21-1 at 7).  One source states that oil prices dropped below $30.00 per barrel, in early March 2020, immediately after the price war, because Saudi Arabia was expected to "flood the market with crude in a bid to recapture market share."  (Docket Entry No. 21-3 at 1).  In January 2020, oil prices dropped slightly, but they remained above $50.00 per barrel until the end of February.  (Docket Entry No. 21-1 at 7; Docket Entry No. 23-8 at 2).  In a January 2020 report, the International Energy Agency did not predict a drop in oil demand.  (Docket Entry No. 21-1 at 53).  At the same time, some experts suggested a worst-case scenario of oil prices dropping roughly $5 per barrel because of COVID-19.  (Docket Entry No. 23-8 at 4; Docket Entry No. 23-9 at 3).  On March 9, 2020, the International Energy Agency suggested that, using optimistic assumptions, short-term oil demand might grow by "480,000 barrels a day."  (Docket Entry No. 21-1 at 92).  The Agency's worst-case-scenario prediction was a drop in demand of "730,000 barrels a day in 2020," which was a small fraction of the "99.9 million barrels a day" demand expected in 2020.  (*Id.*).  The Agency also suggested that the worst effects would stem from a drop in demand from China.  (*Id.*).

The record does not clearly show the relative roles of the price war and the COVID-19 pandemic in the March 18, 2020, layoffs.  In the termination letters US Well Services provided the named plaintiffs, it stated that the cause of the layoff was both "unforeseeable business circumstances resulting from a lack of available customer work caused by the significant drop in

oil prices and the unexpected adverse impact that the Coronavirus has caused." (Docket Entry No. 21-1 at 98). But statements from the US Well Services CEO following the mass layoff do not mention COVID-19. (Docket Entry No. 22-5). US Well Services also terminated employees before the vast majority of other businesses that filed WARN notices with the State of Texas. (Docket Entry No. 23-4 at 27). The US Well Services Form 10-K for 2020 states that the company contemplated "reductions-in-force" and furloughs in February 2020, even though oil prices then hovered around $50.00 per barrel and no COVID-19 national emergency had been declared. (Docket Entry No. 23-2 at 28). The US Well Services Chief Administrative Officer stated in his affidavit that prices above $50.00 per barrel were "commercially viable" in January and February of 2020. (Docket Entry No. 21-1 at 3).

In short, the record evidence is disputed. Some evidence supports the inference that the price decrease from the price war between Russia and Saudi Arabia, before March 18, 2020, may have had the largest effect on oil prices and could be the but-for cause of the US Well Services March 18 mass layoff. Other evidence supports an inference that it was COVID-19 that depressed oil prices and demand for fracking-services as of March 18, 2020. The size of the COVID-19 effect and the timing of that effect in relation to the US Well Services mass layoff are questions that cannot be answered definitively on the current record.[17]

Both motions for summary judgment are denied.

---

[17] In their reconsideration motion, the plaintiffs argue that the court's causation ruling could "wrap in" foreign natural disasters. The ruling does not imply that any effect of a natural disaster, no matter how small, would allow an employer to claim the natural-disaster exception. The employer would still be required to prove that the natural disaster was the cause-in-fact of a plant closing or mass layoff. The effect of a foreign natural disaster is less likely to be the cause-in-fact of a domestic plant closing or mass layoff, as compared to a local disaster.

### B.    The Motion for Interlocutory Appeal

The plaintiffs moved to certify three questions for interlocutory appeal.  A party is generally "entitled to a single appeal, to be deferred until final judgment has been entered."  *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994); *see also Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 171 (5th Cir. 2009) (noting that "as a general rule, parties must litigate all issues in the trial court before appealing any one issue").  Under 28 U.S.C. § 1292(b), a district court judge may certify an order for interlocutory appeal if three conditions are met: the order (1) "involves a controlling question of law"; (2) "there is substantial ground for difference of opinion" on the question; and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  A district court judge certifying an order for interlocutory appeal must articulate, in writing, why the order satisfies each of these criteria. *See Linton v. Shell Oil Co.*, 563 F.3d 556, 557–58 (5th Cir. 2009).  "District courts have unfettered discretion to deny certification, even when all [statutory criteria] are satisfied."  *Nieman v. City of Dallas*, No. 3:14-CV-3897, 2016 WL 470235, *3 (N.D. Tex. Feb. 8, 2016).

The court grants the plaintiffs' motion for interlocutory appeal.  The court certifies two controlling questions of law for interlocutory appeal:

1.    Does COVID-19 qualify as a natural disaster under the WARN Act's natural-disaster exception, 29 U.S.C. § 2102(b)(2)(B)?

2.    Does the WARN Act's natural-disaster exception, 29 U.S.C. § 2102(b)(2)(B), incorporate but-for or proximate causation?

These questions of law are "pure question[s] of law" and will not require the court of appeals to "study the record."  *Ahrenholz v. Bd. of Trustees Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000).  Whether COVID-19 qualifies as a natural disaster, and the causation standard under the natural disaster exception, are statutory-interpretation issues that turn on the WARN Act's language, not the record.

29

These questions involve a substantial ground for difference of opinion over which "fair-minded jurists might reach contradictory conclusions." *See Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). Both questions are "novel and difficult questions of first impression." *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 724 (N.D. Tex. 2006). The WARN Act's definition of natural disaster involves complicated statutory interpretation with little guidance from case law, legislative history, or agency regulations. The plaintiffs' motion for reconsideration, while ultimately unconvincing to the court, presents substantial reasons for a difference of opinion. The court's decision on the natural-disaster exception's causation standard disagrees with the Department of Labor regulations and the opinion of another district court. That district court certified the same question on causation for interlocutory appeal. *See Benson, et al. v. Enter. Leasing Co. Fla., LLC*, No. 6:20-CV-00891, slip op. at 14 (M.D. Fla. Feb. 4, 2021).

Appealing these questions could materially advance the ultimate termination of the litigation. Answering a question materially advances the termination of the litigation "if reversal of the district court's opinion would result in dismissal of the action." *Ryan*, 444 F. Supp. 2d at 723 (quoting *Strougo v. Scudder, Stevens & Clark, Inc.*, No. 96-CV-2136, 1997 WL 473566, at *7 (S.D.N.Y. Aug. 18, 1997)). If reversed on either question, the reversal will materially affect whether US Well Services qualifies for the natural-disaster exception. If COVID-19 does not qualify as a natural disaster, US Well Services will not be able to rely on the exception. Similarly, if US Well Services must prove that COVID-19 was the direct cause of its layoffs, it is unlikely that it will be able to claim the exception.

While the court certifies these questions for interlocutory appeal, the court will not stay the litigation. *See* 28 U.S.C. § 1292(b) ("That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof

shall so order.").  The natural-disaster exception is only one of two affirmative defenses at issue. The case also involves the plaintiffs' affirmative case for liability and class certification under Federal Rule of Civil Procedure 23.  Discovery has just begun and should continue while the court of appeals considers these questions.

## IV.   Conclusion

US Well Services' motion for summary judgment, (Docket Entry No. 21), and the plaintiffs' motion for summary judgment, (Docket Entry No. 23), are denied.  The plaintiffs' motion for reconsideration, (Docket Entry No. 35), is denied.  The plaintiffs' alternative motion to certify questions for interlocutory appeal, (Docket Entry No. 35), is granted.


SIGNED on March 19, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge