**STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SCOTT EASOM, ADRIAN HOWARD, and JOHN NAU, on behalf of themselves and on behalf of all others similarly situated,** | § § § § | |
| **Plaintiffs,** | § § | |
| **V.** | § § | **CIVIL ACTION NO 4:20-CV-02995** |
| **U.S. WELL SERVICES, LLC** | § § | |
| **Defendant.** | § § § § § § | |

---

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

---

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ..................................................................................................1

      A.   Class Definition ......................................................................................2

      B.   WARN Act Exclusions .............................................................................4

      C.   Subclasses................................................................................................4

II.   RELEVANT EMPLOYMENT DATA.................................................................5

III.  STATEMENT OF FACTS ...................................................................................5

      A.   USWS's Fracking Operations....................................................................5

      B.   USWS's Business Prior to March 2020......................................................8

      C.   Customers' Option to Discontinue Work if Oil Prices Drop Below
           a Commercially Viable Level. ...................................................................9

      D.   THE COVID Collapse of the Oil Market ................................................9

      E.   USWS's Abrupt Loss of Customer Work and Layoffs. ...........................9

IV.   ARGUMENT AND AUTHORITIES .................................................................13

      A.   Plaintiffs Cannot Meet the Standard of Rule 23. ....................................14

      B.   Plaintiffs' Purported Class Is Overly-Broad and Should Be Limited...................17

V.    CONCLUSION....................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Armstrong v. Lumpkin,*
  2020 WL 8188422 (S.D. Tex., Sept. 8 2020) ...........................................................................7

*Davis v. Signal Int'l Tex. GP, L.L.C.,*
  728 F.3d 482 (5th Cir. 2013) ................................................................................................19

*Jasso v. HC Carriers, LLC.,*
  2022 WL 16927813 (S.D. Tex. Oct. 19, 2022)......................................................................14

*Kephart v. Data Systems Intern., Inc.,*
  243 F.Supp.2d 1205 (D. Kan. Jan. 16, 2003)........................................................................26

*Maldonado v. Ochsner Clinic Found.,*
  493 F.3d 521 (5th Cir. 2007) ................................................................................................15

*Meadows v. Latshaw Drilling Co.,*
  LLC, 2016 WL 3057657 (N.D. Tex. May 31, 2016)..............................................................21

*Mercer v. Patterson-Uti Drilling Co.,*
  717 Fed. Appx 400 (5th Cir. 2017).......................................................................................21

*Michigan Regional Council of Carpenters v. Holcroft LLC,*
  195 F.Supp.2d 908 (E.D.Mich.2002)....................................................................................26

*Moore v. Warehouse Club, Inc.,*
  1992 WL 318560 (W.D. Pa. July 27, 1992) ..........................................................................27

*Rifkin v. McDonnell Douglas Corp.,*
  78 F.3d 1277 (8th Cir.1996) .................................................................................................26

*Sisney v. Trinidad Drilling, LP,*
  231 F.Supp.3d 233 (W.D. Texas 2017) ............................................................................19, 21

*M.D. ex rel. Stukenberg v. Perry,*
  675 F.3d 832 (5th Cir. 2012) ................................................................................................23

*Viator v. Delchamps Inc.,*
  109 F.3d 1124 (5th Cir. 1997) ..............................................................................................19

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011)...............................................................................................................23

*Weekes-Walker v. Macon Cnty. Greyhound Park, Inc.*,
    281 F.R.D. 520 (M. D. Ala., 2012) ...................................................................16

*Woolery v. Peery*,
    2022 WL 19700 (N. D. Tex. Jan. 3, 2022) ..........................................................7

**Federal Statutes and Rules**

FED. R. CIV. P. 23(a) ................................................................................... *passim*

29 U.S.C. § 2101 ........................................................................................ *passim*

The WARN Act ........................................................................................... *passim*

**Regulations**

20 C.F.R. § 639.3 ....................................................................................... *passim*

20 C.F.R. § 639.5 ................................................................................................25

54 FR 16042-01, 1989 WL 278605 (April 20, 1989) .......................................25

**Other Authorities**

*The Google Knows Many Things: Judicial Notice in the Internet Era,* 39 Colo.
    Law. 19, 24 (2010) ..............................................................................................6

March 13, 2020 National Emergency Proclamation,
    https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-
    declaring-national-emergency-concerning-novel-coronavirus-disease-covid-
    19-outbreak ........................................................................................................11

March 13, 2020 State of Disaster
    Proclamation,https://gov.texas.gov/news/post/governor-abbott-declares-state-
    of-disaster-in-texas-due-to-covid-19........................................................................11

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TO THE HONORABLE CHIEF JUDGE LEE H. ROSENTHAL:**

COMES NOW, DEFENDANT, US WELL SERVICES, LLC, ("USWS" or "Defendant"), by and through its attorneys of record, and respectfully submits its Opposition to Plaintiffs' Amended Motion for Class Certification filed by Plaintiffs Scott Easom ("Easom"), Adrian Howard ("Howard") and John Nau ("Nau") (collectively "Plaintiffs").

## I.     INTRODUCTION

As previously and aptly recognized by the Court, 2020 was "a bad year for the oil business."[1] The unforeseeable circumstances and consequences of COVID-19 and its impact on the world economy triggered the collapse of the oil market in March 2020. With oil prices at historic lows (at times below zero), the cost of production was no longer commercially viable, and USWS's customers quickly decided to shut down the fracking work USWS had been performing at multiple sites in different parts of the country.  During this volatile period, USWS received little or no advance notice from its different oil company customers to pull the USWS crews or "fleets" from the well pads. Amidst this chaos, USWS scrambled to find new work for the idled crews to avoid layoffs, and lowered its fees as an incentive, but oil production had shut down and there was simply no work to be had.

Faced with the crisis caused by the rapidly escalating pandemic, and in an effort to save the company and as many jobs as possible, USWS went into survival mode. To avoid the prospect of filing for bankruptcy, the company was constrained to lay off fracking crews, administrative workers, as well as top executives and managers, including its Chief Operating Officer, General

---

[1] Pacer Docket Entry No. 38 (Memorandum Order).

Counsel, Vice President of Operations, and Vice President of Maintenance. All remaining management had across-the-board salary cuts of up to twenty percent. With the President of the United States declaring COVID-19 a national emergency and the Governor of Texas issuing a disaster proclamation, USWS's Chief Executive Officer reasonably believed that COVID-19 met the requirements of the WARN Act's "natural disaster" exemption, which precluded the formal advance notice requirements of the law.

### A.    Class Definition

In 2020, USWS had seven (7) single sites of employment across the country (including its Houston, Texas headquarters), with each production site separated from the others from anywhere from 200 miles to 1700 miles. In its efforts to prevent the company from failing, USWS instituted layoffs at each of the single sites of employment.  All of this detailed information, including locations, positions, hire dates, termination dates, termination types (involuntary, voluntary, for cause) rehire dates and employment status, was included in Excel charts produced by USWS in discovery.

In attempting to certify an artificially inflated purported national or regional class, Plaintiffs' Motion seeks to include single sites of employment that did not have sufficient numbers of layoffs to constitute "mass layoffs" under a plain and correct reading of the WARN Act, and that would not trigger the notice requirements of the law. Plaintiffs also attempt to certify a class for which they have no class representative and for which they can not provide representative testimony. The purported class representatives, Scott Easom, Adrian Howard, and John Nau, were only employed at the production facilities in Bryan, Texas and San Angelo, Texas. Easom's assigned District or home base was Bryan, Texas[2], Howard was based at the San Angelo, Texas

---

[2] Exhibit 4, Easom Deposition at 15.

District[3], and Nau's home base was also San Angelo, Texas.[4] Moreover, each of purported class representatives was laid off on March 18, 2020.[5]

As such, any purported class (which Defendant would not oppose) should be defined as:

> All USWS employees based out of the production facilities in Bryan, Texas and San Angelo, Texas, who received termination letters on March 18, 2020 excluding any such employees: (1) who were part-time, as defined by the WARN Act, (2) who were rehired by USWS within a six-month period from their date of termination, (3) who voluntarily terminated their employment, (4) who were discharged for cause, or (5) who had signed a release.

USWS does not concede that Plaintiff's calculation of the number of employees employed and terminated at each single site of employment is accurate because Plaintiffs did not produce to the Court the complete charts of data produced by Defendant[6] and also because of the improper time period, as discussed below. However, even accepting that the purported class representatives could adequately represent a version of the class Plaintiffs proposed, the Court should not certify either Plaintiffs' national or regional class as proposed. Accepting the numbers that Plaintiffs provided in the motion as true for the sake of argument, of USWS's seven (7) single sites of employment, only three (3) sites, those located in Bryan, Texas; Pleasanton, Texas; and San Angelo, Texas, laid off a sufficient number of individuals to meet the jurisdictional threshold of the WARN Act. As such, the layoffs at the single sites of employment in Houston, Texas and at USWS's production facilities in Ohio, Pennsylvania and West Virginia do not constitute "mass layoffs" for purposes of the Warn Act, and any purported WARN Act class should not include layoffs at these locations.

---

[3] Exhibit 9, Howard Deposition at 42.

[4] Exhibit 5, Nau Deposition at 4.

[5] *See* Notification Letters to Plaintiffs, attached as Exhibit "11".

[6] Pacer Docket Entry No. 73-10 (Exhibit 10 to Plaintiffs' Motion).

B.    **WARN Act Exclusions**

Pursuant to the WARN Act, any purported class must be further reduced by excluding any workers at those locations who were rehired by USWS within a six-month period from their termination, since under the WARN Act, they did not suffer an employment loss. 29 U.S.C. § 2101(a)(6)(B). In addition, the WARN Act also excludes from the definition of an "employment loss" any voluntary departure, such as a resignation, and any purported class would be further reduced by any employees with such voluntary departures, or any employees who were terminated for cause. 29 U.S.C. § 2101(a)(6)(A). Plaintiffs' purported 87-day class time-period of March 5, 2020 through May 31, 2020 should also be rejected by the Court because it is in direct contradiction to the WARN Act statute and implementing regulations, which expressly limit the relevant timeframe to "any 30-day period." *See* 29 U.S.C. § 2101(a); 20 C.F.R. § 639.3(b). Finally, any class should also exclude employees who signed a release upon their separation from employment.

C.    **Subclasses**

If the Court expands the class definition to include the Pleasanton site and/or dates of termination other than March 18, 2020, which USWS objects to, then subclasses should be utilized for the different sites of employment and the different dates of termination. The orders USWS received from its customers to shut down fracking operations at the customer's well sites varied in terms of the notice USWS received. In some cases, USWS received no advance notice and was told by a customer to immediately shut down operations, leaving those crews with no work.  In other cases, USWS received a few days advance notice before work ceased, and during those few days, USWS tried to find new work for their crews, but no other work was available.  Because this goes to what was reasonably foreseeable at the time notice would have been required under the WARN Act's unforeseeable business circumstances exception for purposes of any differing

damages, this would also necessitate a division of any purported class in subclasses under Rule 23(c)(5), based on the locations where they were employed, and the corresponding notice to employees who were laid off.

## II.    RELEVANT EMPLOYMENT DATA

On September 21, 2022, Defendants produced to Plaintiffs in discovery Excel Charts providing detailed information concerning USWS employees during the period from December 1, 2019 through September 30, 2020.  The columns on the Excel Charts produced included the locations where employees were employed, positions, hire dates, termination dates, termination types (involuntary, voluntary, for cause) rehire dates, and employment status. The Charts also included a listing of all people employed during the December 1, 2019 through September 30, 2020 period and a summary of the data, which included employees who were part-time for purposes of the WARN Act pursuant to 20 C.F. R. § 639.3(h) or rehired within six (6) months.  A true and complete copy of the Excel Chart is attached to this Opposition as an exhibit.[7]

## III.    STATEMENT OF FACTS

### A.    USWS's Fracking Operations.

USWS is in the business of providing Hydraulic fracturing or "fracking" services to its oil company customers.[8] Fracking is the process of injecting liquid at high pressure into subterranean rocks to force open existing fissures for the extraction of oil and gas.[9] The crews and fracking equipment utilized by USWS for fracking are referred to as "fleets." [10] The USWS fleets at the well sites perform fracking services for varied USWS customers under different contracts.[11]

---

[7] Excel Chart of Employment Data Produced by Defendant, Attached as Exhibit 1.

[8] Declaration of Joshua Shapiro at ¶ 3, Attached as Exhibit 2.

[9] Exhibit 2, Shapiro Declaration at ¶ 3.

[10] Exhibit 2, Shapiro Declaration at ¶ 3.

[11] Exhibit 2, Shapiro Declaration at ¶ 3.

5

In early 2020, USWS had seven (7) separate single sites of employment located in different parts of the country.[12] The locations of these were: (1) Headquarters - 1360 Post Oak Blvd Suite 1800, Houston, TX 77056, (2) Bryan Production Facility - 2870 N Harvey Mitchell Pkwy, Bryan, TX 77807, (3) Pleasanton Production Facility - 283 Shale Road, Pleasanton, TX 78064, (4) San Angelo Production Facility - 6728 Highway 853, San Angelo, Texas 76901, (5) Uhrichsville Production Facility – 159 North Wardell Street, Uhrichsville, Ohio 44683, (6) Williamsport Production Facility – 80 Fitness Drive, Muncy, PA 17756, and (7) Jane Lew Production Facility - 533 Industrial Park Road, Jane Lew, West Virginia 26378.[13]

USWS's corporate headquarters is a non-contiguous facility located in a Houston stand-alone office building.[14] The other single sites of employment are in completely separate locations across the country and all have their own staff, buildings, equipment and equipment maintenance facilities where their fracking crews and equipment would be based out of for operations at well sites out in the field.[15] These would include bays to work on the heavy-duty fracking equipment, as well as front offices, training rooms and locker rooms.[16] The USWS production facilities are referred to internally within USWS as "Districts."[17] In addition, many USWS employees also refer to the District they are assigned to as their "base"[18], "base of operations"[19] or "home base."[20]

---

[12] Exhibit 2, Shapiro Declaration at ¶ 5.

[13] Exhibit 2, Shapiro Declaration at ¶ 5.

[14] Exhibit 2, Shapiro Declaration at ¶ 5.

[15] Exhibit 2, Shapiro Declaration at ¶ 5 (Exhibit "A" – Photographs of USWS Production Facilities)

[16] Deposition of Kyle O'Neill at 34, Attached as Exhibit "3".

[17] Exhibit 2, Shapiro Declaration at ¶ 5.

[18] *See* Scott Easom Deposition at 15, Attached as Exhibit "4".

[19] Exhibit 4, Easom Deposition at 118.

[20] *See* John Nau Deposition at 4, Attached as Exhibit "5".

6

As measured by Google Maps[21], the locations of the six Districts range from 101 to 1546 miles from USWS's corporate headquarters, and in some cases, cross multiple state lines.[22] As shown on the table below, also as measured by Google Maps, the USWS Districts are separated from each other by distances ranging from 209 to 1744 miles.[23]

|  | Houston | Bryan | Pleasanton | San Angelo | Uhrichsville | Williamsport | Jane Lew |
|---|---|---|---|---|---|---|---|
| **Houston** | 0 | 101 | 224 | 363 | 1273 | 1546 | 1302 |
| **Bryan** | 101 | 0 | 209 | 284 | 1245 | 1530 | 1251 |
| **Pleasanton** | 224 | 209 | 0 | 256 | 1459 | 1744 | 1465 |
| **San Angelo** | 363 | 284 | 256 | 0 | 1412 | 1693 | 1420 |
| **Uhrichsville** | 1273 | 1245 | 1459 | 1412 | 0 | 274 | 177 |
| **Williamsport** | 1546 | 1546 | 1744 | 1693 | 274 | 0 | 296 |
| **Jane Lew** | 1302 | 1251 | 1465 | 1420 | 177 | 296 | 0 |

The attached Google Earth map of the United States shows the location of each USWS single site of employment in relation to each other, illustrating the significant distances separating each USWS's corporate headquarters, as well as from each other.[24]

At each USWS District, a District Manager controlled day-to-day operations.[25] Each District made its own hiring and staffing decisions.[26] Payroll for the Districts was not handled out of the corporate office in Houston.[27] Each District handled its own payroll with separate processing, review and approval, and each District had its own separate identifying code for hourly

---

[21] *Woolery v. Peery*, 2022 WL 19700, at *4 n. 5 (N. D. Tex. Jan. 3, 2022) (court taking judicial notice of distances based on Google Maps as a source "that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Armstrong v. Lumpkin*, 2020 WL 8188422, at *19 n. 26 (S.D. Tex., Sept. 8 2020) (discussing judicial notice of Google Maps of determining distances); see also David J. Dansky, *The Google Knows Many Things: Judicial Notice in the Internet Era,* 39 Colo. Law. 19, 24 (2010) ("Most courts are willing to take judicial notice of geographical facts and distances from private commercial websites such as MapQuest, Google Maps, and Google Earth.").

[22] Exhibit 2, Shapiro Declaration at ¶ 6. (Exhibit "B" - Google Maps Printouts).

[23] Exhibit 2, Shapiro Declaration at ¶ 6. (Exhibit "B" - Google Maps Printouts).

[24] Exhibit 2, Shapiro Declaration at ¶ 6. (Exhibit "C" – Google Earth Map of USWS Locations).

[25] Deposition of Dean Fullerton at 42, Attached as Exhibit "6".

[26] Exhibit 6, Fullerton Deposition at 39.

[27] Exhibit 6, Fullerton Deposition at 42-43.

7

and salaried workers.[28] When layoffs were ultimately made due to COVID-19, the collapse of the

oil market and the loss of fracking work, the decisions as to who would be laid off were made

locally at the District level.[29]

    **B.**    **USWS's Business Prior to March 2020**

In January 2020, USWS's forecast for the year was highly positive.  USWS's then Chief

Financial Officer Kyle O'Neill testified "[w]e had seen activity levels increase through Q4 of 2019.

We had ramped up and actually hired – I don't remember the exact number, but we had hired a lot

of people to be able to staff up fleets and get those to work.  I believe we had all of our equipment,

or all except for one fleet operational, and we expected that to continue throughout the year."[30]

Increased hiring by USWS continued through January and February of 2020 because they did not

anticipate any need for layoffs.[31] USWS's optimism was shared by the oil industry. In January

2020, the International Energy Association ("IEA") released its Oil Market Report showing

increased oil demand for the rest of 2020,[32] and USWS's review of other oil analysts likewise

showed predictions of increased demand for 2020.[33]  According to the U.S. Energy Information

Administration ("EIA"), the spot price of oil in the first two months of 2020 generally remained

at a range between $50.00 and $60.00 per barrel.[34]

---

[28] Exhibit 6, Fullerton Deposition at 46.

[29] Exhibit 6, Fullerton Deposition at 52.

[30] Exhibit 3, O'Neill Deposition at 40.

[31] Exhibit 6, Fullerton Deposition at 117.

[32] Exhibit 2, Shapiro Declaration at ¶ 8/Exhibit "D" (International Energy Association, *Oil Market Report – January 2020*),https://www.iea.org/reports/oil-market-report-january-2020.

[33] Exhibit 2, Shapiro Declaration at ¶ 8/Exhibit "E" (Petroleum Economist, *Oil Demand to Rebound in 2020*, (January 3, 2020) https://www.petroleum-economist.com/articles/markets/trends/2020/oil-demand-to-rebound-in-2020

[34] Exhibit 2, Shapiro Declaration at ¶ 8/Exhibit "F" (U.S. Energy Information Administration, *Cushing,OK WTI Spot Price FOB*), https://www.eia.gov/dnav/pet/hist/RWTCD.htm.

### C.    Customers' Option to Discontinue Work if Oil Prices Drop Below a Commercially Viable Level.

USWS's business does not directly hinge on the price of oil, but oil prices do have an impact on the drilling activity of USWS's oil company customers and the fracking services they require from USWS.[35]  There is a price point where it starts to become unviable for USWS's customers to drill and accordingly, at that point they have no need for fracking services.[36]

### D.    The COVID Collapse of the Oil Market

In the last week of February 2020, the spot price per barrel of oil, as benchmarked by the EIA, started above $50 per barrel but by week's end, had dropped to $44.83 per barrel.[37] It remained below $50 the first week of March and then the following Monday, plunged to $31.05.[38]

In the following days and weeks, oil prices continued to collapse.  As shown by the EIA benchmark, the price per barrel dropped below $30.00 on March 16, 2020, and below $20.00 per barrel on March 20, 2020, and further dropped to $14.01 per barrel by March 30, 2020.[39]  The price collapse continued. On April 20, 2020, it had deteriorated to minus $36.98 per barrel, the first time in history oil prices had ever fallen below zero, edging back up to $8.91 per barrel the following day. [40]

### E.    USWS's Abrupt Loss of Customer Work and Layoffs.

What forced USWS to begin layoffs in March 2020 was being contacted by its oil company customers, who were shutting down oil field operations and notifying USWS that they did not

---

[35] *See* Exhibit 3, O'Neill Deposition at 38.

[36] *See* Exhibit 3, O'Neill Deposition at 38.

[37] Exhibit 2, Shapiro Declaration at ¶ 9/Exhibit "F" (U.S. Energy Information Administration, *Cushing,OK WTI Spot Price FOB*), https://www.eia.gov/dnav/pet/hist/RWTCD.htm.

[38] *Id.*

[39] *Id.*

[40] *Id.*

need their fracking services.[41]    CFO O'Neil testified "[w]e were scrambling, dropping prices, doing everything we could to try and keep those fleets working to keep as many people employed as possible.  But once there was no work, nothing for people to do, the Company didn't have a choice."[42] USWS was given little to no notice by its customers of the loss of fracking work during this period. USWS's then Vice President of Finance Josh Shapiro testified "[t]here's not advanced notice - - - they call our commercial team and say, 'hey, look, we're done, you guys need to find other plans.'  And then it's communicated to the field.  And all the while, we're watching a commodity tape that's getting obliterated and there's complete uncertainty in the market.  And so every frac company in the industry, every oil service company is scrambling looking for work."[43] USWS workers in the field would learn of the customers' plans to shut down oil field operations before USWS management would find out about the loss of work.[44]

With the loss of work, the first round of layoffs took place during the first week of March 2020, with approximately 40 workers let go from the Districts in Bryan, Texas, Pleasanton, Texas and San Angelo, Texas.[45]  On March 6, 2020 (prior to the date any of the named Plaintiffs were laid off), USWS's Chief Operating Officer Nathan Houston issued an organizational announcement to all employees, advising that the company had to lay off 43 employees, was cutting back on crew air travel, and would be "closely watching our headcount."[46] A Q&A attached to the March 6, 2020 announcement confirmed that "while [employees who were laid off] are eligible for rehire you should <u>NOT</u> assume that this is temporary as we have no way of knowing

---

[41] Exhibit 3, O'Neill Deposition at 43.

[42] Exhibit 3, O'Neill Deposition at 43.

[43] Deposition of Josh Shapiro at 92, Attached as Exhibit "7".

[44] Exhibit 7, Shapiro Deposition at 122-124.

[45] Exhibit 1 (Excel Chart of Employment Data Produced by Defendant).

[46] *See* Declaration of Joel Broussard (Exhibit "A" -March 6, 2020 Notice), attached as Exhibit "8".

whether it is or is not."[47] The Q&A also answered the question "Will there be layoffs in the future?" by stating that "We will continue to monitor market conditions and evaluate additional changes as conditions dictate. Unfortunately, while we hope that no other changes become necessary, we cannot predict the future with certainty."[48]  In his deposition, Plaintiff Adrian Howard testified that he had received the March 6, 2020 notice from USWS announcing the layoffs due to unforeseen actions.[49]  Howard testified it made him aware that his job might also be at issue.[50]

At the time of the layoffs in early March, no determinations had yet been made as to any future layoffs in March.[51] During this same period, when schools across the country were also being closed due to COVID-19, USWS went into survival mode and there were discussions of how to avoid bankruptcy, because "if customers drop your fleet and you're not generating revenue, revenue declines, you collect accounts receivable, your borrowing base decreases, and it could put you in a death spiral."[52]  On March 13, 2020, President Trump declared a national emergency because of the COVID-19 pandemic.[53] On the same day of March 13, 2020, Governor Greg Abbot issued a disaster Proclamation for all Texas counties because of COVID-19.[54]  In light of this, then USWS Chief Executive Officer Joel Broussard reviewed the language of the WARN Act online, including that no notice was required if layoffs were due to a natural disaster.[55]  Based on the

---

[47] *Id.*

[48] *Id.*

[49] Deposition of Adrian Howard at 71-72, Attached as Exhibit "9".

[50] *Id.*

[51] Exhibit 6, Fullerton Deposition at 63.

[52] Exhibit 7, Shapiro Deposition at 66-67, 70-71.

[53] March 13, 2020 National Emergency Proclamation, https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

[54] March 13, 2020 State of Disaster Proclamation,https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19.

[55] Exhibit 8, Declaration of Joel Broussard at ¶ 5-6 (Exhibit "B" -March 19, 2020 Notice),

announcement by the President and Governor, and that the layoffs were due to COVID-19, he reasonably believed that USWS was not required to give the standard 60-day notice under the WARN Act, which was not possible as USWS struggled to avoid going out of business.[56]

The decision to do additional much larger layoffs company-wide later in March, 2020 was made by USWS when they realized that fleets were returning to their Districts from the discontinued drilling sites and there was no additional work available, despite all efforts by USWS.[57]  CFO O'Neill testified "[d]uring that time frame, we were talking to every single customer out there trying to find additional work for that.  And you know, we had some leads.  We thought we were going to be able to win some work, and at the end of the day we were unsuccessful in those attempts.  But it wasn't until pretty close to when we had the mass layoffs that it was clear that, all right, we have no work and we're going to have to lay people off." [58]  According to USWS's Vice President of Operations, the decision for the March 18 layoffs was most likely made just days before the actual layoffs.[59] The named Plaintiffs were among those laid off on March 18, 2020 and all received their notice of termination that same day.  In addition to the layoffs of field workers, as part of its survival mode cost cutting, USWS also laid off top executives, including Chief Operating Officer Nathan Houston, General Counsel Mark Wolf, Vice President of Operations Chuck Johnson, Vice President of Maintenance Robert Kurtz, and Vice President of HSE Richard Hoffman.[60]  Across the board, remaining executives had their salaries cut twenty-percent, salaried management ten-percent, and hourly employees five- percent.[61]  Following the

---

[56] *Id.*

[57] Exhibit 3, O'Neill Deposition at 57.

[58] Exhibit 3, O'Neill Deposition at 58.

[59] Exhibit 6, Fullerton Deposition at 67

[60] Exhibit 3, O'Neill Deposition at 82.

[61] Exhibit 6, Fullerton Deposition at 104.

March 18, 2020 layoffs, USWS issued an announcement to all employees on March 19, 2020, regarding its "Workforce Reductions and Cost-Cutting Initiatives."[62] The March 19 announcement informed employees that USWS was in the process of reducing: "(1) Field and office workers via both layoffs and furloughs where prudent, (2) Materials and overhead spending, (3) Salaries of [the CEO] as well as our CFO and CAO by 20%, (4) and Other areas including stipends for cell phones, vehicles, and fuel."[63]

The layoffs made by USWS were taken to ensure the survival of the Company and to preserve the employee jobs that remained after the loss of the customer work and the major loss of revenue.[64] Because of USWS's rapid response, it was able to negotiate with its lenders to allow the Company to survive through the crisis.[65]  Some of USWS's competitors in the fracking industry did not fare as well under the same circumstances, having to file for Chapter 11 bankruptcy.[66]

## IV.    ARGUMENT AND AUTHORITIES

Plaintiffs cannot adequately represent the class they seek to certify because they were each laid off on March 18, 2020 and worked only at the USWS facilities in Bryan, Texas and San Angelo Texas. As such, the Court should not certify a class of individuals other than those who were terminated on March 18, 2020 from the locations in Bryan, Texas and San Angelo Texas.

Moreover, the Court should not certify either of the unduly and incorrectly expansive classes proposed by Plaintiffs, which are overbroad in both geographic and temporal scope. As discussed below, under the applicable Fifth Circuit precedent, each of the seven (7) USWS

---

[62] Exhibit 8, Declaration of Joel Broussard (Exhibit "B" -March 19, 2020 Notice).

[63] *Id.*

[64] Exhibit 2, Shapiro Declaration at ¶ 11.

[65] Exhibit 2, Shapiro Declaration at ¶ 11.

[66] Exhibit 2, Shapiro Declaration at ¶ 11.

locations constitutes its own single site of employment for purposes of the WARN Act. It is axiomatic that if the number of layoffs at a single site of employment fail to trigger the threshold requirements of the WARN Act, those employees cannot be a member of a purported class. Moreover, because the relevant time period for the WARN Act is a 30-day period, any class that includes individuals who were terminated on dates other than March 18 should be limited to a 30-day period.

Finally, regardless of the temporal and geographic scope of the class the Court certifies, it should exclude those individuals: (1) who were part-time, as defined by the WARN Act, (2) who were rehired by USWS within a six-month period from their date of termination, (3) who voluntarily terminated their employment, (4) who were discharged for cause, or (5) who had signed a release.

### A.    Plaintiffs Cannot Meet the Standard of Rule 23.

Federal Rule of Civil Procedure 23 authorizes certification of a class action "only if: (1) the class is so numerous that joinder of all members is impracticable (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a); *Jasso v. HC Carriers, LLC.*, 2022 WL 16927813, at *2 (S.D. Tex. Oct. 19, 2022) ("To certify a class, the proponent "must first demonstrate that the proposed class meets the four threshold requirements specified in Rule 23(a) - numerosity, commonality, typicality, and adequacy of representation."). In pertinent part, Rule 23 further limits maintenance of a class action to when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). The class certification inquiry is inherently factual and a

matter of the court's discretion. *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007).

The purported class representatives, Scott Easom, Adrian Howard, and John Nau, were all terminated on March 18, 2020 from the USWS facilities in either Bryan, Texas or San Angelo, Texas. As such, the claims of the purported class representatives are <u>only</u> typical to other employees who were terminated on March 18 from either of those locations. The claims of the purported class representatives would not be typical of other individuals who were terminated from different facilities, on different dates, and as the result of different customer decisions that led to a lack of work.

Most WARN Act cases deal with mass layoffs at a single facility or at separate facilities or areas which are connected or in close geographic proximity to each other, which are used for the same purpose and share the same staff or equipment. Most WARN Act cases also involve mass layoffs with a common cause. However, in this matter, the USWS facilities were each their own self-contained single site of employment, with their own buildings, equipment, and staff, separated from each other by hundreds of miles.[67] Each District, and their corresponding fleets of crews and equipment, were performing work for different USWS customers under differing contracts. When COVID-19 and the collapsing oil market sparked cancellations, the amount of notice USWS received from its customers about the loss of work also differed. In some cases, USWS received no advance notice and was told to immediately shut down operations, leaving those crews with no work. In other cases, USWS received a few days advance notice before work ceased. This creates

---

[67] Exhibit 2, Shapiro Declaration at ¶ 5-6. (Exhibit "A" – Photographs of USWS Production Facilities/Exhibit "B" - Google Maps Printouts Exhibit "C" – Google Earth Map of USWS Locations).

a disparity between purported class members as to the notice USWS received from customers and the reasonableness of the notice available to the company.

At a minimum, because there were distinct layoff dates during the relevant period between March 5, 2020 and April 4, 2020, at best Plaintiffs could argue that should have subclasses pursuant to Rule 23(c)(5) since the notice received by the named Plaintiffs (on different dates and at different locations) would not be typical for other purported class members. *See Weekes-Walker v. Macon Cnty. Greyhound Park, Inc.*, 281 F.R.D. 520, 526 (M. D. Ala., 2012) (finding that the issues of law and fact "are very different" for class members who were laid off on different dates and "suggest subclass treatment."). Subclasses could correspond to the separate locations and/or the separate dates the employees received notice of the layoff. For the same reason, subclasses would address the representation issue in this matter, since the named Plaintiffs were based in the Bryan, Texas and San Angelo, Texas Districts, but due to their lack of knowledge and the differing circumstances in each District, they could not fairly and adequately represent the interests of class members who were based in the Pleasanton, Texas District, or any other USWS District. One fundamental problem that undercuts any subclass argument is that there are not named Plaintiffs who could represent all subclasses.

For example, when questioned about his Declaration submitted by his counsel in support of class certification, Plaintiff Easom acknowledged in his deposition that he actually has no personal knowledge of the layoff circumstances of other USWS employees, other than the handful of people he talked with at his own District in Bryan, Texas.[68]  Plaintiff Nau also testified that his knowledge about USWS layoffs after his own layoff is based on rumors he has heard, but that he

---

[68] Exhibit 4, Easom Deposition at 120-121.

has no knowledge of why other USWS employees were laid off.[69] In his deposition, Nau also testified he was not aware that in 2020 COVID-19 shut down the U.S. economy, that the price of oil tanked, and that oil companies told fracking companies such as USWS to stop work on their well sites. Plaintiff Howard testified that back in 2020 he did not pay attention to oil prices dropping and also testified as to not knowing that his children had been sent home from school during the COVID-19 pandemic because he likewise wasn't paying attention.[70] It is clear from their depositions that the putative class representatives' claims are not typical of the class they seek to certify.

This shocking lack of any contemporaneous knowledge about COVID-19 and the collapse of the oil market, and the impact of both on the layoffs in question by named Plaintiffs underscores the deficiencies of having them provide representative testimony on behalf of other laid off employees, who were aware of the COVID-19, the impact it was having on USWS's customer base, and their knowledge of the impending layoffs in the Spring of 2020.  This highlights the advantage of subclass treatment pursuant to Fed. R. Civ. P. 23(c)(5).

**B.      Plaintiffs' Proposed Class Is Overly-Broad and Should Be Limited.**

If the Court rejects Defendant's proposed class definition, and determines that the purported class representatives can represent class members who were terminated on dates other than March 18, 2002 <u>and</u> who were employed at locations other than Bryan or San Angelo, then Defendant submits the Court should still reject Plaintiffs' proposed class definition and follow the WARN Act's definition of single-site of employment and therefore limit a class to the following definition:

---

[69] Exhibit 5, Nau Deposition at 36-37.

[70] Exhibit 9, Howard Deposition at 61, 65, 89.

17

> All USWS employees based out of the production facilities in Bryan, Texas, Pleasanton, Texas and San Angelo, Texas, who were laid off between March 5, 2020 and April 4, excluding any such employees: (1) who were part-time, as defined by the WARN Act, (2) who were rehired by USWS within a six-month period from their date of termination, (3) who voluntarily terminated their employment, (4) who were discharged for cause, or (5) who had signed a release.

Under this definition, only the single sites of employment that met the jurisdictional threshold under the WARN Act would be included and the class would comport with the Department of Labor Regulations and the Fifth Circuit jurisprudence interpreting what constitutes a single site of employment.

### i.    *Each USWS location constitutes a single site of employment for purposes of the WARN Act.*

The WARN Act defines a "mass layoff" as "a reduction in force" that "results in an employment loss at the <u>single site of employment</u> during any 30-day period for—at least 33 percent of the employees...and at least 50 employees[.]" 29 U.S.C. § 2101(a)(3) (emphasis added). The WARN Act does not define "single site of employment," but Department of Labor regulations do. 20 C.F.R. § 639.3(i) provides, in pertinent part:

> **(1)** A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.

> **(2)** There may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be its single site of employment.

> **(3)** Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

18

**(4)** Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single **employer** are separate sites if they employ different workers.

**(5)** Contiguous buildings owned by the same **employer** which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

**(6)** For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the **employer's** regular employment sites (e.g., railroad workers, bus drivers, salespersons), the **single site of employment** to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

**(7)** Foreign sites of employment are not covered under WARN. U.S. workers at such sites are counted to determine whether an **employer** is covered as an **employer** under § 639.3(a).

**(8)** The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

*Id. See Sisney v. Trinidad Drilling, LP*, 231 F.Supp.3d 233, 237 (W.D. Texas 2017). While the USWS locations are single sites under any application of the regulation, the provisions of 20 C.F.R. § 639.3(i)(3) are the most germane to the instant case.

In the Fifth Circuit, the general rule is that "separate facilities are separate sites." *Davis v. Signal Intern. Texas GP, LLC,* 728 F.3d 482, 485 (5th Cir. 2013). "[S]eparate facilities are only to be treated as a single site of employment if **all** three factors identified in [20 C.F.R. § 639.3(i)(3)] are met, namely: (1) the separate facilities are in reasonable geographic proximity of one another; (2) they are used for the same purpose; (3) and they share the same staff and equipment." *Viator v. Delchamps Inc.,* 109 F.3d 1124, 1127-1128 (5th Cir. 1997) (separate stores each constituted a single site of employment) (emphasis added). For purposes of the WARN Act, the term "facility" refers to a building or buildings. 20 C.F.R. § 639.3(j).

19

In this instance, the first factor predominates.  There is no question that each of the seven USWS locations is a facility with its own building, as shown by the photographs in the record. One building being the corporate headquarters and the remaining six being the production facilities where crews and fracking equipment were based out of for fracking operations at well sites in the field. [71] The seven facilities were not remotely in any reasonable general proximity to each other. As measured by Google Maps, the locations of the production facilities range from 101 to 1546 miles from USWS's corporate headquarters, and in some cases, cross multiple state lines.[72]  As also measured by Google Maps, and shown below, USWS's production facilities are separated from each other by distances ranging from 209 to 1744 miles.

|  | Houston | Bryan | Pleasanton | San Angelo | Uhrichsville | Williamsport | Jane Lew |
|---|---|---|---|---|---|---|---|
| Houston | 0 | 101 | 224 | 363 | 1273 | 1546 | 1302 |
| Bryan | 101 | 0 | 209 | 284 | 1245 | 1530 | 1251 |
| Pleasanton | 224 | 209 | 0 | 256 | 1459 | 1744 | 1465 |
| San Angelo | 363 | 284 | 256 | 0 | 1412 | 1693 | 1420 |
| Uhrichsville | 1273 | 1245 | 1459 | 1412 | 0 | 274 | 177 |
| Williamsport | 1546 | 1546 | 1744 | 1693 | 274 | 0 | 296 |
| Jane Lew | 1302 | 1251 | 1465 | 1420 | 177 | 296 | 0 |

As to sharing the same staff and equipment, the vast geographic distances precluded the sharing of equipment or personnel except for random exigencies. The crews at each facility operate independently and with their own equipment. While the widely dispersed production facilities in different parts of the country serve the same general purpose of fracking, they serve different customers under different contracts at different drill sites and different oil fields. Moreover, each facility made its own hiring and staffing decisions,[73] and payroll for each of the facilities was handled independently, with separate processing, review and approval, rather than centralized

---

[71] Exhibit 2, Shapiro Declaration at ¶ 5 (Exhibit "A" - Photographs of the USWS Production Facilities).

[72] Exhibit 2, Shapiro Declaration at ¶ 6 (Exhibit "B" - Google Maps Printouts/Exhibit "C" – Google Earth Map).

[73] Exhibit 6, Fullerton Deposition at 39.

20

payroll out of the corporate office in Houston.[74] When layoffs were ultimately made due to COVID-19, the collapse of the oil market and the loss of fracking work, the decisions as to who would be laid off were made locally at the facility level.[75] Pursuant to the test of 20 C.F.R. § 639.3(i)(3), each of the seven (7) USWS facilities is its own single site of employment.

In the context of the oil industry, courts within the Fifth Circuit have held that geographically dispersed drilling rigs, even though operated by the same company, were each individual sites of employment and that the exception of 20 C.F.R. § 639.3(i)(8) did not apply to change that conclusion. *See Mercer v. Patterson-Uti Drilling Co.*, 717 Fed. Appx 400, 404 (5th Cir. 2017) (finding separate drilling rigs separated by hundreds of miles were not a single site of employment under § 639.3(i)(3) and "[a]ny other reading would be inconsistent with the plain language of the regulation."); *Sisney v. Trinidad Drilling*, LP, 231 F. Supp. 3d 233, 243 (W.D. Tex. 2017) (finding no evidence of an unusual organizational structure where multiple rig sites within a geographic region operated independently); *Meadows v. Latshaw Drilling Co.*, LLC, 2016 WL 3057657, at *7 (N.D. Tex. May 31, 2016), aff'd, 866 F.3d 307 (5th Cir. 2017) (court declined to apply § 639.3(i)(8) to a drilling contractor with a single corporate office, three yards, and thirty-nine geographically dispersed drilling rigs, instead assuming each job site was a single site of employment). The rulings of courts within the Fifth Circuit as to oil rigs are equally applicable to USWS's fracking operations because of the obvious similarities between the functions and operations of drilling and fracking crews. For the reasons discussed, each of USWS's seven (7) separate facilities should be considered single sites of employment in determining whether the

---

[74] Exhibit 6, Fullerton Deposition at 42-43, 46.

[75] Exhibit 6, Fullerton Deposition at 52.

21

WARN Act was triggered by the 2020 layoff and whether such layoffs at each single site can constitute a Rule 23 class.

> ### ii. The layoffs in Houston, Texas, Uhrichsville, Ohio, Williamsport, Pennsylvania and Jane Lew, West Virginia do not constitute "Mass Layoffs" under 29 U.S.C. § 2101(a)(3) and cannot be included in a purported class.

Accepting for purposes of argument only, Plaintiffs' calculations presented to the Court, based on the employment data produced by Defendant, the USWS single sites of employment in Houston, Texas; Urichville, Ohio; Williamsport, Pennsylvania; and Jane Lew, West Virginia, did **not** lay off sufficient employees to trigger the WARN Act, and those employees cannot be part of any purported class.

According to Plaintiffs' Motion, at its corporate headquarters in Houston, USWS had 106 full-time workers and laid off 32 of those employees during the period from March 1, 2020 to May 31, 2020.[76] For purposes of 29 U.S.C. § 2101(a)(3), this does not constitute a mass layoff because the number laid off constituted 30.18% of the workforce at the single site of employment, less than the 33% required, and also failed to meet the threshold of at least 50 employees. The production facility in Jane Lew, West Virginia also fails to meet the test § 2101(a)(3). According to the numbers offered by Plaintiffs' Motion, USWS laid off 50 of its 204 full-time workers during the designated period, which constitutes 24.50% of the workforce, short of 33%.[77] According to Plaintiffs' numbers, Uhrichville, Ohio laid off 8 employees and Williamsport, Pennsylvania laid off 19 employees, so the WARN Act was not triggered for those locations for failure to meet the 50-worker threshold.[78]

---

[76] *See* Plaintiffs' Amended Motion to Certify Rule 23 Class Action, Pacer Docket Entry No. 73 at p. 10-11 of 32.

[77] *Id.* at p. 11 of 32.

[78] *Id.*

Plaintiffs cannot dispute, based on their own calculations, that no mass layoff, as defined by 29 U.S.C. § 2101(a)(3), occurred at these four single sites of employment. It is self-evident that for purposes of certifying a class under Rule 23, Plaintiffs must "demonstrate that the class members have suffered the same injury." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551 (2011)). In this case the alleged injury would be a mass layoff, meaning a "reduction in force which results in an employment loss at the single site of employment during any 30-day period for at least 33 percent of the employees, excluding and part-time employees); and at least 50 employees (excluding any part-time employees)." 29 U.S.C. § 2101. Since a mass layoff did not occur at these locations, the employees at these USWS sites did not suffer an injury for purposes of the WARN Act and are not properly members of any purported class.

### iii.    Any purported class would be limited to those laid off from USWS's single sites of employment in Bryan, Texas, Pleasanton, Texas and San Angelo, Texas.

USWS does not concede that Plaintiff's calculation of the number of employees employed and terminated at each single site of employment is accurate. However, even accepting Plaintiff's numbers as true for the sake of argument, only the sites of Pleasanton, TX; Bryan, TX; and San Angelo, TX laid off a sufficient number of individuals to trigger the WARN Act for purposes of 29 U.S.C. § 2101(a)(3) and the requirement of at least 50 employees and at least 33 percent of the workforce.

### iv.    Any purported class should be limited to a 30-day period, from March 5, 2020 to April 4, 2020.

The WARN Act defines both a "plant closing" and a "mass layoff" as an event which results in an "employment loss" at a single site of employment "during any 30–day period." 29 U.S.C. § 2101(a). Specifically, "The term 'plant closing' means the permanent or temporary

shutdown of a 'single site of employment', or one or more 'facilities or operating units' within a single site of employment, if the shutdown results in an 'employment loss' <u>during any 30–day period</u> at the single site of employment for 50 or more employees, excluding any part-time employees." Similarly, "The term 'mass layoff' means a reduction in force which first, is not the result of a plant closing, and second, results in an employment loss at the single site of employment <u>during any 30–day period</u> for: (i) At least 33 percent of the active employees, excluding part-time employees, and (ii) At least 50 employees, excluding part-time employees." The Regulations implementing the WARN Act likewise limit the relevant timeframe to "<u>any 30–day period</u>." 20 C.F.R. § 639.3(b) (defining "plant closing"); 20 C.F.R. § 639.3(c) (defining "mass layoff"). As such, Plaintiffs' proposed class of employees who were terminated between March 5 and May 31, 2020 should be limited to only those employees who were terminated in the 30-day period from March 5 to April 4, 2020.

USWS first terminated individuals in Pleasanton, TX, Bryan, TX, and San Angelo, TX on March 5, 2020. In the 30-day period beginning on March 5, 2020, and excluding "part time" workers as that term is defined in 29 U.S.C. § 2101(a)(8), USWS laid off more than 50 employees, comprising at least 33% of the workforce the locations in Pleasanton, Bryan, and San Angelo. Specifically, between March 5 and April 4, 2020 (and excluding part-time workers), USWS laid off approximately 56 (of 106) employees in Pleasanton, approximately 66 (of 74) employees in Bryan, and approximately 96 (of 200) employees in San Angelo.  The WARN Act regulations caution an employer to "[l]ook ahead 30 days and behind 30 days to determine whether employment actions both taken and planned will, in the aggregate for any 30–day period, reach the minimum numbers for a plant closing or a mass layoff and thus trigger the notice requirement." Within the 30-day period beginning March 5, USWS had terminated enough employees to trigger

the WARN Act. As such any class should be limited to the 30-day period from March 5, 2020 to April 4, 2020.[79]

Plaintiffs seemingly maintain that a 90-day period should apply to the class definition, but this is not supported by the WARN Act or regulations. The WARN Act provides that a plant closing or mass layoff has occurred, if within a 90-day period, separate employment losses occur, "each of which is less than the minimum number of employees" necessary to trigger WARN coverage but which together add up to the minimum numbers necessary to trigger coverage. 29 U.S.C. § 2102(d). However, "[i]t is important to note that the 90-day aggregation provision applies only to separate actions each of which is under the coverage threshold." Worker Adjustment and Retraining Notification, 54 FR 16042-01, 1989 WL 278605 (April 20, 1989). Both the WARN Act and the implementing regulations make clear that the 90-day period only applies to aggregate employment losses when each set of employment losses is less than the threshold required to trigger the WARN Act. See 29 U.S.C. § 2102(d) ("For purposes of this section, in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, <u>each of which is less than the minimum number of employees</u> specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff.") (emphasis added); see also 20 C.F.R. § 639.5(a)(1)(ii) ("Look ahead 90 days and behind 90 days to determine whether employment actions both taken and planned <u>each of which separately is not of sufficient size to trigger WARN coverage</u> will, in the aggregate for any 90–day period, reach the minimum numbers for a plant closing or a mass layoff and thus trigger the notice requirement.") (emphasis added). Because USWS's layoffs met the threshold to

---

[79] *See* Declaration of Dean Fullerton, Attached as Exhibit "10".

trigger the WARN Act in a 30-day period beginning in March, any class that includes individuals who were terminated on dates other than March 18, 2020 should be limited to individuals terminated in a 30-day period.[80]   Because the threshold for WARN notice was met in a 30-day period, Plaintiffs' proposed 90-day aggregation period is inapplicable and should not be considered for purposes of class certification.   As such, any purported class should be limited to individuals who were terminated in a 30-day period beginning in March, 2020.

> ### v. *Any purported class should exclude employees who did not suffer an employment loss because they were rehired within 6 months and/or who voluntarily departed their employment and/or who were discharged for cause and/or who signed a release.*

The WARN Act expressly excludes from the definition of an employment loss "a layoff exceeding 6 months." 29 U.S.C. § 2101(a)(6)(B). Consistent with this definition, federal courts have held that employees were laid off but were later rehired within six months did not suffer an employment loss under the WARN Act. *See Michigan Regional Council of Carpenters v. Holcroft LLC,* 195 F.Supp.2d 908, 912 (E.D. Mich. 2002) ("only layoffs *exceeding* 6 months are considered employment losses" for the purposes of WARN Act claims) (emphasis in original); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1282 (8th Cir. 1996) (holding that employees laid off for less than six months did not suffer an "employment loss" although the employees expected the layoffs to be permanent); *Kephart v. Data Systems Intern., Inc.*, 243 F.Supp.2d 1205, 1224–25 (D. Kan. Jan. 16, 2003) ("An employee who is laid off and rehired within six months does not fall within the purpose of the WARN Act because there is no need to "adjust to the prospective loss of

---

[80] This argument holds true even if the Court considers a larger national class or a class defined by region. Company-wide, USWS laid off over 50 people in the 30-day period from March 5 to April 4, 2020. While USWS strongly maintains that the Court should not consider "regions" of the company as plaintiffs propose, if USWS is broken into the Texas and Northeast Regions, then each of those regions terminated over 50 employees in a 30-day period beginning in March.

employment, to seek and obtain alternative jobs and, if necessary, to enter skills training or retraining.").

The calculations in Plaintiffs' Motion show 11 employees at USWS's Pleasanton, Texas production facility were rehired within 6 months, and 13 were rehired at the San Angelo production facility, for a total of 24 employees.[81]  Defendant's own calculations based on the actual Excel Chart of Employment Data Produced by Defendant on September 21, 2022 show 14 employees rehired within 6 months at the Pleasanton production facility and 16 rehired at San Angelo, for a total of 30 employees.[82] Regardless, these individuals should be excluded from any class.

Also excluded from the definition of an employment loss under the WARN Act is "an employment termination, other than a discharge for cause, voluntary departure, or retirement." 29 U.S.C. § 2101(a)(6)(A).  *See also Moore v. Warehouse Club, Inc.*, 1992 WL 318560, at *4 (W.D. Pa. July 27, 1992) (finding that employee who either voluntarily quit his job or was fired for cause had not suffered an employment loss under the WARN Act and was properly excluded from calculation of full-time employees for WARN Act coverage).  While data concerning such voluntary departures was included in the employment information that was produced by Defendant to Plaintiffs on September 21, 2022, Plaintiffs do not address it in their Motion.  Defendant's calculations show that during the relevant period, there were 2 such voluntary terminations at the Bryan Texas production facility, 3 at the Pleasanton, Texas location, and 11 at the San Angelo, Texas production facility. Accordingly, any purported class should exclude any employees who voluntarily left their employment at these locations, and would likewise, pursuant to 29 U.S.C. § 2101(a)(6)(A), exclude those employees discharged for cause.

---

[81] *See* Plaintiffs' Amended Motion to Certify Rule 23 Class Action, Pacer Docket Entry No. 73 at p. 17 of 32.

[82] *See* Exhibit 2 (Excel Chart of Employment Data Produced by Defendant).

Finally, any purported class should also exclude any USWS employee who received consideration in exchange for signing a release of claims. *Hardy v. Chicago Housing Authority*, 189 Fed. Appx. 510, 512–13, 2006 WL 1868522, at *2 (7th Cir. June 26, 2006) (a general release of federal statutory claims applies to the WARN Act and is enforceable).

## V.    CONCLUSION

Plaintiffs cannot adequately represent USWS employees, other than those who were terminated on March 18, 2020 from the USWS facilities in Bryan, Texas and San Angelo, Texas. As such, any class should be limited to:

> All USWS employees based out of the production facilities in Bryan, Texas and San Angelo, Texas, who received termination letters on March 18, 2020 excluding any such employees: (1) who were part-time, as defined by the WARN Act, (2) who were rehired by USWS within a six-month period from their date of termination, (3) who voluntarily terminated their employment, (4) who were discharged for cause, or (5) who had signed a release.

However, if the Court determines that named Plaintiffs can represent others outside of Defendant's proposed class definition, then the Court should: (1) limit such a class to the single sites of employment in Bryan, Pleasanton, and San Angelo, Texas and (2) should also limit the relevant time period to 30-days. Regardless of the temporal and geographic scope of the class, the Court should exclude any "part time" employee, any employees who were rehired, any employees who voluntarily terminated their employment, any employees who were discharged for cause, and any employee who had signed a release.

If Plaintiffs are permitted to represent USWS employees who were terminated on other dates and other locations, then the class should be defined as:

> All USWS employees based out of the production facilities in Bryan, Texas, Pleasanton, Texas and San Angelo, Texas, who were laid off between March 5, 2020 and April 4, excluding any such employees: (1) who were part-time, as defined by the WARN Act, (2) who were rehired by USWS within a six-month period from their date of termination, (3) who voluntarily terminated their

employment, (4) who were discharged for cause, or (5) who had signed a release.

THIS the 27th day of January 2023.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:    /s/ David M. Korn
　　　　DAVID M. KORN
　　　　Texas Bar No. 24026161
　　　　S.D. of Texas Federal ID No. 33987
　　　　MARK FIJMAN
　　　　Texas Bar No. 24112984
　　　　S.D. of Texas Federal ID No. 3596495
　　　　Canal Place, 365 Canal Street, Suite 2000
　　　　New Orleans, Louisiana 70130-6534
　　　　Telephone: 504-566-1311
　　　　Telecopier: 504-568-9130
　　　　Email: david.korn@phelps.com
　　　　　　　　mark.fijman@phelps.com

**ATTORNEYS FOR DEFENDANT U.S. WELL SERVICES, LLC**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing instrument has been served on all counsel of record via e-file notification on January 27, 2023.

/s/ David M. Korn
DAVID M. KORN

PD.41011313.2