# EXHIBIT 1

Dean Fullerton
1/6/2023

```
        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
                  HOUSTON DIVISION

SCOTT EASOM, ADRIAN        )
HOWARD, and JOHN NAU, on   )
behalf of themselves and   )
on behalf of all others    )
similarly situated,        )
Plaintiffs,                )
                           )
vs.                        ) CASE NO. 4:20-CV-02995
                           )
US WELL SERVICES, LLC,     )
DEFENDANT.                 )
```

ORAL DEPOSITION

DEAN FULLERTON

January 6, 2023

ORAL DEPOSITION OF DEAN FULLERTON, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 6th day of January, 2023, from 10:05 a.m. to 1:54 p.m., before Laurie Carlisle, Certified Shorthand Reporter in and for the State of Texas, reported by computerized machine shorthand at the offices of McDonald Worley, P.C., 1770 St. James Place, Suite 100, Houston, Texas  77056, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 38

1   A.  Yes.
2   Q.  Was he responsible for the hiring of
3   employees?
4   A.  No.
5   Q.  How did the recruitment process work?
6   A.  What process?
7   Q.  Like would he find -- would he like
8   recruit people and they'd be interviewed by him, or
9   would they be interviewed by someone else?  Or was
10  there even an interview?
11  A.  He would interview over the phone or on
12  Zoom, and then he would refer the candidate to the
13  local site and the local site would do its own
14  hiring.
15  Q.  And who determined compensation for each
16  employee?
17  A.  We had a set pay scale for employees.
18  Q.  Across the country?
19  A.  Across the company.
20  Q.  And who set that pay scale?
21  A.  That scale was set by human resources.
22  Q.  That's yourself?
23  A.  Yes, myself and my team.
24  Q.  Okay.  And did the pay scale take into
25  account location?

Page 39

1   A.  In difficult hiring areas at times, yes.
2   Q.  Was it common, or was it rare?
3   A.  It was common in certain locations.
4   Q.  What locations?
5   A.  It would be common in West Texas, as an
6   example.  More difficult to hire.  Each site made
7   its own decisions, however, in hiring.
8   Q.  On hiring, correct?
9   A.  Correct.
10  Q.  So Mr. Lorenz would do a phone interview,
11  determine whether or not this person should go to
12  the next phase of the recruitment process, and refer
13  that person to the local area that the person --
14  A.  Local site manager.
15  Q.  Local site.
16      Let's talk about -- just so we have
17  the same understanding, what were the local sites in
18  March -- February and March of 2020?
19  A.  Jane Lew, West Virginia; Uhrichsville,
20  Ohio; Williamsport, Pennsylvania; Houston, Texas;
21  Pleasanton, Texas; Bryan, Texas; San Angelo, Texas.
22      To the best of my recollection, those
23  sites were all in existence in March 2020.
24  Q.  And Utah, what did that fall under?
25  A.  Utah was not in existence at the time.

Page 40

1   Q.  When did Utah become in existence?
2   A.  I believe sometime in 2021.
3   Q.  Do you know whether or not -- if you had
4   people working in Utah in 2020, where would they
5   be -- what office or what location would they be
6   working out of?
7       MR. KORN:  You mean if you had people
8   working in the state of Utah?
9       MR. ASSAAD:  Yes.
10      MR. KORN:  What office would they work
11  out of?
12      MR. ASSAAD:  What location, yes.
13  A.  I don't believe any employees were working
14  in Utah at that time.
15  Q.  Okay.  So Utah didn't have a local site in
16  March -- February or March of 2020.  Okay.
17      Now, I noticed that there's -- if you
18  call places in the documents a district or a
19  satellite, what's the difference?
20  A.  Really depends on the size of the --
21  number of employees that are at that location at the
22  time.  And it sometimes gets smaller, sometimes gets
23  larger based upon where our fleets are located.
24  Q.  Are they treated -- from a managerial
25  standpoint, are they treated differently, or are

Page 41

1   they part of each other?  I understand that Byron is
2   like a satellite now of --
3   A.  Bryan.
4   Q.  Bryan is a satellite of Pleasanton,
5   correct?  At one point?
6   A.  At one point it was.
7   Q.  What's the relationship there?  How does
8   that work?
9   A.  Bryan was previously a district.  When it
10  got smaller and the district manager transferred,
11  they put Bryan under another district manager for a
12  period of time.
13  Q.  Okay.  And would it be the district
14  manager that controls the day-to-day operations of
15  his district?
16  A.  Yes.
17  Q.  And a regional manager would report to the
18  district manager, correct?
19  A.  No.
20  Q.  No?
21  A.  The regional manager would have district
22  managers reporting to them.
23  Q.  Okay, I'm sorry.  I think I'm a little bit
24  confused, so let me just clarify something in my
25  mind.

Page 50

1  Q.  Did Sarah Sopko handle any other HR duties
2  for Pennsylvania and Ohio?
3  A.  She oversaw general other HR
4  responsibilities for those locations because both of
5  them at the time were quite small.
6  Q.  And you mentioned before that no one
7  reported to these five individuals that we
8  discussed, but now you're saying that Precious Culp
9  reported to Sarah Sopko?
10  MR. KORN:  Objection, I don't think he
11  specified a time.  I'm going to object to form.
12  Q.  Let's go back.  In March of 2020 did
13  any -- February and March of 2020, did anyone report
14  to the five individuals, Ms. Wiggins, Rohmfeld,
15  Sopko, Lorenz or Creed?
16  MR. KORN:  Object to the form.
17  A.  I don't recall.  To the best of my
18  recollection, Precious Culp reported to Sarah Sopko.
19  Q.  Was there a district HR manager for the
20  Jane Lew office?
21  A.  There was no district HR manager.
22  Q.  Across the company?
23  A.  No.  They had a different title.
24  Q.  With respect to Sarah Sopko, she was a
25  regional HR manager that would cover basically the

Page 51

1  northeast?
2  MR. KORN:  Object to form.
3  A.  Yes.
4  Q.  And the northeast would consist of Ohio,
5  Pennsylvania and Jane Lew?
6  A.  Yes.
7  Q.  And she handled the day-to-day operations
8  for HR in those areas?
9  A.  In all areas but Jane Lew.  We had
10  Precious Culp in Jane Lew.
11  Q.  They handled the day-to-day with respect
12  to payroll?
13  A.  Yes.
14  Q.  What about other HR duties?
15  A.  Yes, she had other HR duties besides
16  payroll.
17  Q.  Okay.  What are the day-to-day HR duties
18  that Sarah Sopko did in Ohio and Pennsylvania and
19  Precious Culp did in Jane Lew?
20  MR. KORN:  Object to form.  It's
21  compound.
22  A.  Sarah supervised Precious Culp.  Other
23  duties that existed in the field included managing,
24  hiring, terminations, employee relations and
25  interpretation of HR or payroll policies.

Page 52

1  Q.  During the terminations in March or April
2  of 2020, did any of the employees complain that they
3  weren't provided any WARN Act notice?
4  A.  Not that I can recall.
5  Q.  With respect to the terminations that
6  occurred in March and April of 2020, was Sarah Sopko
7  involved with respect to who was going to be
8  terminated?
9  MR. KORN:  Object to the form.
10  A.  Decisions on who would be terminated were
11  made by operations in each location.
12  Q.  So with respect to -- well, you were
13  involved with respect to the terminations in March
14  and April of 2020, correct?
15  A.  I did not choose who was terminated.
16  Q.  I understand, but you were involved in the
17  process?
18  MR. KORN:  Object to the form.  It's
19  vague.
20  A.  Yes.
21  Q.  What was your involvement?
22  A.  Involvement was assisting operations and
23  other departments in consolidating lists of
24  employees to be laid off and working with the HR
25  team to provide notifications and timing.

Page 53

1  Q.  What do you mean by timing?
2  A.  Getting a notification into the hands of
3  employees in a timely fashion.
4  Q.  When you say "in a timely fashion," what's
5  a timely fashion?
6  MR. KORN:  Object to the form.
7  A.  At time of termination.
8  Q.  At time of termination?
9  A.  Yes.
10  Q.  So with respect to the layoffs in March
11  and April, would it be accurate to state that the
12  employees learned of the termination at the time
13  they were terminated?
14  MR. KORN:  Object to the form of the
15  question.
16  A.  I can't make that -- I can't answer that.
17  That's a general statement.  I can't answer that.
18  Q.  Were any employees advised of their
19  terminations prior to their termination?
20  A.  Yes.
21  Q.  Which employees?
22  A.  I don't know which ones.  I couldn't
23  possibly recall which employees.
24  Q.  How were they notified?
25  A.  At the time there was a great deal of