# EXHIBIT 7

## UNPUBLISHED OPINIONS

1. **PIRON V. GEN. DYNAMICS INFO. TECH**

2. **ROQUET V. ARTHUR ANDERSON LLP**

3. **GAUTIER V. TAMS MGMT., INC.**

4. **HERNANDEZ V. NACOGDOCHES CNTY**

5. **RANGEL V. CARDELL CABINETRY**

2022 WL 363958
United States District Court, E.D. Virginia,
Richmond Division.

Mollie **PIRON**, et al., Plaintiffs,
v.
**GENERAL DYNAMICS
INFORMATION TECHNOLOGY**,
INC. Defendants.

Civil Action No. 3:19cv709
|
Signed 02/07/2022

**Attorneys and Law Firms**

Edward Everett Bagnell, Jr, Jennifer Jo West, Kasey Leigh Hoare, Robert H. Chappell, III, Spotts Fain PC, Richmond, VA, Isaac Solomon Raisner, Pro Hac Vice, Jack Raisner, Pro Hac Vice, Rene Sara Roupinian, Pro Hac Vice, Raisner Roupinian LLP, New York, NY, for Plaintiffs.

Fiona Rose Moran, Neil Harvey MacBride, Davis Polk & Wardwell LLP, Washington, DC, Craig J. Bergman, Pro Hac Vice, Marie Michele Killmond, Pro Hac Vice, Paul S. Mishkin, Pro Hac Vice, Davis Polk & Wardwell LLP (NA), New York, NY, for Defendants.

**MEMORANDUM OPINION**

Robert E. Payne, Senior United States District Judge

**\*1** This matter is before the Court on PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF ("Class Certification Motion") (ECF No. 61). For the reasons set forth below, the motion will be granted.

**I. BACKGROUND**

Mollie **Piron**, Stephanie Merino, Bounsou Thamvanthongkham, and Christina Beecroft ("Plaintiffs"), on behalf of themselves and all other similarly situated individuals, request that the Court certify their claims against **General Dynamics Information Technology** ("GDIT" or "Defendant"). See ECF No. 61. The Second Amended Complaint, in its sole CLAIM FOR RELIEF, alleges that GDIT violated the Worker Adjustment and Retraining Notification Act ("WARN" Act) (29 U.S.C. § 2101, et seq.) by not providing at least "60 days' notice prior to terminating 500 or more employees in a mass layoff, or before terminating 50 or more employees in a plant closing." SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ. ("SAC") (ECF No. 49 ¶ 6). In its PRAYER FOR RELIEF, the SAC seeks to recover up to 60 days of wages and benefits of various kinds. Id. GDIT opposes class certification by arguing that the predominance requirement of Rule 23(b) (3) has not been established. GDIT does not contest any of the other factors under Rule 23 as substantiated in the Class Certification Motion. See DEFENDANT GDIT's MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 72). The crux of the predominance issue is whether Plaintiffs and Putative Class Members can claim a "single site of employment" under the WARN Act by relying on Department of Labor ("DOL") regulations promulgated in Subpart 6 (20 C.F.R. § 639.1(6)).

**A. The WARN Act**

Before assessing the arguments for, and in opposition to, class certification, it is necessary to provide a brief background on the WARN Act.

Enacted in 1988, the WARN Act requires employers to provide notice of abrupt, substantial employment terminations in order to enable workers to seek alternative employment and to prepare communities for economic disruption. See Meson v. GATZ Tech. Servs. Corp., 507 F.3d 803, 808 (4th Cir. 2007) (relying on Bader v. N. Line Layers, Inc., 503 F.3d 813 (9th Cir. 2007)); 20 C.F.R. § 639.1(a)). The WARN Act requires employers to provide 60 days written notice to employees before effectuating a "mass layoff" or "plant closing". 29 U.S.C. § 2102(a). Under the WARN Act, employees may bring a claim of action when they incur a covered employment loss without such notice, and employers who fail to give this notice are liable to each affected employee for back pay,

Piron v. General Dynamics Information Technology, Inc., Slip Copy (2022)

171 Lab.Cas. P 11,344, 2022 IER Cases 40,578

benefits, and attorneys' fees. 29 U.S.C. § 2104.

The WARN Act defines "mass layoff" as a reduction in workforce at a "single site of employment" that impacts at least 33 percent of the employees and a minimum of 50 employees in a 30-day period. 29 U.S.C. § 2101(a) (3). The WARN Act does not define the term "single site of employment." However, DOL, the federal agency responsible for administering the statute, has defined through regulations a "single site of employment" as "either a single location or a group of contiguous locations." 20 C.F.R. § 639.3(g) (i) (1).

**\*2** The parties in the present case dispute whether certain requirements of the "single site of employment" regulations, particularly Subpart 6, apply to Plaintiffs and Putative Class Members:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is the assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i) (6).

Courts apply a highly deferential, narrow standard of review for interpretative regulations promulgated by federal agencies. See generally Ohio Valley Env't Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 200) ("Although [the court's] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.") (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

In the Fourth Circuit, courts must not only defer to DOL's regulatory interpretation, but also apply the standard set forth by Meson for determining "single site of employment" under Subpart 6 of the regulations when reviewing WARN Act claims. See Meson, 507 F.3d at 809-10. In Meson, the Court of Appeals held that Subpart 6 was "intended to apply only to truly mobile workers without a regular, fixed place of work." Id. at 809.

**B. Procedural History**
On September 27, 2019, Plaintiffs filed a Complaint claiming that GDIT had violated the WARN Act by not providing Plaintiffs and Putative Class Members at least 60 days advance written notice of their terminations. See CLASS ACTION COMPLAINT FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ. (ECF No. 1). On March 10, 2020 Plaintiff's AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ. (ECF No. 5) was dismissed, without prejudice, pursuant to the ORDER (ECF No. 38) and the accompanying MEMORANDUM OPINION (ECF No. 37). In the opinion, the Court determined that the Amended Complaint failed to allege the requirements for the definition of "mobile worker" under Meson because Plaintiffs had not adequately alleged that they fell within Subpart 6. Piron v. Gen. Dynamic Info. Tech., Inc., No. 3:19-cv-709, 2020 WL 115983, at \*3-4 (E.D. Va. Mar. 10, 2020). However, Plaintiffs were afforded leave to file another amended complaint "if, upon careful examination, the Plaintiffs' counsel can file such a pleading consistent with the requirements of Fed. R. Civ. P. 11." ORDER (ECF No. 38).

On April 27, 2020, Plaintiffs subsequently filed the SAC which alleges that GDIT violated the WARN Act by failing to give adequate written notice 60 days before ordering a mass layoff between July 3, 2019 through September 13, 2019 that resulted in "employment losses" for at least 50 of Defendant's employees as well as 33 percent of Defendant's workforce at the GDIT facility in Falls Church, Virginia. ECF No. 39 ¶¶ 139-40, 145-46. The premise for that allegation is the assertion that the Falls Church facility was the single site of employment for Plaintiffs and Putative Class Members. Id. ¶ 142.

**\*3** GDIT filed DEFENDANT GDIT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (ECF No. 41) which was denied because "the Second Amended Complaint alleges facts from which it plausibly could be held that the plaintiffs and class members fit within the so-called 'mobile worker' category [in Meson] ..." However, the Court also noted that "further development of the record [may] necessitate a different conclusion after the end of discovery." ORDER (ECF No. 50 at 2).

Thereafter, "the parties ... completed more than two months of class certification discovery, including production of over 40,000 pages of documents, interrogatories, and positions." ECF No. 72 at 13 (referencing ECF Nos. 51, 54). Plaintiffs subsequently moved for PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 61). Timely replies and responses were filed.

**C. Factual Background**

GDIT is an *information technology* company headquartered in Falls Church, Virginia. ECF No. 39 ¶ 14. In the Spring of 2018, GDIT acquired CSRA, Inc. ("CSRA"), a company that performed federal agency employee background checks for the Office of Personnel Management ("OPM"). Id. at 1, ¶ 17. The CSRA/OPM contract was an asset to which GDIT succeeded when it acquired CSRA. Id.

Plaintiffs and Putative Class Members were employed by the CSRA and became employed by GDIT after it acquired CSRA. After the CSRA employees, which included about 1,200 Investigators and 300 Reviewers, became employees of GDIT, they continued to work on the OPM contract within GDIT as part of GDIT's Civil and Homeland Security Group. Id. at 1.

To support performance of the OPM contract, GDIT maintained a Program Management Office ("PMO") in Falls Church, Virginia. The PMO was divided into two sections: operations management functions and corporate program support. See Ex. 6, ECF No. 66-6 at 14-16, 81. Plaintiffs and Putative Class Members were employed in the PMO's operations management section, which oversaw what GDIT described as its "mobile workforce." Id. at 14, 19, 31. Continuity for field investigations across the country was enabled by GDIT's software known as Case Management System ("CMS"). Id. Operations management employees, including the field investigative staff reported to the PMO. Id. at 14-15.

GDIT's hierarchical nature created a management system whereby the PMO led "the daily priorities of the teams" including those within the Operations Field Branch and Operations Quality Branch (i.e., the "mobile workforce"). ECF No. Ex. 11, 66-11 at 3-4, 9. Works assignments originated from the PMO, led by Anthony Durante, who was situated in GDIT's Falls Church, Virginia office. ECF No. 39 at 1-2; Ex. 22, ECF No. 66-22. According to the PMO Falls Church Office Organizational Chart, the majority of employees were considered remote resources, who were subject to Durante's oversight either directly or indirectly. See Ex. 22, ECF No. 66-22 at 2 (representing Durante as responsible for the Operations Managers and Workload Team); Ex. 6, ECF No. 66-6 at 81 (representing Durante as responsible for the Field Supervisors and Case Reviewers).

GDIT employees were located in various locations across

the country in order to support, and, to efficiently perform, the field investigations required under the OPM contract. Id. at 81-82. GDIT divided its fieldwork staff into four groups: Background Investigators ("Investigators"), Field Supervisors ("Supervisors"), Case Reviewers (including Quality Analysts), and Case Reviewer Supervisors. ECF No. 39 ¶¶ 40, 43; ECF No. 66 at 2, n. 4. GDIT's performance of the OPM contract began when OPM sent to GDIT requests for background investigations for people who applied for jobs at OPM. Then, GDIT would assign the background investigation for the applicant to Investigators, ECF No. 39 ¶ 18, who were divided into teams that reported to Supervisors. Id. ¶ 42. Investigators typically worked from their homes from which they traveled to the situs of the interviews so that they could conduct interviews face-to-face. Id. ¶ 20-21. Senior Investigators also could act as Mentors to new Investigator. Id. ¶ 41.

**\*4** Supervisors worked from their homes. Their job was to assist Investigators in establishing and navigating investigations, provided feedback to Investigators, and performed ride-along check-ins during field investigations. Id. ¶¶ 42, 57, 85, 87, 88.

Case Reviewers typically worked from their homes. Their job was to determine whether a case needed to be reopened and further investigated by an Investigator. Id. ¶¶ 121-23. Case Reviewers were assigned cases by the PMO and their reports went to the PMO. Id. ¶ 124.

While employed by GDIT, *Piron* served as a Quality Analyst Associate performing case reviews and worked remotely from her home in North Dakota until her termination on or about July 3, 2019.[1] Merino was employed as an Investigator III and worked remotely from her home in Virginia until her termination on or about September 5, 2019. Thamvanthongkham was employed as a Supervisor and worked remotely from his home in Virginia until his termination on or about July 3, 2019. Beecroft was employed as an Investigator IV/Mentor and worked remotely from her home in Virginia until on or about August 7, 2019. Id. ¶¶ 10-13; ECF No. 43 ¶¶ 10-13; Ex. 8, ECF No. 66-8. According to the SAC, these employees "did not work at any site owned, occupied or controlled by GDIT." ECF No. 39 at 2. This apparently refers to the record evidence that, GDIT's employees who worked from home were permitted to do their work from other locations, such as coffee shops, at the employee's election. Id. ¶¶ 66, 100.

GDIT's hierarchical nature created a management system whereby the PMO led "the daily priorities of the teams" including those within the Operations Field Branch and

Operations Quality Branch (i.e., the "mobile workforce"). ECF No. Ex. 11, 66-11 at 3-4, 9. Works assignments originated from the PMO, led by Anthony Durante, who was situated in GDIT's Falls Church, Virginia office. ECF No. 39 at 1-2; Ex. 22, ECF No. 66-22. According to the PMO Falls Church Office Organizational Chart, the majority of employees were considered remote resources, who were subject to Durante's oversight. Ex. 22, ECF No. 66-22 at 2 (representing Durante as responsible for the Operations Managers and Workload Team); Ex. 6, ECF No. 66-6 at 81 (representing Durante as responsible for the Supervisors and Case Reviewers).

In the Spring of 2019, GDIT determined that the OPM contract would soon end, and the company began to terminate employees in its Civil and Homeland Security Group. ECF No. 39 ¶ 1. GDIT sent the first wave of termination letters on June 19, 2019, informing employees that their employment would end on July 3, 2019. Id. ¶ 2. Subsequent waves of layoffs occurred on July 26, 2019 and August 16, 2019, and a final wave of termination letters was sent on August 22 and 26, 2019 with termination dates set for September 5 or 13, 2019. Id. at ¶¶ 3-4.

The SAC alleges that, in taking those actions, GDIT violated the WARN Act by failing to provide 60 days' advance written notice of terminations to employees:

> who worked at, reported to, or received assignments from one of Defendant's Facility and were terminated without cause beginning on or about July 3, 2019 through September 5, 2019, and within 90 days of those dates, or were terminated without cause as the reasonably foreseeable consequence of the mass layoff and/or plant closing ordered by Defendant beginning on or about July 3, 2019, and who are affected employees.

*5 Id. ¶ 126. The employees include approximately 1,200 Investigators and Supervisors and about 300 Case Reviewers. Id. at 1.

**D. Proposed Class and Subclass**

In the Class Certification Motion, Plaintiffs request the Court to certify the proposed class as a subclass pursuant to Fed. R. Civ. P. 23, comprising:

> The GDIT employees who worked on its OPM contract and were terminated between July and December 2019 and have not filed a timely request to opt-out of the class.

> [Case Management Subclass: Travel Subclass: The GDIT employees who worked on its OPM contract as Background Investigator, Project/Task Supervisor, or similarly situated positions and were terminated between July and December 2019 and have not filed a timely request to opt-out of the class.]

Plaintiffs also request that: (1) Raisner Roupinian LLP be appointed as Class Counsel; (2) Plaintiffs Piron, Merino, Thamvanthongkham, and Beecroft be the Class Representatives; and (3) the Court approve the form and manner of Notice. [PROPOSED] ORDER CERTIFYING A CLASS AND GRANTING RELATED RELIEF (ECF No. 61-1).

For the most part, the proposed class consists of the remote workers (who comprise 94 percent of the proposed class) and includes the employees who worked on the OPM contract, "including the 1,143 'remote resources' who reported up to [Program Director] Anthony Durante and provided field investigative services." ECF No. 66 at 2 (referencing BICS PMO Falls Church Office Org., Ex. 22, ECF No. 66-16 at 2-3). In addition, the proposed class includes approximately 70 employees who were physically at the Falls Church office. ECF No. 66 at 17.

**II. CLASS CERTIFICATION DISCUSSION**

A class can be certified if Plaintiffs show that the four requirements of Fed. R. Civ. P. 23(a) are met and that the class fits the requirements of at least one of the class types outlined in Fed. R. Civ. P. 23(b). Branch v. Gov't Emps. Ins. Co., 323 F.R.D. 539, 544 (E.D. Va. 2018) (emphasis added). The analysis of each requirement must be "rigorous," Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011), and Plaintiffs bear the burden to demonstrate that all of the Rule 23 requirements have been satisfied. Branch, 323 F.R.D. at 545.

"Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class." Souter v. Equifax Info. Servs., 307 F.R.D. 183, 195 (E.D. Va. 2015) (quotations omitted) (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 155 (1982)). Class certification is appropriate when "the numerosity, commonality, typicality, representativeness, predominance, and superiority requirements of both Rule 23(a) and (b) (3) are met." Lienhart v. Dryvit Sys., 255 F.3d 138, 146 (4th Cir. 2001). Rule 23 also contains an implicit threshold "ascertainability" requirement. See EQT Prod. Co. v.

Piron v. General Dynamics Information Technology, Inc., Slip Copy (2022)

171 Lab.Cas. P 11,344, 2022 IER Cases 40,578

Adair, 764 F.3d 347, 358 (4th Cir. 2014).

**A. Legal Framework for Rule 23(a)**
Under Rule 23(a), class certification is appropriate if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). A review of the record discloses that the proposed class meets each of these elements. Defendants do not appear to suggest otherwise. Nonetheless, it is appropriate to confirm that to be the case. So each Rule 23(a) factor will be reviewed briefly.

**1. Numerosity**
**\*6** Rule 23(a) (1) requires the Court to find that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a) (1). Whether joinder is impracticable is a fact-specific inquiry that depends not only on the number of class members but also on the circumstances of the case. Soutter, 307 F.R.D. at 199. " 'Courts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion.' " Id. (quoting Adams v. Henderson, 197 F.R.D. 162, 170 (D. Md. 2000)).

The putative class is estimated to be between 800 and 1,200 individuals. ECF No. 66 at 19. Exhibit 8 contains a list of 857 individuals identified at least by their name, employee number, job title, hire date, and termination date. See Ex. 8, ECF No. 66-8. This surpasses the threshold necessary for the numerosity requirement, and GDIT has not offered any arguments to the contrary. The numerosity requirement has been established.

**2. Commonality**
The second element of Rule 23(a) is commonality. The Court must find that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a) (2). To meet

this burden, "plaintiffs must present a common contention capable of being proven or disproven in 'one stroke.' " Brown v. Nucor Corp., 785 F.3d 895, 909 (4th Cir. 2015) (internal citation omitted). The primary concern is not just the presence of common questions, but whether "a classwide proceeding [can] generate common answers apt to drive the resolution of the litigation." Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009).

Plaintiffs have shown that "the driving factual and legal questions stem from a common core of facts regarding Defendant's actions and are provable through common evidence," which includes but is not limited to questions such as:

• Whether Defendant terminated the employment of the class members without cause.

• Whether the class members' single site of employment was the Falls Church office.

• Whether Defendant terminated the class members without giving them at least 60 days prior written notice as required by the WARN Act.

• Whether Defendant has any valid defenses justifying less than 60 days' notice.

• Whether Defendant failed to pay the class members 60 days' wages and benefits.

See ECF No. 66 at 19-21.

In this case, the putative class satisfies the commonality requirement, which is related to, but far less demanding than, the predominance requirement of Fed. R. Civ. P. 23(b). Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 624 (1997). Common factual and legal questions pervade the putative class, as listed above, nearly all of which are capable of being "proven or disproven in one stroke." Nucor Corp., 785 F.3d at 909. GDIT has not argued to the contrary. The commonality factor is satisfied.

**3. Typicality**
The third requirement for certification under Rule 23(a) necessitates a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a) (3). Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." Falcon, 457 U.S. at 156 (internal quotation

marks omitted). It is not necessary that the claims "be perfectly identical or perfectly aligned," but that the prosecution of the plaintiffs' cases "tend[s] to advance the interest of the absent class members." Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006); see also Branch, 323 F.R.D. at 547 (The representative's claims "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim.") (quoting Deiter, 436 at 466-67).

**\*7** Plaintiffs explain that the third requirement is met because they allege the same injury as the Putative Class Members: they were all terminated by GDIT as part of the same plant closing or mass layoff. Plaintiffs also argue that they and the Putative Class Members all seek to demonstrate that GDIT was a covered WARN employer; directed a plant closing or mass layoff beginning on or around July 3, 2019; did not offer any of the employees with 60 days' notice of their terminations; and did not have any valid defense justifying that failure. ECF No. 66 at 21-22.

Plaintiffs have met their burden of showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a) (3). The proposed class representatives appear to **generally** have "the same interest and suffer the same injury as the class members." Deiter, 436 F.3d at 466. Accordingly, the claims of the named Plaintiffs align with the claims of the class. GDIT does not say otherwise. And, the typicality requirement is satisfied.

**4. Adequacy of Representation**
The final prerequisite of Rule 23(a) is adequacy: Plaintiffs must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a) (4). This inquiry involves an assessment of both the class representative as well as class counsel. Wal-Mart Stores, Inc., 564 U.S. at 350 n.5 (noting that although the final three requirements do "tend to merge," the adequacy requirement also "raises concerns about the competency of class counsel and conflicts of interest."). The requirement is satisfied "when: (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are qualified, experienced, and **generally** able to conduct the litigation." Brown v. Transurban USA, Inc., 318 F.R.D. 560, 567 (E.D. Va. 2016) (internal quotation marks omitted).

The representativeness requirement is satisfied for both

the proposed Class Representatives and proposed Class Counsel because: (1) there are no conflicts of interest as both Plaintiffs and proposed class must establish that they were entitled to and not provided adequate WARN notice; (2) Plaintiffs "have been diligent in prosecuting the case"; and (3) Plaintiffs' counsel are "qualified, experienced and **generally** able to conduct the proposed litigation." ECF No. 66 at 22 (quoting Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2nd Cir. 1968), cert. denied, 417 U.S. 156 (1974)) (internal quotation marks omitted). Plaintiffs' counsel, Raisner Roupinian LLP, only represents employees affected by mass layoffs and shutdowns and therefore appropriate for this action. GDIT does not question Plaintiffs' choice of legal representation nor class representatives. The adequacy component of Rule 23(a) has also been met.

**B. Legal Framework for Rule 23(b) (3)**
In a motion for certification under Rule (23) (b) (3), the plaintiff faces the additional burden of demonstrating that "questions of law or fact common to class members predominate over any questions affecting only individual members; and that a class action is superior to other available methods of fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b) (3) (emphasis added). In the Fourth Circuit, it is also necessary to demonstrate compliance with a third "implicit" requirement: the proposed class must be readily ascertainable "in reference to objective criteria." EQT Prod. Co., 764 F.3d at 358. Each of these three requirements–predominance, superiority, and ascertainability–must be met before certification can be granted.

**\*8** The Rule 23(b) (3) analysis may overlap with the merits of the underlying case, but "[t]hat cannot be helped." Branch, 323 F.R.D. at 545 (quoting Wal-Mart Stores, Inc., 564 U.S. at 350-51). However, " 'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.' " Branch, 323 F.R.D. at 545 (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013)).

GDIT does not dispute the superiority or ascertainability facets of the Rule 23(b) analysis and argues against class certification only on the lack of predominance. And, an independent assessment by the Court confirms that both of those facets are satisfied.[2]

Piron v. General Dynamics Information Technology, Inc., Slip Copy (2022)

171 Lab.Cas. P 11,344, 2022 IER Cases 40,578

**1. Predominance**

Although similar to Rule 23(a)'s requirement of commonality, the predominance criterion of Rule 23(b) (3) is "far more demanding." Amchem Prod., Inc., 521 U.S. at 624; see also Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013) ("If anything, Rule 23(b) (3)'s predominance criterion is even more demanding than Rule 23(a)."). The more challenging standard is a function of the more "adventuresome" nature of Rule 23(b) (3), which "allows class certification in a much wider set of circumstances but with greater procedural protections." Wal-Mart Stores, Inc., 564 U.S. at 362.

Under Rule 23(b) (3), it is not enough merely to demonstrate that common questions exist across the class. Instead, Plaintiffs must demonstrate that those common "questions of law or fact ... predominate over any questions affecting only individual members." EQT Prod. Co., 764 F.3d at 366. Accordingly, "[t]he predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation." Id. This inquiry further turns on whether "the defendants' common conduct is sufficient to ensure the predominance of common issues over individual ones." Id. at 367.

Predominance may not be fulfilled by relying on "the legal or factual questions that qualify each class member's case as a genuine controversy." Amchem Prod., Inc., 521 U.S. at 622. In other words, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Id. at 23. This concept renders the predominance inquiry fundamentally qualitative: The Court must examine the relationship between the common questions and the individual questions in the context of the case as a whole. See Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019); Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 429 (4th Cir. 2003).

However, "common issues of liability may still predominate even when some individualized inquiry is required." Ealy v. Pinkerton Gov't Servs., 514 F. App'x 299, 305 (4th Cir. 2013). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to ==generalized==, class-wide proof.' " Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016) (internal citation omitted). So long as the overarching issue in a case is common to the class, class certification is still appropriate even if there are some individual issues (e.g., damages) that will need to be resolved. Krakauer, 925 F.3d at 658; Ealy, 514 Fed. App'x at 305. Accordingly, it is necessary to review whether class-based questions may undermine or support class cohesion, such as whether the class members experienced the same wrongdoing during the same timeframe and by the same means. See Amchem Prod., Inc., 521 U.S. at 624 (discussing the predominance factors relied upon by the Court in Georgine v. Amchem Prod., Inc., 83 F.3d 610, 626 (3rd Cir. 1996)).

**(a) Parties' Arguments**

**\*9** Here, the parties dispute whether Plaintiffs and Putative Class Members are entitled to recovery under the WARN Act, the resolution of which turns on the proposed class's "single site of employment" and the factual allegations supporting each party's statutory interpretation. Specifically, the parties dispute whether the proposed class's "single site of employment" for WARN Act purposes is the Falls Church, Virginia office where the PMO was housed and from which GDIT's mobile workforce was directed.

Because the WARN Act does not define "single site of employment," resolution of this keen question necessitates consideration of DOL's "single site of employment" regulations known as Subpart 6.[3] See ==generally== 20 C.F.R. § 639.3(6). "These regulations are entitled to 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.' " Meson, 507 F.3d at 808-809 (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 844 (1984)). Subpart 6, as previously replicated above, states:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is the assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i) (6) (emphasis added).

Both parties agree that whether Subpart 6's characterization of "single site of employment" applies to Plaintiffs and Putative Class Members is governed by the Fourth Circuit's decision in Meson. There, the Fourth

Piron v. General Dynamics Information Technology, Inc., Slip Copy (2022)

171 Lab.Cas. P 11,344, 2022 IER Cases 40,578

Circuit held that Subpart 6 applies to "truly mobile workers, without a regular, fixed place of work." Meson, 507 F.3d at 809.

In Meson, a former employee, whose employment had ended when the employer's assets were sold, sued the employer and its parent company alleging a violation of the WARN Act for untimely notice, among other things. The employee attempted to assert that the company's headquarters was her single employment site. The Fourth Circuit determined that the employee's company office in Virginia, rather than the company's headquarters in Florida, was the plaintiff's "undisputed fixed place of work" and, therefore, her WARN single site. Id. at 810. The Court of Appeals found that the corporate headquarters could not be used as the single site of employment for the plaintiff-employee because it would lead to "a potentially limitless scope" in which "every such regional manager or chief executive could claim the corporate headquarters–in lieu of the office she manages–as her 'single site of employment'." Id. Accordingly, the Fourth Circuit held that the WARN Act did not apply to the employee because she was not a "mobile worker". Id. at 811.

**\*10** To decipher whether the plaintiff-employee was a mobile worker within the context of Subpart 6, the Court analyzed her office location and job duties. Although the plaintiff-employee traveled to client sites as well as received assignments from and reported in the Florida headquarters, the dispositive fact was that she was assigned to a specific office in Virginia where she managed two employees.[4]

In reaching its conclusion, the Court of Appeals explained that the language in Subpart 6 "connote[s] the absence of a fixed workplace" and that "home base" has been construed as "a site that the employee visits during the course of a typical business trip." Id. at 809 (quoting Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 146 (3rd Cir. 1998)) (internal quotation marks omitted). Moreover, the decision in Meson considered it important that the Subpart's language, specifically "[t]he terms 'travel ... from point to point,' 'outstationed,' and 'home base,' all connote[d] the absence of a fixed workplace." Id. That text combined with examples from the regulatory commentary, led to the conclusion that Congress intended Subpart 6 to apply to employees with no fixed worksite, such as bus drivers and railroad workers, whose "jobs are characterized by travel and mobility." Id. (quoting Commentary to Worker Adjustment and Retraining Notification Act, 54 Fed. Reg. 16042, 16051 (Apr. 20, 1989)).

In the present case, Plaintiffs claim that Subpart 6 entitles them to WARN Act coverage because GDIT's Falls Church office, and not their home offices, is their "single site of employment." Plaintiffs assert that common evidence will demonstrate that "the primary duties of all proposed class members 'involve[d] work outside any of the employer's regular employment sites,' ... and that their homes were not a 'fixed office' under Meson." ECF No. 66 at 25 (internal citation omitted). This common evidence in the record includes: GDIT's Technical Proposal and Excerpt of Price Proposal (Ex. 6, ECF No. 66-6); GDIT's "Flexible Work Location" policy (Ex. 25, ECF No. 66-18); the Protection of Personally Identifiable **Information** ("PII") policy (Ex. 26, ECF No. 66-19); Operations Position Descriptions (Ex. 11, ECF No. 66-11); Organizational Chart Review (Ex. 10, ECF No. 66-10); and Excerpt from Labor Hours Report (Ex. 28, ECF No. 66-20). These policies, according to Plaintiffs, were uniformly applied to the Putative Class Members and will establish that GDIT enabled employees to work outside of the home.

In particular, the Flexible Work Location Policy states that "employees may work some or all of the workweek in a company-provided office setting, co-located with customers, or from an alternative location (**generally** the employee's home)." Ex. 25, ECF No. 66-18 (emphasis added). The policy applies to all GDIT's organizational units and defines two different types of home-based employees: those who work from home at least three days a week ("Home-based Worker") and those who work from a GDIT office at least three days a week ("Home Flex Worker"). Id. at 3. The PII Policy requires employees working on the OPM contract to securely store and retain private **information** pertinent to investigations regardless of workplace location. See Ex. 26, ECF No. 66-19. Taken together, Plaintiffs assert that these policies describe the job duties of the potential class members, which demonstrates that "their homes were not a fixed office under Meson." ECF No. 66 at 32 (internal quotation marks omitted).

**\*11** Plaintiffs also add that "the primary duties" of putative class employees included traveling from "point to point" for interviews and reviews. Id. at 33. This, according to Plaintiffs, substantiates that "the primacy of mobility" that GDIT's contract with OPM required so as to allow for the efficient completion of investigations. Id. Other evidence in the record, including Labor Hour Reports, travel expense records, daily manifest check-ins and check-outs, check ride forms, and daily task records from the CMS[5] are probative of how travel was a primary, indeed essential, part of the employees' jobs. Id. at 34. Finally, Plaintiffs point out that common evidence in the

171 Lab.Cas. P 11,344, 2022 IER Cases 40,578

form of Workday records[6] and PMO management activities demonstrates that employees reported to and received assignments from the PMO office in Falls Church, which they believe is consistent with Subpart 6. ECF No. 66 at 34; 20 C.F.R. 639.3(i) (6) (the single site location includes the facility "from which their work is assigned" and "to which they report").

Plaintiffs argue that the legal issues will have class-wide application and the factual evidence will be assessed through common evidence without the need for individualized assessments. ECF No. 66 at 28. Therefore, Plaintiffs assert that their WARN claim provides common elements among the proposed class that are "class-wide proof" because the Court will have to assess whether Plaintiffs and Putative Class Members engaged in "primary duties [that] require travel from point to point" or "involve work outside any of the employer's regular employment sites." Id. at 25 (referencing 20 C.F.R. § 639.3(i) (6)).

In response, GDIT asks the Court to contemplate the merits of Plaintiffs' argument to decide "whether the Rule 23 prerequisite for class certification are satisfied." ECF No. 72 at 18 (quoting EQT Prod. Co., 764 F.3d at 357). GDIT agrees that the meaningful issue in dispute is "whether the Falls Church Office constitutes the single site of employment for the putative class members," but GDIT takes the view that Plaintiffs cannot prove that point without "individualized mini-trials." Id. at 26.

Because the employees worked from home offices across the country and abided by varying travel requirements, GDIT asserts that "true mobility" within the confines of Subpart 6 cannot be demonstrated on a class-wide basis because: (1) the Meson test "is holistic and circumstance-dependent"; (2) the common evidence provided by Plaintiffs is insufficient to demonstrate "true mobility"; (3) Meson demands individualized proof; and, (4) certification would deprive GDIT of its right to litigate its Meson-based defense against individual Putative Class Members. See ECF No. 72 at 22-27.

GDIT's view about the lack of predominance relies on the Fourth Circuit's holding in Meson, which requires the Court to construe Subpart 6 narrowly because the Subpart "was intended to apply only to truly mobile workers without a regular, fixed place of work." 507 F.3d at 809. Thus, according to GDIT, Meson necessitates that the Court must assess whether "class members qualified as 'truly mobile workers' ... such that Subpart 6 could even *potentially* apply." ECF No. 72 at 26 (emphasis added). Further, GDIT argues that, "even if Subpart 6 potentially applied, the Court would still need to assess individuals'

single sites of employment using the disjunctive guidelines of that provision, a fact-intensive exercise that would involve pinpointing where class members 'reported' or were 'assigned' work, in a context where most or all of their supervisors and assigners were based in home offices." Id. And, GDIT takes the view that under Meson, job duties necessitating even "significant travel" are legally inadequate to apply to Subpart 6. Id. at 28 (quoting Meson, 507 F.3d at 804, 809-11).

**\*12** Both parties agree that, in order to claim Falls Church, Virginia, the location of the PMO, as their WARN single site of employment, Putative Class Members must show that their job duties meet the standard set forth in Subpart 6. However, the parties differ on how Meson should be applied to the Putative Class Members in light of the Subpart 6 requirements. Compare ECF No. 72 at 28-29 with ECF No. 75 at 14-15. Plaintiffs argue that the Subpart 6 applies under Meson because "all [putative] class members' work was to be performed outside any of [GDIT's] regular employment sites" and their "primary duties required them [to] travel point to point (in the case of Investigators and Supervisors)."[7] GDIT argues that Meson's definition of "truly mobile workers" precludes the application of Subpart 6 to the Putative Class Members because employees with travel responsibilities who maintain a "regular fixed place of work" (e.g., the employees' home offices) cannot be deemed "truly mobile" under the Fourth Circuit's test. ECF No. 72 at 28-29.

**(b) Analysis**

First, as a threshold issue, courts within the Fourth Circuit have ==generally== certified Rule 23 WARN class actions, rejecting objections based on predominance where, as here, there are few and insignificant individual issues. See e.g., Gautier v. Tams Mgmt., Inc., No. 5:20-CV-00165, 2021 WL 4429611, at \*5 (S.D. W.Va. Sep. 27, 2021) (granting motion to certify and finding that "[r]especting predomination, any individual questions are minor and substantially outweighed by the common questions regarding whether a WARN Act violation occurred."); McKenzie v. CDA, Inc., No. 3:19-cv-213, 2021 WL 1220620 (W.D.N.C. Mar. 31, 2021) ("Plaintiff has shown that he and the prospective class members desire to prove predominantly the same facts against the Defendant without presenting any conflicts of interest against one another."); Droste v. Vert Cap. Corp., No. 3:14-cv-467, 2015 WL 1526432 (E.D. Va. Apr. 2, 2015) (granting class certification for manufacturing plant employees); Nolan v. Reliant Equity Invs., LLC, No. 3:08-CV-62, 2009 WL

2461008 (N.D. W. Va. Aug. 10, 2009) (granting class certification for employees in three separate facilities); Washington v. Aircap Inds. Corp., 831 F. Supp. 1292 (D.S.C. 1993) (granting class certification for seasonal employees). Courts may contemplate whether a "single site of employment" should be deemed where a business is headquartered and operated out of, even when employees travel across the county and service various contracts at different client sites. Schmidt v. FCI Enters. LLC, No. 1:18-cv-01472, 2019 WL 5748952 (E.D. Va. Nov. 5, 2019), rev'd Schmidt v. FCI Enters. LLC, 3 F.4d 95, 104 n.7 (4th Cir. 2021) (reversing because employer at issue was not an employer covered by the WARN Act and declining to address whether defendant's headquarters were properly construed as the single site of employment).

Second, the facts of Meson differ significantly from those presented here. In Meson, the plaintiff was a regional sales manager who oversaw two employees located in a Virginia office. Accordingly, Meson identifies two types of employees: (1) those "characterized" by mobility, including "traveling salespersons who work primarily out of their homes or cars" and (2) the Meson plaintiff who "worked out of a fixed office" and "managed the two other employees in that office." 507 F.3d at 809. To analyze whether Subpart 6 applied, the Meson Court relied on the plaintiff's job duties to determine that she was more like a regional sales manager rather than a traveling salesperson despite being required to occasionally travel to various client sites. Id. at 810. Thus, her single employment site was anchored by her position's responsibilities (i.e., managing two employees in the Virginia office where she worked regularly worked). Id.

Here, the employees at issue are not required to work at, or to supervise others at, a particular GDIT site. The GDIT policies in the record provide flexibility as to where the employees worked, and those policies apply to the class equally without the need for an individualized inquiry. See e.g., Technical Proposal and Excerpt of Price Proposal, Ex. 6, ECF No. 66-6. For the entire class identified by GDIT as its "mobile workforce," GDIT's policies governing where employees may work appear to have been applied uniformly and may establish "whether those policies created 'place of employment[.]' " ECF No. 75 at 11. These policies will be assessed to determine the place of employment on a class-wide basis. For the "travel subclass", the following evidence tends to indicate that travel was a primary job duty: CSRA OPM Field Work Services (Ex. 6, ECF No. 66-6 at 28, 31, 82), Excerpt from Labor Hours Report (Ex. 28, ECF No. 66-20) (listing investigator travel), Beecroft Travel

Expenses (Ex. 29, ECF No. 66-21), and Merino Travel Expenses (Ex. 30, ECF No. 66-22). Accordingly, there appears to be evidence that GDIT's conduct was substantially the same with respect to all Putative Class Members.

**\*13** The Court declines to engage in a full merits-based analysis of whether Plaintiffs can prove a "single site of employment" at this stage in the litigation, particularly because Meson was not a decision respecting whether class certification was appropriate. GDIT's argument that, in this case, an individualized inquiry will be necessary for each Putative Class Member does not properly contemplate whether there is a "single site of employment" that serves as a common question addressable through common evidence. And, the issue should be litigated on its merits, rather than leveraged as a tool to deny class certification at this stage in the proceedings. Amgen, 568 U.S. at 467. Class certification remains appropriate because it "provides a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects the defendant from inconsistent adjudications" driven by "the fact that the class action is binding on all class members." Gunnells, 348 F.3d at 427 (internal quotation marks omitted).

Also, at this stage, the record strongly shows that what GDIT called its "mobile workforce" was essential both to OPM's decision to award the contract to CSRA, GDIT's predecessor, and to the efficient performance of the OPM contract. And, the record also provides strong support for the Plaintiffs' position that the mobile workforce was directed from the PMO and that the PMO distributed the work-product of the mobile workforce to the OPM.

Further, "there is no risk whatsoever that a failure of proof on the common question of [single site of employment] will result in individual questions predominating." Amgen, 568 U.S. at 468. If Plaintiffs cannot prove a single site of employment, the litigation must end, and "thus will never cause individual question of reliance or anything else to overwhelm questions common to the class." Id. GDIT, therefore, will not be deprived of its right to litigate a Meson-based defense against the class as a whole (i.e., whether the former employees were tied to the PMO Office or not as their home base), rather than individual class members.

The elements of Plaintiffs' WARN Act claim can be resolved largely on a class-wide basis. The two primary issues include: (1) whether GDIT's PMO office in Falls Church, Virginia constitutes a site of employment for the OPM contract employees, and (2) whether GDIT failed to

provide notice under the WARN Act. Both inquiries impact the Putative Class Members without the need for individualized explorations. They also go to the core of the WARN Act claim and predominate over any individualized issues. Therefore, the predominance requirement has been fulfilled because "Rule 23(b) (3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." Amgen, 568 U.S. at 459.

Granting class certification will still allow the parties to dispute whether Plaintiffs can meet the "single site of employment" under Subpart 6 and Meson, particularly because "the Fourth Circuit has not provided specific guidance regarding which standard a district court should use to evaluate single employer status under the WARN Act." Butler v. Fluor Corp., 511 F. Supp. 3d 688, 698 (D.S.C. 2021). Accordingly, the contention that Plaintiffs cannot prove a WARN Act claim due to lack of a "single site of employment" "is properly addressed at trial or in a ruling on a summary judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." Amgen, 568 U.S. at 470.

**2. Superiority**

The superiority requirement of Rule 23(b) (3) requires the Court to find "that a class action is superior to other available methods of fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b) (3). Along with predominance, the superiority requirement seeks "to cover cases in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem Prod., Inc., 521 U.S. at 615. A "strong presumption in favor of a finding of superiority" arises where "the alternative to a class action" is "no action at all." Soutter, 307 F.R.D. at 218 (internal citation omitted). After considering each of the criteria set out by Rule 23(b) (3) (A)-(D), the Court finds that adjudication on a class-wide basis is superior to individual litigation.

**\*14** Plaintiffs assert that "the [small] size of the employees' respective claims makes individual suits not only inferior, but unfeasible." ECF No. 66 at 35. On that score, Plaintiffs have shown that each class members' claim is less than $10,000, not including benefits, and that therefore, they cannot retain counsel to pursue these claims as individual litigants. Id. at 14, 28. GDIT has not

addressed that point.

The WARN Act limits damages and disincentivizes individual claims because of the potential for a small recovery even if there is merit to the claims. Here, it is evident that damages per Putative Class Member are small and unlikely to be litigated on an individual basis. Thus, the Court finds that Plaintiffs and Putative Class Members' interests in individually directing the prosecution of separate actions is negligible. "Concentrating any WARN litigation in a single class action will avoid multiple suits and will maximize judicial economy, efficiency, and uniformity of outcomes for similarly situated individuals." Applegate v. Formed Fiber Techs., LLC, 2:10-cv-00473, 2012 WL 3065542, at \*9 (D. Me. Jul. 27, 2012). Further, the Court has not detected any difficult issues in managing the class action, as proposed. Whether GDIT neglected to give the requisite notice under the WARN ACT is particularly well-suited for class action procedure: the class members have already been identified through discovery, the potential liability of GDIT can be calculated, and only GDIT's conduct must be examined and adjudicated. See id. Finally, when a class is certified, GDIT may still pursue dispositive motions, including whether there is a single site of employment, against the class without need for individual litigation.

**3. Ascertainability**

In the Fourth Circuit, "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." EQT Prod. Co., 764 F.3d at 358. And, "if class members are impossible to identify without extensive and individualized fact-finding or mini-trials, then a class action is inappropriate." Id.

Here, Plaintiffs provide evidence identifying the employees assigned to the OPM contract who were subsequently terminated. See Ex. 22, ECF No. 66-16 at 2-10; Ex. 8, ECF No. 66-8 at 3-11. Exhibit 22 lists the BICS PMO Falls Church Officer Organization Chart for May 31, 2019, which contains names for GDIT staff members and indicating the total on staff as 1,225. See Ex. 22, ECF No. 66-16 at 1. This exhibit does not appear to explicitly convey whether the staff listed were assigned to the OPM contract; however, Exhibit 8 contains a list of 857 individuals identified at least by their name, employee number, job title, hire date, and termination date. See Ex. 8, ECF No. 66-8. Accordingly, the proposed class appears to be ascertainable.

Piron v. General Dynamics Information Technology, Inc., Slip Copy (2022)

171 Lab.Cas. P 11,344, 2022 IER Cases 40,578

## III. CONCLUSION

For the foregoing reasons, PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 61) will be granted.

It is so ORDERED.

**All Citations**

Slip Copy, 2022 WL 363958, 171 Lab.Cas. P 11,344, 2022 IER Cases 40,578

Footnotes

1  Quality Analysts are considered part of the Case Review team based on the depositional testimony and briefings. See ECF No. 66 at 2, n. 4.

2  See supra Parts II.B.2 and 3, pp. 34-37.

3  Plaintiffs alternatively argue that, if Subpart 6 does not apply, the employees' single site will depend on whether GDIT's mobile workforce was a "truly unusual organizational situation" within the meaning of Subpart 8 of the DOL regulations. 20 C.F.R. § 639.3(i) (8). This determination, according to Plaintiffs, depends on reviewing the organizational structure. ECF No. 66 at 27. GDIT asserts that, although this argument is untimely, it does not alter the predominance analysis. GDIT further avers that Plaintiffs have not pled facts suggesting that Subpart 8 applies nor engaged in discovery that would support this contention. See ECF No. 72 at 35-36. GDIT is correct. Subpart 8 has not been sufficiently addressed in the pleadings, has not been addressed in discovery, and was first presented in the PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 66). For these reasons, Subpart 8 will not be considered at this stage.

4  The Court of Appeals also indicated that more than a "minimal impact" to the community and its economy would be necessary to warrant application of the WARN Act (i.e., at least greater than three employees in the area). Id. at 811.

5  GDIT tracked case progress in the CMS. CMS captured Investigators' daily work, including tasks performed (e.g., interview, record review), source units transmitted, timeliness, quality deficiencies (as noted by Case Reviewers), and incidents of misplaced PII. ECF No. 66-6 at 10.

6  "The listed information (job classification, manager, hire/termination date, purported WARN notice date, and designated work location) was stored in GDIT's 'Workday' HR database, which also contained performance review information, team and line management, leave time, and related information." Shartle 30b6 Dep., 28:23-29:3, 29:20-30:2, Ex. 1, ECF No. 66-1.

7  PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 75 at 15) (referring to 20 C.F.R. § 639.3 (i) (6)).

**Piron v. General Dynamics Information Technology, Inc., Slip Copy (2022)**

171 Lab.Cas. P 11,344, 2022 IER Cases 40,578

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Roquet v. Arthur Anderson LLP, Not Reported in F.Supp.2d (2002)

19 IER Cases 670

2002 WL 1900768

United States District Court, N.D. Illinois, Eastern Division.

Nancy J. ROQUET and Coretta Robinson, Plaintiffs,

v.

ARTHUR ANDERSON LLP, Defendant.

No. 02 C 2689.
|
Aug. 16, 2002.

### Synopsis

Employees of accounting firm who were terminated as part of mass layoff brought class action suit against employer alleging violation of Worker Adjustment and Retraining Notification Act (WARN Act). Employer moved to dismiss. The District Court, Darrah, J., held that part-time employees could experience "employment loss" and were proper parties in WARN Act suit.

Motion denied.

*MEMORANDUM OPINION AND ORDER*

DARRAH, J.

**\*1** Plaintiffs, Nancy J. Roquet ("Roquet") and Coretta Robinson ("Robinson"), brought a class action suit against Defendant, Arthur Anderson LLP ("Arthur Anderson"), alleging Defendant violated the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101-2109. Presently before the Court is Defendant's Motion to Dismiss.

In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.,* 205 F.3d 323, 326 (7th Cir.2000).

Dismissal is only warranted if the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

A reading of the Complaint supports the following summary of the alleged conduct of the parties.

Roquet was employed by Arthur Anderson as an Executive Assistant. On April 8, 2002, Roquet's employment was terminated as part of a mass layoff by Arthur Anderson. At the time of the mass layoff, Roquet had been employed at Arthur Anderson for approximately three months. Roquet received two weeks' severance pay, which was termed "job search" in the notice she received concerning the mass layoff.

Robinson was also an employee of Arthur Anderson who was terminated as part of the mass layoff. Robinson received five weeks' severance pay. Plaintiffs allege that Defendant violated the WARN Act by failing to provide sixty days' warning of its mass layoff.

Defendant seeks to dismiss the Amended Complaint as to Roquet and all other part-time employees, arguing that part-time employees are excluded from coverage under the WARN Act.

Under the WARN Act, an employer who orders a mass layoff or plant closing in violation of Section 2102 of the Act is "liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff...." 29 U.S.C. § 2104(1). Section 2102 requires that an employer not order a closing or mass layoff until the end of a sixty-day period after the employer serves written notice of such closing or layoff. 29 U.S.C. § 2102(a).

An "employer" is defined as a business enterprise that employs either 100 or more employees, excluding part-time employees; or 100 or more employees who, in the aggregate work, at least 4,000 hours per week, exclusive of overtime. 29 U.S.C. § 2101(a)(1). A plant closing occurs if a single site of employment is permanently or temporarily shutdown or if one or more facilities or operating units within a single employment site is shutdown, if the shutdown results in an employment loss at a single employment site "during any 30-day period for 50 or more employees excluding any part-time employees...." 29 U.S.C. § 2101(a)(2). A mass layoff occurs where a reduction in work force results in an employment loss at a single site of employment during any 30-day period for at least 33 percent of the employees (excluding any part-time employees; and at least 50

Roquet v. Arthur Anderson LLP, Not Reported in F.Supp.2d (2002)

19 IER Cases 670

employees (excluding any part-time employees; or at least 500 employees (excluding any part-time employees). 29 U.S.C. § 2101(a)(3)(B).

*2 An "employment loss" is "(A) an employment termination, other than discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period." 29 U .S.C. § 2101(a)(6). Excluded from the definition of an "employment loss" is the

case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale. After the effective date of the sale of part or all of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff.... Notwithstanding any other provision ... any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale.

An "affected employee" is "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5). A "part-time employee" is "an employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required." 29 U.S.C. § 2101(a)(8).

Defendant argues that based on the above statutory language, Roquet, as a part-time employee, is excluded from experiencing an employment loss under the WARN Act; therefore, she is not a proper party under the WARN Act.

In determining whether Roquet is included in the class of individuals that may experience an employment loss and are allowed to bring suit, the Court begins within the language of the statute. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, ----, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (*Barnhart* ). The first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart,* 534 U.S. at ----. The inquiry ceases "if the scheme is coherent and consistent." *Barnhart,* 534 U.S. at ----. A general principle of statutory construction provides that when Congress has included particular language in one section of a statute but omits such language in another

section of the same statute, it is presumed that "Congress acts intentionally and purposefully in the disparate inclusion or exclusion". *Barnhart,* 534 U.S. at ---- (internal quotations omitted).

The parties do not dispute that Roquet is a part-time employee pursuant to the WARN Act. *See* 29 U.S.C. § 2101(a)(8). As stated above, Congress defined an "employment loss" and a "part-time employee". The definition of an "employment loss" does not specifically exclude part-time employees in any of the categories that are considered an employment loss. Nor does the definition of an "affected employee" exclude part-time employees.

*3 Several other definitions in the statute specifically state that part-time employees are excluded. For example, part-time employees are excluded when determining if a plant closing or mass layoff has occurred. *See* 29 U.S.C. § 2101(a)(2), (3). In both of these provisions, part-time employees are specifically excluded when determining if the minimum number of employees have lost their employment to constitute a plant closing or mass layoff. Defendant argues the exclusion of part-time employees in these calculations as requiring exclusion of part-time employees from being subject to an employment loss. However, such an interpretation ignores that Congress, in specifically defining employment loss, did not exclude part-time employees from such definition.

The language of the statute clearly demonstrates that in those sections of the statute where Congress intended to exclude part-time employees, Congress specifically stated such exclusion. For example, Congress's definition of an "employer" includes a business enterprise that employs "100 or more employees, excluding part-time employees; or 100 employees who in the aggregate work at least 4,000 hours per week ..." 29 U.S.C. § 2101(a)(1). Accordingly, part-time employees may be included in the calculation made in determining if a business entity is an employer under one definition but may not be included under the alternate definition. Pursuant to the definitions of a plant closing and mass layoff, part-time employees are not included in calculating if a closing or mass layoff has occurred. Accordingly, part-time employees are never included in determining whether a plant closing or mass layoff has occurred. These examples demonstrate that Congress specifically stated when part-time employees were not to be included in certain provisions under the Act. Therefore, the exclusion of part-time employees in some of the criteria under that WARN Act cannot be interpreted as excluding part-time employees as experiencing an employment loss when employment loss is specifically defined and such definition does not

exclude part-time employees. *See Barnhart,* 534 U.S. at ----. Based on the plain and unambiguous statutory language, part-time employees can experience an employment loss and are proper parties in a WARN Act suit.

This interpretation is further supported by the United States Department of Labor's ("DOL") interpretation of the statute. The DOL is authorized by 29 U.S.C. § 2017 to "prescribe such regulations as may be necessary to carry out this chapter". The DOL has found that "[W]hile part-time employees are not counted in determining whether a plant closing or mass layoff thresholds are reached, such workers are due notice." 20 C.F.R. § 639.6. *See also, Carpenters Dist. v. Dillard Dept. Stores,* 778 F.Supp. 297, 313-14 (E.D.La.1991), *rev'd on other grounds,* 15 F.3d 1275 (5th Cir.1994), *cert. denied,* 513 U.S. 1126, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995) (finding that part-time employees are covered under the WARN Act because Congress did not specifically exclude part-time employees under the definition of an "affected employee"); *Solberg v. Inline Corp.,* 740

F.Supp. 680, 685 (D.Minn.1990)(stating, "Congress' intent was to exclude 'part-time employees' from the calculation of a mass layoff, not to exclude them from protection once a mass layoff occurs"); *Local 1239, Int'l Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, & Helpers v. Allsteel.* 9 F.Supp.2d 901, 905 (N.D.Ill.1998) (finding part-time employees would not receive a windfall if "calendar approach" was used to calculate damages).

**\*4** For the reasons stated above, part-time employees are included in those employees that may experience an employment loss, and Defendant's Motion to Dismiss is denied.

### All Citations

Not Reported in F.Supp.2d, 2002 WL 1900768, 19 IER Cases 670

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    3

2022 WL 3162177
United States District Court, S.D. West Virginia,
at Beckley.

Jules GAUTIER, individually and on behalf
of all others similarly situated, Plaintiffs,

v.

TAMS MANAGEMENT, INC., Pay
Car Mininc, Inc., Bluestone Industries,
Inc., Bluestone Resources, Inc.,
Bluestone Coal Corp., Defendants.

CIVIL ACTION NO. 5:20-cv-00165
|
Signed August 8, 2022

**Attorneys and Law Firms**

Aubrey Sparks, Bren J. Pomponio, Mountain State Justice, Inc., Charleston, WV, Samuel Brown Petsonk, Petsonk, Beckley, WV, Laura C. Davidson, Mountain State Justice, Morgantown, WV, for Plaintiffs.

Christopher Schroeck, Ronald H. Hatfield, Jr., Bluestone Resources, Roanoke, VA, for Defendants.

## MEMORANDUM OPINION AND ORDER

Frank W. Volk, United States District Judge

*1 Pending are cross motions for summary judgment as to Tams Management, Inc., Pay Car Mining, Inc., Bluestone Industries, Inc., Bluestone Resources, Inc., and Bluestone Coal Corp. (collectively, the "Defendants") and Plaintiff Jules Gautier. [Docs. 88, 90].[1] The parties timely filed their responses and replies. The matter is ready for adjudication.

## I.

Mr. Gautier, Plaintiff and class representative, worked at the Burke Mountain Mine Complex from March to October 2019. The Complex is owned and operated by Defendants. [Doc. 39-1]. On October 24, 2019, Mr. Gautier was laid off with approximately 90 other full-time employees without prior written notice. [Doc. 39-2]. On or about April 22, 2020,

Patrick Graham, Tams Management, Inc.'s Vice President of Safety and Human Resources, called Mr. Gautier and other class members and offered them reemployment. [Doc. 39-1]. Mr. Gautier declined. [Doc. 11 ¶ 6]. The employees who accepted the offer returned to work on April 23, 2020, 5 months and 30 days after the discharge. [*Id.* ¶ 8].

Mr. Gautier instituted this action on March 4, 2020. [Doc. 1]. He pleads on behalf of himself and a class of workers harmed by an alleged Worker Adjustment and Retraining Notification ("WARN") Act violation. [*Id.* ¶ 33]. Specifically, he alleges Defendants Tams Management, Inc. and Pay Car Mining, Inc., "on their own and in concert with their affiliates Bluestone Industries, Inc., Bluestone Resources, Inc., and Bluestone Coal Corp." violated the WARN Act. [*Id.* at 1]. He alleges on October 24, 2019, Defendants "failed to provide their full-time employees with sixty-days['] notice" prior to laying off more than 50 workers at the Burke Mountain Mine Complex, [*id.* at 1], which he asserts is a "single site of employment" under the WARN Act, [*id.* ¶ 15].

Both parties seek summary judgment. [Docs. 88, 90]. Mr. Gautier alleges he suffered an "employment loss" from an indefinite termination, a reduction in hours of work of more than 50%, or both. [Doc. 91]. Defendants maintain the reduction in hours claim should be excluded inasmuch as it was alleged only through motion practice. [Doc. 89]. In addition, they contend there was a "layoff," not a "reduction in hours" or "termination," and that the layoff did not exceed six months. Thus in their view, there was no "employment loss" under the Act. [*Id.*].

## II.

### A. Summary Judgment

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

**\*2** The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 221 (4th Cir. 2022).

### *B. The WARN Act*

The WARN Act, enacted in 1988, requires an employer to provide 60-days' notice before ordering a "plant closing" or "mass layoff." 29 U.S.C. § 2102(a). "An employer who fails to provide this notice is liable to each affected employee for backpay, benefits, and attorney's fees." *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 808 (4th Cir. 2007) (citing 29 U.S.C. § 2104(a)). To succeed on a claim under the WARN Act, plaintiffs must show (1) there was a "mass layoff" or "plant closing" as defined by the Act; (2) the layoff was conducted by an "employer" covered by the Act; and (3) the employer terminated employees who were covered by the Act and thus who were entitled to notice. *McKenzie v. CDA, Inc.*, 3:19-cv-213, 2021 WL 1220620, at \*8 (W.D.N.C. Mar. 31, 2021).

A "mass layoff" is a "reduction in force ... not the result of a plant closing[, which] results in an employment loss at the single site of employment during any 30-day period for ... at least 33 percent of the employees ... and ... at least 50 employees." 29 U.S.C. § 2101(a)(3). A "plant closing" is

> [t]he permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees.

29 U.S.C. § 2101(a)(2).

The WARN Act defines "employer" as "any business enterprise that employs ... 100 or more employees, excluding part-time employees." *Schmidt v. FCI Enters. LLC*, 3 F.4th 95, 101 (4th Cir. 2021) (citing 29 U.S.C. § 2101(a)(1)(A)). An affected employee who is entitled to notice under the Act is an employee "who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5). The applicable Department of Labor regulations define an

"employment loss" as "(i) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (ii) a layoff exceeding 6 months, or (iii) a reduction in hours of work of individual employees of more than 50% during each month of any 6–month period." 20 C.F.R. § 639.3(f).

### III.

#### *A. WARN Act Standing*

Defendants incorporated into their Motion for Summary Judgment their assertion Plaintiff does not have standing to bring a WARN Act claim.[2] This assertion reduces to a couple of main issues. First is whether the Defendants are a "single employer" under the Act. This is a crucial inquiry not only to establish if all defendants are liable but also because it is unclear in the record whether Tams Management, Mr. Gautier's direct employer, meets the definition of "employer" under the Act. Second, because the Act specifies the employment loss must have occurred at a "single site of employment," Mr. Gautier must establish the Burke Mountain Mine Complex comprises such a "single site."

#### 1. *Single Employer*

**\*3** The first issue is whether Defendants constitute a "single employer." Defendants maintain they are not a single employer and Mr. Gautier was employed only by Tams Management. [Doc. 47 at 5]. They assert the number of Tams Management employees who were affected does not meet the 50-employee threshold established by the WARN Act. [Doc. 47 at 5]. They further contend Tams Management did not employ 100 individuals and is not, standing alone, an "employer" as defined by the Act. [*Id.*].

Determining whether a business is an "employer" under the Act is a mixed question of law and fact. *Schmidt*, 3 F.4th at 101. The WARN Act's regulations provide that "[u]nder existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(ii)(2) (1989); *see also Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 697 (D.S.C. 2021), *aff'd sub nom. Pennington v. Fluor Corp.*, 19 F.4th 589 (4th Cir. 2021).

When considering whether related entities are a "single employer," courts should consider the following non-

2022 WL 3162177, 2022 IER Cases 274,775

exclusive factors: (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations. 20 C.F.R. § 639.3(a)(2). "The [Department of Labor] factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind." *Pennington*, 19 F.4th at 597 (quoting *Pearson v. Component Tech Corp.*, 247 F.3d 471, 489 (3d Cir. 2001)). "[I]n some instances distinct businesses may count as the same employer for the purposes of the WARN Act. This would be the case where the operational differences between the two companies are purely formal, so that for all intents and purposes the businesses really do operate as the same employer." *Pennington*, 19 F.4th at 596 (citing *Pearson*, 247 F.3d at 495 (noting that the proper inquiry is "into whether the two nominally separate entities operated at arm's length")).

Independent contractors may also be treated as part of the contracting company for present purposes. 20 C.F.R. § 639.3(a)(2). The factors enumerated in determining whether parent/subsidiary companies are an "integrated enterprise" also determine whether an independent contractor and the contracting company are an "integrated enterprise." 20 C.F.R. § 639.3(a)(2); *see also McKinney v. Carlton Manor Nursing & Rehabilitation Ctr., Inc.* 868 F.3d 461, 464 (6th Cir. 2017). Again, the critical factor is the degree of independence. *See* 20 C.F.R. § 639.3(a)(2).

The common ownership factor "inquires as to whether a parent or related entity directly owns a separate corporate entity." *Butler*, 511 F. Supp. 3d at 700. The common directors or officers factor

> ordinarily looks to whether the two nominally separate corporations: (1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company.

*Butler*, 511 F. Supp. 3d at 700 (citing *Pearson*, 247 F.3d at 497).

"De facto exercise of control applies where one company is 'the decisionmaker responsible for the employment practice giving rise to the litigation.' " *Pennington*, 19 F.4th at 598 (quoting *Pearson*, 247 F.3d at 503–04). "The factor thus incorporates a longstanding theory of affiliate liability that holds parents accountable where they are directly liable for

the actions of a subsidiary." *Id.* De facto control in the context of a relationship between a principal and its contractor also considers "whether the business in question has specifically directed the allegedly illegal employment practice that forms the basis for the litigation." *Butler*, 511 F. Supp. 3d at 700–01 (citing *Administaff Cos. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457–58 (5th Cir. 2003)).

**\*4** The unity of personnel policies factor "is analogous to the aspect in the federal labor law test concerning 'centralized control of labor operations,' " and includes such elements as "centralized hiring and firing, payment of wages, maintenance of personnel records, benefits and participation in collective bargaining." *Vogt v. Greenmarine Holdings*, 318 F. Supp. 2d 136, 142–43 (S.D.N.Y. 2004). In essence, this factor examines "whether the companies actually functioned as a single entity with regard to its relationship with employees." *Pearson*, 247 F.3d at 499.

"In some cases, the dependency of operations factor 'addresses three areas of overlap between related corporations: (1) sharing of administrative or purchasing services, (2) interchanges of employees or equipment, or (3) commingled finances.' " *Butler*, 511 F. Supp. 3d at 710 (quoting *Guippone v. BH S & B Holdings*, No. 09 Civ. 1029, 2010 WL 2077189, at \*6 (S.D.N.Y. May 18, 2010)). "But in other cases, courts look beyond an individual job site to see if two entities are otherwise dependent on their continued operations." *Id.* (citing *Martin-Smith v. Ramcor Servs. Grp.*, No. 2:10–CV–00403, 2012 WL 4472036, at \*6 (D. Nev. Sept. 25, 2012)) (observing two companies were not codependent because their respective operations went "well beyond" the contract at issue, and outside of that contract, the companies had no relationship, "much less a dependency relationship")).

The Defendants alleged status as a "single employer" is a material factual issue. As noted above, this status is required if all Defendants are to be liable for the alleged WARN Act violation, as well as to show that the minimum numbers required by the "employer" and "mass layoff" definitions are met. [Doc. 46 at 6, Doc. 47 at 7].

Further, whether Defendants constituted a single employer is disputed. As to the common ownership factor, Plaintiff maintains all the named Defendants are related entities. [Doc. 46]. The Declaration of Stephan Ball, Vice President for Bluestone Resources, Inc., certifies that 60% of Bluestone Resources is owned by James C. Justice, II, and the remaining 40% is owned by James C. Justice, III. [Doc. 47-1 ¶

6]. Further, Bluestone Industries, Inc., is a wholly-owned subsidiary of Bluestone Resources. [*Id.* ¶ 7]. Bluestone Coal Corporation is a wholly-owned subsidiary of Bluestone Resources. [*Id.* ¶ 8]. Pay Car Mining, Inc. is a wholly-owned subsidiary of JCJ Coal Group, LLC, which is a wholly-owned subsidiary of Bluestone Resources. [*Id.* ¶ 9]. While Tams Management is not legally tied to Bluestone Resources, it is owned directly by James C. Justice, III and Jillean L. Justice. [*Id.* ¶ 10]. The record is such that a reasonable jury could find this factor weighs in favor of either parties' position.

Considering next the factor of whether the entities had common directors and/or officers, again there are genuine issues of fact to be resolved. Plaintiff asserts many of the supervisors and managers at the Burke Mountain Complex were on the payroll of Bluestone Industries. [Doc. 46 at 9]. Further, he states two of these supervisors are the ones who told him not to return to work. [*Id.*]. Mr. Gautier notes further occurrences where individual directors for Bluestone Industries exercised authority to idle other mines and operations at the Burke Mountain Complex. [*Id.*]. Defendants summarily deny that these facts indicate they operated as a single employer. [Doc. 47 at 6–7]. Accordingly, based on further development of these facts at trial, this factor could weigh in favor of either party.

**\*5** As to the de facto exercise of control, Mr. Gautier conclusorily notes, in a footnote, that "Bluestone Industries has customarily exercised central control over the employment determinations regarding coal production, coal sales, maintenance, and the mine planning processes at the Burke Mountain Mine Complex, specifically including the determination to idle the operations and/or conduct a reduction in force." [Doc. 46 at 10, n.4]. There appears to have been no record developed -- or at least not presented to the Court -- respecting whether Bluestone Industries was involved in the decision to idle the Burke Mountain Complex on this occasion. Defendants again deny they were a single employer and that they exercised control over the complex, stating Tams Management was hired to run the operation. [Doc. 47 at 6]. But again, they do not point to facts in the record that would support that assertion or that would prevent a finding of single employer status based on an independent contractor theory.

Much the same could be said regarding the factors of unity of personnel policies emanating from a common source and the dependency of operations. Plaintiff again offers conclusory statements, citing to the limited record. Defendants dispute

the admissibility and utility of the supporting record but do not offer facts that tend to show otherwise. Accordingly, there is an insufficient basis for the Court to grant either party summary judgment on the issue.

Inasmuch as balancing the factors to determine whether Defendants operated as a single employer requires careful consideration of the facts -- and requires a more fully developed record -- the evidence on this issue must be presented to the jury.

### 2. Single Site of Employment

Defendants likewise maintain the Burke Mountain Mine Complex was not a single site of employment. [Doc. 46 at 10]. The WARN Act does not, itself, define what constitutes a "single site of employment" for the purposes of its provisions. However, " 'the Secretary of Labor, pursuant to her authority, has promulgated interpretive regulations,' 20 C.F.R. § 639.3(i), that are 'entitled to "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." ' " *Meson*, 507 F.3d at 808–09 (quoting *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 844 (1984)). These regulations provide that a "single site of employment" may refer to a "single location" or a "group of contiguous locations." 20 C.F.R. § 639.3(i)(1).

In general, "separate facilities are separate sites." *Davis v. Signal Int'l Tex. GP*, 728 F.3d 482, 485 (5th Cir. 2013). "Separate buildings or areas which are not directly connected or in immediate proximity" may, however, constitute a single site of employment, "if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment." 20 C.F.R. § 639.3(i)(3). On the other hand, "[n]on-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site." *Id.* § 639.3(i)(4).

Again, inasmuch as establishing that the alleged employment loss occurred at a "single site of employment" is required by the Act, 29 U.S.C. § 2101(a), it presents a material factual issue. For many of the same reasons discussed above, it is also disputed. Plaintiff maintains the complex was operated under a "unified management team employed by Bluestone Industries." [Doc. 46 at 5]. He further alleges "the mines used a commingled workforce in which hourly miners were routinely exchanged between the working areas. [*Id.*]. Plaintiff also cites to the close geographic nature of the job sites and the sharing of equipment and facilities. [*Id.* at 11].

Specifically, Mr. Gautier cites to three pieces of the complex, Mine No. 57, Job 39, and the K2 plant, which he states, "were located within close geographic proximity to one another via permitted coal mining operations under the control of the Defendants, pursuing a common operational purpose, and sharing crews, equipment, and facilities." [*Id.*]. He also maintains that "the coal-mining permits at the Burke Mountain site are all coterminous and otherwise directly connected by the same haulage roadways that are permitted in the name of the same Defendants, and connected to the Defendants' coal preparation facilities." [*Id.*].

**\*6** On the other hand, Defendants maintain that the record only shows that "coal produced at Plaintiff's mine (Mine 39A) was processed at the K2 preparation plant, and that slurry produced at Plaintiff's mine in 2019 was processed at the K-2 slurry cells/refuse site." [Doc. 47 at 6]. Thus, this issue is likewise preserved for presentation to the fact finder at trial.

### B. Employment Loss

There remains, as well, the extant factual question of whether the employment action here was an "employment loss" under the Act. Mr. Gautier maintains he "suffered an 'employment loss' under the WARN Act because he experienced either an indefinite termination of employment and/or a reduction in hours of work of more than fifty percent during each month of the 6-month period following October 24, 2019." [Doc. 91 at 1]. Defendants, however, contend the severance from employment constituted neither a termination nor a reduction in force, but rather a layoff which did not exceed six months. They further maintain the reduction in hours theory was not properly pled. [Doc. 89 at 4].

"Not every negative turn in employment circumstances constitutes an 'employment loss' for purposes of the WARN Act." *Graphic Commc'ns Int'l Union, Loc. 31-N v. Quebecor Printing (USA) Corp.*, 252 F.3d 296, 299 (4th Cir. 2001). "Employment loss" means (A) an employment termination other than discharge for cause, voluntary departure, or retirement; (B) a layoff exceeding six months; or (C) more than 50% reduction in work hours during each month of any six-month period. *Id.* (citing 29 U.S.C. § 2101(a)(6)).

The distinction between a layoff or termination for the purposes of defining "employment loss," is that "the term 'termination' means the permanent cessation of the employment relationship and the term 'layoff' means the temporary cessation of that relationship." *Long v. Dunlop Sport Grp. Ams.*, 506 F.3d 299, 302 (4th Cir. 2007).

This determination requires an initial categorization of the dismissal imposed on the employee. *Leeper v. Hamilton Cnty. Coal, LLC*, 939 F.3d 866, 870 (7th Cir. 2019), *cert. denied* 140 S. Ct. 2568 (2020). As the United States Court of Appeals for the Seventh Circuit stated in *Leeper*, this threshold question is most reasonably considered with an objective analysis of the circumstances, not a "hindsight-informed count of how many employees returned within a six-month period." *Leeper*, 939 F.3d at 870. *But see Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1282 (8th Cir. 1996) ("A common sense reading of the [WARN Act] indicates it is the actuality of a termination which controls and not the expectations of the employees.").

Employees have a "reasonable expectation of recall" when they understand, through notification or industry practice, that their employment has been temporarily interrupted and that they will be recalled to the same or a similar job. 20 C.F.R. § 639.3(a)(1); *see also Bledsoe v. Emery Worldwide Airlines, Inc.* 635 F.3d 836, 848 (6th Cir. 2011). Relevant factors in determining the "reasonableness" of the employees' expectations include (1) past experience of the employer; (2) employer's future plans; (3) circumstances of the layoff or absence; (4) expected length of layoff or absence; and (5) industry practice. *Bledsoe*, 635 F.3d at 848.

As a preliminary matter, Defendants assert Mr. Gautier cannot proceed on the reduction in hours theory because it was not set forth in the Complaint. [Doc. 89 at 4]. Mr. Gautier responds "this Court already concluded the eleventh-hour offer of employment did not preclude the Plaintiff from asserting he experienced a reduction in hours of over fifty percent in each of the six months following his severance of employment." [Doc. 91 at 10]. As noted in the margin, the purported "finding" was instead a recognition there was a prima facie showing on the point for the limited purpose of certifying the class. Importantly, as Defendants note in their Response, that "finding" suggested such a claim could be actionable. [Doc. 94 at 2–3]. Defendants are likewise correct Mr. Gautier has only "pled" the work-reduction basis in motion practice, not the operative pleading. [Doc. 94 at 2]. The operative pleading alleges only that the class suffered an employment loss from a plant closing or mass layoff. [*See, e.g.*, Doc. 1 ¶ 30]. The reduction of hours assertion appears nowhere therein. [Doc. 1].

**\*7** At the same time, Defendants have been aware of this theory of Plaintiff's case throughout the discovery period. There is thus no surprise, much less prejudice. Additionally,

the July 27, 2022 integrated pretrial order, which is not a model of clarity from either side, fairly raises the theory. That makes a pleading amendment unnecessary. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) ("Here, we have not only an amended complaint, but a final pretrial order that superseded all prior pleadings and 'controll[ed] the subsequent course of the action,' Fed. Rule Civ. Proc. 16([d])."); *Curtis v. Loether*, 415 U.S. 189, 190, n.1 (1974) (Where a claim was not included in the complaint, but was included in the pretrial order, "it is irrelevant that the pleadings were never formally amended." (citing Fed. R. Civ. P. 15(b), 16[d])).

Turning to the substance of the issue, Mr. Gautier testified that he was told orally about his discharge, and "the record indicates that the cessation of employment was for an indefinite period of time." [Doc. 91 at 13]. Further, the "testimony of numerous class members indicates they may well have had a reasonable expectation of permanent cessation of employment, *i.e.*, (1) the mine shut down, (2) they were unemployed, (3) they felt that they had to (and did) relocate their families, and (4) they understood that they were 'terminated." [Doc. 91 at 13]. Defendants contend Mr. Gautier and other members of the class were aware this was a temporary layoff and they may be recalled. [Doc. 89 at 7]. Defendants, in support of their position, point to the testimony of several class members, a call-back sheet that was circulated the last day of operations, and the fact that Mr. Gautier was ultimately called back to work. [*Id.*]. This sharp factual dispute in the evidentiary record is thus also reserved to the fact finder at trial.

Furthermore, Plaintiff is not precluded by law from arguing in the alternative that the employment loss here was a reduction in hours under § 2101(a)(6)(C). Defendants maintain that such a construction of subsection (C) would conflate the layoff and reduction in force provisions of the statute, making them superfluous. However, the Court need not turn to such

a canon of construction when the text of the statute is clear, as it is here. *United States v. Graham*, 608 F.3d 164, 176 (4th Cir. 2010) ("[P]roper statutory construction 'begins with the language of the statute,' and when, as here, 'the statutory language provides a clear answer, it ends there as well.' *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).") If Mr. Gautier was not scheduled to work from October 24, 2019, until April 23, 2020, that may indeed ultimately coincide with the plain meaning of a reduction in hours by 50% over a 6-month period.

**IV.**

For the foregoing reasons, the Court **DENIES** both Plaintiff's Motion for Summary Judgment [**Doc. 90**] and Defendants' Motion for Summary Judgment [**Doc. 88**].

Given that both parties demanded a trial by jury on all issues in their pleadings, the Court will submit the issue of damages to the jury, along with liability. The Court will treat any damages finding, in the alternative, as an advisory verdict under *Federal Rule of Civil Procedure* 39. Fed. R. Civ. P. 39(c)(1) ("In an action not triable of right by a jury, the court, on motion or on its own may try any issue with an advisory jury."); *see also Creech v. Va. Fuel Corp.*, 61 F. Supp. 3d 592, 593–94 (W.D. Va. 2014) ("Few courts have decided whether there is a right to jury trial under the WARN Act, and the Fourth Circuit has not yet decided the issue. The weight of existing authority—including the Sixth Circuit court of appeals, the only circuit court to have squarely addressed the issue—holds that there is no right to jury trial because the Act's remedies are equitable in nature.").

**All Citations**

Slip Copy, 2022 WL 3162177, 2022 IER Cases 274,775

---

Footnotes

1   Also pending is Plaintiff's Motion for Leave to File Supplemental Authority, filed August 4, 2022. [Doc. 116]. The Motion is **GRANTED**.

2   Regarding the parties' references to the Court's suggestion at an earlier point in the case that Defendants constitute a single employer and the Burke Mountain Mine Complex is a single site of employment, [Doc. 89 at 2, n.2], there appears to be a misconception that the matters have been finally adjudicated. The Court's suggestion earlier in the litigation was a prima facie determination for purposes of certifying the class. [Doc. 59 at 8]; *see also Piron v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19CV709, 2022 WL 363958, at *13 (E.D. Va. Feb. 7, 2022) ("Granting class certification will still allow the parties to dispute whether Plaintiffs can meet the 'single site of employment' requirement ... particularly because

2022 WL 3162177, 2022 IER Cases 274,775

'the Fourth Circuit has not provided specific guidance regarding which standard a district court should use to evaluate single employer status under the WARN Act.' *Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 698 (D.S.C. 2021). Accordingly, the contention that Plaintiffs cannot prove a WARN Act claim due to lack of a 'single site of employment' 'is properly addressed at trial or in a ruling on a summary judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class.' [*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 470 (2013)].")

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 11441681
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Lufkin Division.

Adan Arturo **HERNANDEZ**,
Individually and on Behalf of all
Persons Similarly Situated, Plaintiff,

v.

**NACOGDOCHES** COUNTY,
TEXAS, Defendant.

Civil Action No. 9:08-CV-119
|
Signed 09/10/**2008**

**Attorneys and Law Firms**

Richard S. Fischer, Law Offices of Richard S. Fischer, **Nacogdoches**, TX, for Plaintiff.

Robert Scott Davis, David R. Iglesias, Flowers Davis LLP, Tyler, TX, for Defendant.

**ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION FOR CERTIFICATION AND DENYING DEFENDANT'S MOTION TO DISMISS**

Ron Clark, United States District Judge

**\*1** Plaintiff Adan Arturo **Hernandez** filed suit against Defendant **Nacogdoches** County, Texas[1] pursuant to 42 U.S.C. § 1983, seeking declaratory relief and damages stemming from his purported illegal immigration detention in the **Nacogdoches** County Jail. **Hernandez** also requests the court certify him as representative of a class consisting of "all foreign-born persons who have been, are being[,] or will be held in the **Nacogdoches** County Jail after they would otherwise have been released, based on 'immigration detainers' or 'immigration holds.' " **Nacogdoches** County now moves under Fed. R. Civ. P. 12(b)(6) to dismiss the instant suit because **Hernandez** has failed to meet the prerequisites for a class action.

Because **Hernandez's** motion to certify is insufficient to satisfy the requirements of class certification, the court will deny his motion without prejudice at this time. **Hernandez**

will be permitted to re-file his motion after discovery on the issue of class certification has been conducted. **Nacogdoches** County's motion to dismiss is denied.

**I. Background**

The following facts are alleged by **Hernandez**, and the court makes no determination of their veracity at this time. On September 13, 2007, **Hernandez** was arrested in **Nacogdoches**, Texas on a Class C misdemeanor assault charge. He pled guilty the following day, was assessed a fine, and was purportedly informed that he would be freed upon payment of the fine. The fine was paid on September 14, but **Hernandez** was held until September 19, allegedly because **Nacogdoches** County Jail officials had communicated with federal immigration authorities and reached an agreement to retain **Hernandez** on an immigration detainer until federal immigration authorities came to pick him up. It is not clear from **Hernandez's** Complaint or motion whether he was picked up on September 19 by immigration officials or simply released from jail.

**II. Applicable Law**

A. Motion to Dismiss Under Rule 12(b)(6)
Fed. R. Civ. P. 12(b)(6) provides that a party may move a court to dismiss an action for "failure to state a claim upon which relief can be granted." On motion under 12(b)(6), the court must decide whether the facts alleged, if true, would entitled Plaintiff to some legal remedy. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957), abrogated on other grounds by *Bell Atlantic Corp. v. Twombly*, —— U.S. ——, 127 S. Ct. 1955 (2007). Unless a Rule 12(b)(6) motion is converted to a summary judgment motion, the court may not consider material outside the complaint. *See Powe v. Chicago*, 664 F.2d 639, 642 (7th Cir. 1981). The court must accept as true all well-pleaded facts and review them in the light most favorable to the Plaintiff. *Piotrowski v. City of Houston*, 51 F.3d 512, 514 (5th Cir. 1995).

**\*2** A pleading "need not specify in exact detail every possible theory of recovery--it must only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Thrift v. Estate of Hubbard*, 44 F.3d 348, 356 (5th Cir. 1995)(quoting *Conley*, 355 U.S. at 47, 78 S. Ct. at 103). Once a claim has been adequately stated, "it may be supported by showing any set of facts consistent with the

Case 4:20-cv-02995   Document 92-7   Filed on 02/03/23 in TXSD   Page 26 of 32

Hernandez v. Nacogdoches County, Texas, Not Reported in Fed. Supp. (2008)

allegations in the complaint." *Twombly*, 127 S. Ct. at 1969; *see also Southwestern Bell Telephone, LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. **2008**)(quoting *Twombly*, 127 S. Ct. at 1965, 1974).

B. Class Certification

The party filing a motion for class certification bears the burden to demonstrate the propriety of establishing a class under Fed. R. Civ. P. 23. *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002). Generally, the moving party is neither required to prove the merits of the class claim, nor to establish a probability that the action will be successful. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78, 94 S. Ct. 2140, 2152 (1974). A motion for class certification must assert that all the requirements of Rule 23(a) are met and that the class falls within one of the three categories of Rule 23(b). *Amchem Prods. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 2245 (1997); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007).

Rule 23(a) imposes four threshold requirements that are applicable to all class actions. First, the class must be so numerous that joinder of all members is impracticable. The proposed class representative need not prove the precise number or identity of class members. *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868, n.11 (5th Cir. 2000). However, to satisfy the numerosity prong, the putative representative must demonstrate "some evidence or reasonable estimate of the number of purported class members." *Id.* at 868 (internal quotation omitted).

Second, there must be questions of law and fact that are common to the class. The commonality requirement is "not demanding," and is met when the resolution of at least one issue will affect all, or substantially all, of the putative class members. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). Third, the proposed class representative must have claims or defenses that are typical of the class. As with the commonality requirement, the typicality test is not a demanding one. *Stirman*, 280 F.3d at 562. The test will focus on the similarity between the legal and remedial remedies of the proposed class representative, and those of the rest of the class. *Id.* So long as the proposed representative is a member of the class with the same interests and has suffered generally the same type of injury, the representative's claims need not be identical to the claims of the rest of the putative class. *General Tel. Co. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 2370 (1982).

Fourth, the proposed class representative must demonstrate that he or she will fairly and adequately protect the interests of the class. The court cannot presume the adequacy of the proposed representative; rather, adequacy must be proved. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481-82 (5th Cir. 2001). To demonstrate adequacy, the proposed representative must demonstrate that he or she: (1) is a representative of the class, *East Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403, 97 S. Ct. 1891, 1896 (1977); (2) has the same interest as the class members and does not have a conflict of interest with the class members, *Id., Sosna v. Iowa*, 419 U.S. 393, 403, 95 S. Ct. 553, 559 (1975); (3) has suffered the same injury as the class members, *E. Tex. Motor Freight Sys.*, 431 U.S. at 403, 97 S. Ct. at 1896; and (4) has competent counsel. *Amchem Prods.*, 521 U.S. at 626 n.20, 117 S. Ct. at 2251, n.20. With respect to (4), the court should consider both mandatory[2] and discretionary[3] criteria. Fed. R. Civ. P. 23(g)(1).

**\*3** In addition to the four requirements in Rule 23(a), a class action must also satisfy the requirements of one of the three categories under Rule 23(b). First, a class action is permitted if the prosecution of separate actions would create the risk of (1) inconsistent or varying adjudication for individual class members or (2) adjudications for individual class members that would (a) as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or (b) substantially impair or impede the other members' ability to protect their interests. Second, a class action is allowed if the Defendant has acted or refused to act on grounds generally applicable to the class. Rule 23(b)(2). Finally, a class action is permitted if two criteria are met: (1) common questions of law or fact predominate over individual issues and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Rule 23(b)(3)[4]; *Amchem Prods.*, 521 U.S. at 615, 117 S. Ct. at 2245-46.

The court may permit discovery and conduct hearings on the issue of class certification, as well as to decide whether discovery on the merits should proceed before determining whether to certify the class. *See Stewart v. Winter*, 669 F.2d 328, 331 (5th Cir. 1982). In most cases, a certain amount of discovery is necessary. *See Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 315-16 (5th Cir. 1978)(Plaintiff had to identify issues of substantive law that would control the outcome of the litigation); *Pittman v. E.I. duPont de Nemours & Co.*, 552 F.2d 149, 150 (5th Cir. 1977)(some discovery was necessary to define the issues and scope of the action).

Case 4:20-cv-02995   Document 92-7   Filed on 02/03/23 in TXSD   Page 27 of 32

Hernandez v. Nacogdoches County, Texas, Not Reported in Fed. Supp. (2008)

## III. Discussion

Nacogdoches County argues primarily that Hernandez's Complaint and motion both fail to satisfy the class action certification requirements discussed above because Hernandez lacks any specific facts. For example, Hernandez cites "information and belief" to support his assertion that "hundreds of foreign-born persons" fulfill the numerosity requirement. He fails to articulate any specific questions of fact or law common to the purported class, other than a general statement that these hundreds of individuals are being, or have been, held in the Nacogdoches County Jail on immigration detainers. Finally, Hernandez pleads only that he will fairly and adequately represent the class interests because he was "treated the same as the members of his class, has no conflict with the members of his class, and is represented by competent and experienced counsel."[5]

Although several of the threshold requirements for class certification are "not demanding," Hernandez has, at a minimum, failed to demonstrate the adequacy requirement. Adequacy must be proven; it cannot be presumed. *Berger*, 257 F.3d at 481-82. Merely stating in a conclusory fashion that the requirement is met, without any factual support, is not sufficient. For example, the fact that Hernandez has failed to identify any actual class members makes it impossible for the court to determine at this time whether Hernandez or his counsel has a conflict of interest with any class member which would make Hernandez an inappropriate choice for class representative.

This case has been on the court's docket for little more than two months. As the initial Case Management Conference has not yet been held and the court's Scheduling Order has not issued, it is unlikely that little, if any, discovery has been conducted by the parties to date. The Fifth Circuit has stated that discovery may be appropriate before class certification is considered, and the court considers that to be the situation in this case.

**\*4** The court will therefore deny Hernandez's motion for class certification without prejudice at this time. It directs the parties to submit with their Joint 26(f) Report a two-tiered proposed scheduling order which would first allow for limited discovery on the issue of class certification and a deadline for Hernandez's motion to certify after such discovery has been conducted. In the event a class is certified, the case would then proceed according to the regular scheduling order deadlines.

The court will also deny Nacogdoches County's Rule 12(b)(6) motion to dismiss. The motion focuses entirely on Hernandez's failure to fulfill the class certification requirements, which is addressed above. Although not raised in Defendant's motion, the court also notes that the Complaint itself states a claim under Section 1983 against Nacogdoches County as to Hernandez, namely whether Hernandez's incarceration between September 14 and September 19, 2007 violated his constitutional rights.[6]

IT IS THEREFORE ORDERED that Plaintiff Adan Arturo Hernandez's Motion for Class Certification [Doc. # 1] is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant Nacogdoches County, Texas's Motion to Dismiss [Doc. # 4] is DENIED.

So **ORDERED** and **SIGNED** this **10** day of **September, 2008**.

### All Citations

Not Reported in Fed. Supp., 2008 WL 11441681

### Footnotes

1    Despite the fact that Hernandez named "Michael Chertoff, in his official capacity as Secretary of the Department of Homeland Security of the United States" as the Defendant in his motion for class certification, the court is fairly sure Nacogdoches County is the only Defendant in this action, as it is the sole party referenced in the Complaint and in the style of all other filings.

2    The following criteria are mandatory: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Rule 23(g)(1)(A).

Hernandez v. Nacogdoches County, Texas, Not Reported in Fed. Supp. (2008)

3      The court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class. Rule 23(g)(1)(B). For example, counsel should not have any conflicts of interest with the other class members. *Amchem Prods.*, 521 U.S. at 626 n.20, 117 S. Ct. at 2251, n.20.

4      Rule 23(b)(3) sets out four non-exhaustive factors to consider when determining whether a case meets these criteria: (1) the class members' interest in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation on the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.

5      **Hernandez** also submitted a three-page affidavit from his counsel, in which counsel's qualifications to handle the case are detailed.

6      At the same time, it is unclear from **Hernandez's** pleadings whether he was held between September 14 and September 19 pursuant to a federal warrant or merely at the unofficial request of federal immigration officials. The specific facts of the situation will govern whether or not **Hernandez** can ultimately prevail on his claims.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 12542900
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas.

Fernando **RANGEL**, Eric Dean
Gibson, and Esther Zamora, Plaintiffs,

v.

**CARDELL CABINETRY**, LLC,
H.I.G. Capital LLC, and H.I.G.
**Cardell** Acquisition Inc., Defendant.

NOS. SA-13-CA-843, SA-13-CA-890
|
Signed 01/22/**2014**

**Attorneys and Law Firms**

Benjamin F. Johns, Joseph G. Sauder, Matthew D. Schelkopf, Chimicles & Tikellis, L.L.P., Haverford, PA, Cory S. Fein, Cynthia Chapman, Michael A. Caddell, Caddell & Chapman, Houston, TX, Peter W. Overs, Jr., Robert I. Harwood, Wechsler, Harwood, Halebian & Feffer, L.L.P., New York, NY, for Plaintiffs.

Thomas Edward Sanders, Mark J. Barrera, Cox Smith Matthews Incorporated, San Antonio, TX, Garrett D. Kennedy, Joseph A. Piesco, Jr., Mark W. Lerner, Kasowitz Benson Torres & Friedman, LLP, New York, NY, for Defendant.

**ORDER CERTIFYING CLASS**

HARRY LEE HUDSPETH, SENIOR UNITED STATES DISTRICT JUDGE

 **\*1** On January 17, **2014**, this Court denied without prejudice the motion for summary judgment filed by Defendants H.I.G. Capital, LLC and H.I.G. **Cardell** Acquisition, Inc. (the H.I.G. Defendants) (Docket No. 41). Because Defendant **Cardell Cabinetry**, LLC (**Cardell**) is the subject of an involuntary bankruptcy, the Court has stayed the proceedings against it. Before the Court is the Plaintiffs' unopposed motion for class certification as to the H.I.G. Defendants (Docket No. 34). Undertaking its own independent review, the Court finds that the motion for class certification should be granted.

**I. Background**

The relevant facts are summarized in the Court's opinion dated January 17, **2014** (Docket No. 41). The Plaintiffs, former **Cardell** employees, filed separate civil actions alleging that their employment was terminated without the notice required by the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. § 2102(a). This Court has previously held that the Plaintiffs may pursue discovery against the H.I.G. Defendants, a private equity firm and its investment vehicle which owned a controlling share in **Cardell** at the time. The Plaintiffs have moved to certify the following class:

> All persons employed at the Facilities who were involuntarily terminated as a result of the September 9, 2013 plant closure, and within 30 days of such date.

In a footnote, the Plaintiffs provide the addresses of the various **Cardell Cabinetry** facilities in San Antonio. The proposed class consists of approximately 900 workers who lost their jobs when **Cardell** ceased operations. The law firms that filed these two actions, Chimicles & Tikellis LLP and Harwood Feffer LLP, have litigated the claims of the individual Plaintiffs and now seek to be appointed as class counsel.

**II. Applicable Law and Analysis**

In order to obtain class certification, Plaintiffs must first meet the four prerequisites contained in Rule 23(a). Those are: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." Fed. R. Civ. P. 23(a); **Amchem Prods., Inc. v. Windsor**, 521 U.S. 591, 613-14 (1997).

If all four requirements have been met, the party seeking class certification must also satisfy at least one of the requirements listed in Rule 23(b). Here, the Plaintiffs seek certification under Rule 23(b)(3), which provides that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."

Case 4:20-cv-02995   Document 92-7   Filed on 02/03/23 in TXSD   Page 30 of 32

Ranger v. Cardell Cabinetry, LLC, Not Reported in Fed. Supp. (2014)

In deciding whether to certify a class, a district court must conduct a "rigorous analysis" of Rule 23's prerequisites. **Wal-Mart Stores, Inc. v. Dukes**, 564 U.S. \_\_\_\_, \_\_\_\_, 131 S. Ct. 2541, 2551 (2011) (quoting **General Tel. Co. of Southwest v. Falcon**, 457 U.S. 147, 161 (1982)). The Court may look past the pleadings to determine whether the requirements of Rule 23 have been met. **Id.** (citing **Falcon**, 457 U.S. at 160); **Castano v. American Tabacco Co.**, 84 F.3d 734, 744 (5th Cir. 1996). The parties seeking certification bear the burden of proof to establish that the proposed class satisfies those requirements. **Wal-Mart**, 564 U.S. at \_\_\_\_, 131 S. Ct. at 2551.

**A. Rule 23(a)**

**1. Numerosity**

 *2  In reviewing whether a potential class meets Rule 23(a)'s numerosity requirement, courts should not focus on numbers alone. **In re TWL Corp.**, 712 F.3d 886, 894 (5th Cir. 2013) (courts should also consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim"). By its very terms, however, the WARN Act "applies only to those employer actions which affect large quantities of employees." **Gomez v. Am. Garment Finishers Corp.**, 200 F.R.D. 579, 581-82 (W.D. Tex. 2000) (citing 29 U.S.C. § 2101). Here, **Cardell** allegedly laid off approximately 900 employees without notice. Considering the relatively small size of each individual claim and the Congressional purpose in enacting the WARN Act, the Court finds that these allegations satisfy the numerosity requirement. **See Gomez**, 200 F.R.D. at 581 (certifying a WARN Act class of 350 employees).

**2. Commonality**

In **Wal-Mart**, the Supreme Court held that " [c]ommonality requires the plaintiff to demonstrate that the class members **have suffered the same injury.**" **M.D. ex rel. Stukenberg v. Perry**, 675 F.3d 832, 840 (5th Cir. 2012) (quoting **Wal-Mart**, 564 U.S. at \_\_\_\_, 131 S.Ct. at 2551). Claims of every class member "must depend upon a common contention ... of such a nature that it is capable of classwide resolution – which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims

in one stroke." **Id.** (quoting **Wal-Mart**, 564 U.S. \_\_\_\_, 131 S.Ct. at 2551).

Here, the Plaintiffs clearly assert that the remaining **Cardell** employees suffered the same injury: losing their jobs without the 60 days' advance notice required by the WARN Act. This contention is appropriately resolved on a classwide basis. The only perceived difference between the Plaintiffs' claims and the other class members' claims is the final amount of back pay that each employee would be entitled to receive, a predicament that exists in every WARN Act case and which does not preclude class certification. **Applegate v. Formed Fiber Techs., LLC**, 2012 WL 3065542, at *6 (D. Me. 2012) ("Indeed, class action suits under the WARN Act always involve a class comprised of persons with different positions, different pay, and who may have been terminated on different dates.") (citing **Guippone v. BH S&B Holdings LLC**, 2011 WL 1345041, at *5 (S.D.N.Y. 2011)). The Plaintiffs have satisfied the commonality requirement.

**3. Typicality**

Typicality is shown when the representative plaintiff's claims arise out of the same event or course of conduct as the other class members, and are based on the same legal theory. **Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.**, 2012 WL 565997, at *2 (N.D. Tex. Jan. 27, 2012), **aff'd sub nom. Erica P. John Fund, Inc. v. Halliburton Co.**, 718 F.3d 423 (5th Cir. 2013), **cert. granted**, \_\_\_ U.S. \_\_\_\_, 134 S.Ct. 636 (2013)). The test for typicality is not extremely rigorous. **Id.** The Plaintiffs' claims and the other **Cardell** workers' claims arise out of the same course of conduct (the **Cardell** factory closed without notice) and are based on the same legal theory (the WARN Act). Therefore, the Plaintiffs have satisfied the typicality requirement.

**4. Adequacy of representation**

This prerequisite requires the Court to examine the class representatives and the proposed class counsel to ensure that the representative party will fairly and adequately protect the interests of the class. **Archdiocese of Milwaukee**, 2012 WL 565997, at *2 (citing **Berger v. Compaq Computer Corp.**, 257 F.3d 475, 479 (5th Cir. 2001)). The Plaintiffs must show that their counsel has the zeal and competence to represent the class, and that the proposed class representative is willing and able to take an active role in controlling the litigation

and protecting absent class members. **Id.** The Court must also examine whether there are conflicts of interest between the named Plaintiffs and the absent class members the Plaintiffs seek to represent. **Id.**

**\*3** The Plaintiffs propose to use two east coast law firms as class counsel. One of these firms has some specialized experience in WARN Act class actions, and the other appears to have experience in other forms of class actions, such as securities litigation. The proposed class counsel appear sufficiently "qualified, experienced, and generally able to conduct the proposed litigation." **Gomez**, 200 F.R.D. at 582 (quoting **N. Am. Acceptance Corp. v. Arnall, Golden & Gregory**, 593 F.2d 642, 644 (5th Cir. 1979)). Further, the named Plaintiffs appear to be adequate class representatives. The Plaintiffs and their counsel have actively pursued their claims, having initiated litigation shortly after Cardell closed the factory, and there appears to be no conflict of interest between the named Plaintiffs and the proposed class members. They would all be pursuing the same claims against the same Defendants. Therefore, the Plaintiffs have met Rule 23's adequacy requirement.

### B. Rule 23(b)(3)

This rule requires the Plaintiffs to show that "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement is easily satisfied here, because the class members' injuries and remedies are all nearly identical. **See Gomez**, 200 F.R.D. at 584 ("[E]stablishing WARN liability turns on straightforward issues regarding whether Defendant is an 'employer' under WARN; whether a 'mass layoff' or 'plant closing' took place ... and, if so, whether Defendant gave the proper notice required by WARN.").

The superiority requirement is also established, because requiring each of the 900 former Cardell employees to "establish liability in an individual lawsuit simply would destroy efficiency." **Gomez**, 200 F.R.D. at 584. With roughly two months of back wages as the potential damages, WARN Act cases are often described as "negative value" suits in which it costs more for an individual plaintiff to investigate and initiate a claim than his or her individual claim is worth. **See In re TWL Corp.**, 712 F.3d at 903 ("Since this is clearly

a 'negative value suit'—the cost to each worker to litigate his or her own WARN Act proof of claim would almost certainly outweigh the value of the claim-it only makes sense to pursue the claims as a class in an adversary proceeding.") (Graves, J., concurring). For this reason, WARN Act claims are "particularly amenable to class litigation." **Gomez**, 200 F.R.D. at 585 (citing **Finnan v. L.F. Rothschild & Co., Inc.**, 726 F. Supp. 460, 465 (S.D.N.Y. 1989)). Finally, the Plaintiffs also represent that no other pending actions allege similar claims against the Defendants, and "[t]he lack of such individual actions also indicates that the class members do not have any desire to vindicate their rights separately." **Gomez**, 200 F.R.D. at 584.

In addition to all four of the Rule 23(a) requirements, the Plaintiffs have satisfied Rule 23(b)(3)'s requirements of predominance and superiority. Therefore, the motion for class certification should be granted. However, the Court will slightly modify the Plaintiffs' definition of the proposed class to "define the class and class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). The class will now consist of:

All persons who were

(1) employed at the Cardell Cabinetry Facilities in San Antonio, Texas;

(2) who were involuntarily terminated as a result of the September 9, 2013 plant closure, and within 30 days of such date; and

(3) who did not receive 60 days' advance notice of the mass layoff.

### C. Notice to Class

The Plaintiffs have not specified how they intend to notify the class members pursuant to Rule 23(c)(2), instead stating that they will wait until after the Court rules on the present motion to furnish their proposed notice. The Court will now order the Plaintiffs to furnish their proposed notice within two weeks.

### D. Appointment of Class Counsel

**\*4** Without discussing Rule 23(g), the Plaintiffs have moved for "appointment of interim co-lead and liaison counsel." However, it appears that the Plaintiffs are seeking the appointment of their law firms not as **interim** counsel, but as

Case 4:20-cv-02995 Document 92-7 Filed on 02/03/23 in TXSD Page 32 of 32

Ranger v. Cardell Cabinetry, LLC, Not Reported in Fed. Supp. (2014)

counsel for the certified class. **See** Fed. R. Civ. P. 23(g)(3) ("The court may designate interim counsel to act on behalf of a putative class **before** determining whether to certify the class as a class action.") (emphasis added). Because the Court has certified the class action, it now "must appoint class counsel." Fed. R. Civ. P. 23(g)(1). The Court finds that the Plaintiffs' two law firms satisfy the competency-based considerations in Rule 23(g)(1), and that they will "fairly and adequately represent the interests of the class" as required by Rule 23(g)(4). Therefore, the Court will appoint these law firms as co-lead class counsel.

It is therefore ORDERED that the Plaintiffs' motion for class certification (Docket No. 34) be, and it is hereby, GRANTED.

It is further ORDERED that the following class be, and it is hereby, CERTIFIED:

All persons who were

(4) employed at the **Cardell Cabinetry** Facilities in San Antonio, Texas;

(5) who were involuntarily terminated as a result of the September 9, 2013 plant closure, and within 30 days of such date; and

(6) who did not receive 60 days' advance notice of the mass layoff.

It is further ORDERED that the Plaintiffs' motion for appointment of class counsel (Docket No. 34) be, and it is hereby, GRANTED.

It is further ORDERED that Plaintiffs submit their proposed notice to absent class members to the Court for approval no later than February 5, **2014**.

SIGNED AND ENTERED this 22nd day of January, **2014**.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12542900

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.