United States District Court
Southern District of Texas
**ENTERED**
September 26, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SCOTT EASOM, ADRIAN HOWARD, and JOHN NAU, on behalf of themselves and on behalf of all others similarly situated, | § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. H-20-2995 |
| v. | § § | |
| US WELL SERVICES, LLC, | § § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER ON SUMMARY JUDGMENT AND CLASS CERTIFICATION**

US Well Services provides hydraulic fracturing services. (Docket Entry No. 21-1 at ¶ 2). Its presence in Texas includes a Houston headquarters and production facilities in Bryan, San Angelo, and Pleasanton. (Docket Entry No. 73-12 at 3–4; Docket Entry No. 91-2 at ¶ 5). It also has production facilities in Uhrichsville, Ohio; Jane Lew, West Virginia; Williamsport, Pennsylvania; and Vernal, Utah. (Docket Entry No. 73-12 at 3–4; Docket Entry No. 91-2 at ¶ 5).

As detailed in the court's previous summary judgment order, (Docket Entry No. 38), US Well Services suffered economic setbacks before and during the COVID-19 pandemic. When oil prices dropped to historic lows in the early spring of 2020, oil producers cancelled their fracking contracts with US Well Services. (Docket Entry No. 21 at 9–11; Docket Entry No. 21-1 at ¶ 9). US Well Services responded with an initial round of layoffs on March 5, 2020. (Docket Entry No. 91-10 at ¶ 4). As COVID hit and as oil prices continued to drop through March and April, US Well Services laid off more employees across all facilities. (*Id.* at ¶¶ 5–6; Docket Entry No. 73-12 at 25–27). US Well Services told its employees that the reason for the layoffs was "unforeseeable business circumstances resulting from a lack of available customer work caused

by the significant drop in oil prices and the unexpected adverse impact that the Coronavirus has caused." (Docket Entry No. 70-2).

The plaintiffs—Scott Easom, John Nau, and Adrian Howard—were among the workers laid off on March 18, 2020. (Docket Entry Nos. 70-2, 70-3, 70-4). In August 2020, they sued US Well Services, representing themselves and seeking to represent a class of similarly situated employees, alleging violations of the WARN Act, 29 U.S.C. § 2101 *et seq*. (Docket Entry No. 1 at 10).

In November 2020, US Well Services moved for summary judgment, arguing that it qualified for the WARN Act's natural-disaster exception, *see* 29 U.S.C. § 2102(b)(2)(B), because the COVID-19 pandemic had caused the layoffs. (Docket Entry No. 21). The plaintiffs cross-moved for summary judgment, arguing that the natural-disaster exception did not apply. (Docket Entry No. 23). The court denied both parties' motions for summary judgment, determining that although COVID-19 was a "natural disaster" within the meaning of the WARN Act's exception, there were factual disputes as to whether COVID-19 or the plunge in oil prices had caused the layoffs. (Docket Entry No. 33). Recognizing that the issue was novel, the court certified for interlocutory appeal under 28 U.S.C. § 1292(b) the questions of whether COVID-19 was a "natural disaster" and what the applicable causation standard was under the natural-disaster exception. (Docket Entry No. 38 at 2). The plaintiffs appealed, and the Fifth Circuit reversed, holding that COVID-19 was not a "natural disaster" under § 2102(b)(2)(B) and that the natural-disaster exception incorporates proximate causation. (Docket Entry No. 65 at 2).

The plaintiffs then moved for partial summary judgment on another of US Well Services's affirmative defenses—that the layoffs were "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." § 2102(b)(2)(A).

2

(Docket Entry No. 70).  The plaintiffs also filed an amended motion for class certification.  (Docket Entry No. 73).  After US Well Services stated at a hearing that it would not be relying on advice of counsel to establish its good-faith defense under 29 U.S.C. § 2104(a)(4), the plaintiffs filed a separate motion for partial summary judgment targeting that defense.  (Docket Entry No. 78).  This opinion resolves the three pending motions, beginning with the amended motion for class certification.[1]

## Motion for Class Certification

### I.      The Legal Standards

#### A.      Class Certification

Under Rule 23(a), plaintiffs seeking class certification must satisfy four elements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).

Numerosity means that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Commonality means that "there are questions of law or fact common to the class."  *Id.* 23(a)(2).  Typicality means that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  *Id.* 23(a)(3).  Adequacy means that the representative party and the named class counsel "will fairly and adequately protect the interests of the class."  *Id.* 23(a)(4).

Once the plaintiffs satisfy those four elements, they must further show that the class action falls within at least one of the following three categories under Rule 23(b): (1) cases in which prosecuting separate actions by or against individual class members would create a risk of inconsistent adjudication; (2) cases in which "the party opposing the class has acted or refused to

---

[1]  Resolution of the motion for class certification moots the defendant's argument that the plaintiffs' motions for summary judgment violate the one-way intervention rule.   The court does not address that argument.

act on grounds that apply generally to the class," so that final injunctive or declaratory relief is appropriate with respect to the class as a whole; or (3) cases in which "questions of law or fact common to class members predominate over any questions affecting only individual members" and the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b).

The Rule 23 analysis is "rigorous," and "a district court must detail with sufficient specificity how the plaintiff has met the requirements of Rule 23." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 545 (5th Cir. 2020) (quoting reference omitted). "Rule 23 does not set forth a mere pleading standard." *Id.* (quoting *Dukes*, 564 U.S. at 350). "'A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' and so on." *Id.* (quoting *Dukes*, 564 U.S. at 350). A district court must often "probe behind the pleadings" and reach considerations "'that are enmeshed in the factual and legal issues' of the case." *Id.* (first quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982), then quoting *Dukes*, 564 U.S. at 351). Accordingly, the court must "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020) (quoting reference omitted).

### B.      The WARN Act

The WARN Act prohibits an employer from closing a plant or ordering a mass layoff unless the employer provides affected employees with 60-days' notice of the closing or layoff. 29 U.S.C. § 2102(a); *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 382 (5th Cir. 2000). The notice period is to give those affected time "to adjust to the prospective loss of employment, to seek and obtain alternative jobs and . . . to enter skill training or retraining that will allow [them] to

4

successfully compete in the job market."  20 C.F.R. § 639.1(a).  Employers who violate the notice provision are required to provide "back pay for each day of violation."  § 2104(a)(1)(A).

To prove a WARN Act violation, a plaintiff must show that: (1) the defendant was "an employer"; (2) the defendant ordered a "plant closing" or "mass layoff"; (3) the defendant failed to give employees 60-days' notice before the closing or layoff; and (4) the plaintiff is an "aggrieved" or "affected" employee.  §§ 2102, 2104.

## II.    Analysis

The plaintiffs' motion for class certification presents three issues about the scope of the putative class.  The issues are whether the class should: (1) consist of terminated employees from all Texas and Northeast[2] US Well Services locations, or only some locations; (2) consist of employees terminated within a 30-day period or a 90-day period beginning on March 5, 2020; and (3) include terminated part-time employees, employees rehired within six months, or employees who released their WARN Act claims.  After resolving these issues, the court moves to the Rule 23 analysis.

### A.    "Single Site of Employment"

The WARN Act requires employers to give 60-days' notice before ordering a "plant closing" or "mass layoff."  § 2102(a).  The Act defines "mass layoff" as "a reduction in force which . . . (B) results in an employment loss at the single site of employment during any 30-day period for (i)(I) at least 33 percent of the employees (excluding any part-time employees); and (II) at least 50 employees (excluding any part-time employees)."  § 2101(a)(3).

The parties disagree about what constitutes a "single site of employment" on the facts here.  But they agree that the Department of Labor's regulations at 20 C.F.R. § 639.3(i) govern the

---

[2]    The Northeast locations are Jane Lew, West Virginia; Uhrichsville, Ohio; and Williamsport, Pennsylvania.

question.  (Docket Entry No. 73 at 13; Docket Entry No. 91 at 22).  Section 639.3(i) provides, in

relevant part:

> (1) A single site of employment can refer to either a single location or a group of contiguous locations.  Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.
>
> . . .
>
> (3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment.  An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.
>
> (4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site.  For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.
>
> (5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.
>
> (6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.
>
> . . .
>
> (8) The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply.  The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

The plaintiffs give three alternatives for defining the sites of employment.  The first is to

treat all US Well Services locations as a single site because US Well Services employees fall under

§ 639.3(i)(6) and all employees receive work assignments from the Houston headquarters.  (Docket

Entry No. 73 at 14–15).  The second is to treat the Texas locations (Houston, San Angelo,

Pleasanton, and Bryan) as a single employment site, and to treat the Northeast locations (Jane Lew,

West Virginia; Williamsport, Pennsylvania; and Uhrichsville, Ohio) as a separate, single employment site. (*Id.* at 16). The third alternative is to treat the Northeast locations as one single site of employment and to treat the Texas locations as three separate single sites of employment: (1) Houston; (2) San Angelo; and (3) Pleasanton and Bryan. (*Id.* at 18–19). The plaintiffs are content to exclude the Vernal, Utah facility from the class. (*Id.* at 16). US Well Services, by contrast, argues that each location is a separate single site of employment. (Docket Entry No. 91 at 23). The court agrees with US Well Services.

"The general rule is that 'separate facilities are separate sites.'" *Davis v. Signal Intern. Tx. GP, L.L.C.*, 728 F.3d 482, 485 (5th Cir. 2013) (quoting 54 F.R. 16042, 16050 (Apr. 21, 1989)). "Separate facilities are only to be treated as a single site of employment if all three factors identified in the regulations are met, namely: 1) the separate facilities are in 'reasonable geographic proximity' of one another; 2) they are 'used for the same purpose'; 3) and they 'share the same staff and equipment.'" *Viator v. Delchamps Inc.*, 109 F.3d 1124, 1127 (5th Cir. 1997) (quoting 20 C.F.R. § 639.3(i)(3)). This is a "'narrow' exception to th[e] general rule." *Mercer v. Patterson-UTI Drilling Company, L.L.C.*, 717 Fed. App'x 400, 404 (5th Cir. 2017) (quoting *Meadows v. Latshaw Drilling Company, L.L.C.*, 866 F.3d 307, 311 (5th Cir. 2017)). The regulations define "facility" as "a building or buildings." 20 CFR § 639.3(j).

Each US Well Services location is a separate facility and, under the regulations, a separate site. (Docket Entry No. 91-2 at 2, 6–12). The locations are separated from each other by distances ranging from 101 to 1744 miles. (*Id.* at ¶ 6). The locations closest together are the headquarters in Houston and the production facility in Bryan, approximately 101 miles apart. (*Id.*). The next closest are Pleasanton and Bryan, 209 miles apart. (*Id.*). The plaintiffs argue that the locations are within reasonable geographic proximity because US Well Services at one time contemplated

merging the Pleasanton and San Angelo locations and because the Northeast locations "form a geographical triangle separated by comparable distances."  (Docket Entry No. 92 at 15).

The court is not persuaded that any of the separate facilities are close enough to be treated as a single site of employment.  The regulations indicate that the sites must be close to be considered in "reasonable geographic proximity."  *See* 20 C.F.R. § 639.3(i)(1) ("[S]eparate facilities across the street from one another[] may be considered a single site of employment."); *id.* 639.3(i)(4) ("Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site.  For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.").  The Fifth Circuit has noted that "two plants across town will rarely be considered a single site."  *Meadows*, 866 F.3d at 311 (quoting *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 934 (5th Cir. 1994)).  The Fifth Circuit has refused to find that "drilling rigs in a basin 250 miles wide by 300 miles long . . . and spread across two states" can be treated as a single site of employment.  *Id.* at 313; *see also Mercer*, 717 Fed. App'x at 405 (evidence that "some drilling rigs were within viewing distance of one or more of the others" did not raise a factual dispute as to whether the rigs were a single site of employment); *compare Davis*, 728 F.3d at 488 (an annex and yard located one mile apart was a single employment site).

The lack of reasonable geographic proximity alone compels the conclusion that each facility is a separate site of employment.  *See Viator*, 109 F.3d at 1127 ("Because we agree with the district court that the three stores did not share the same staff or equipment, we need not address the other factors . . . .").  The analysis of the other two factors supports this result.

On the second factor, US Well Services admits that the production facilities "serve the same general purpose of fracking," but notes that "they serve different customers under different

8

contracts at different drill sites and different oil fields." (Docket Entry No. 91 at 24).  On the third factor, US Well Services asserts that "the vast geographic distances precluded the sharing of equipment or personnel except for random exigencies." (*Id.*).  US Well Services also asserts that "each facility made its own hiring and staffing decisions, and payroll for each of the facilities was handled independently, with separate processing, review and approval, rather than centralized payroll out of the corporate office in Houston." (*Id.* at 24–25).  The plaintiffs, by contrast, point to evidence that the Northeast locations operated "under a single managerial umbrella." (Docket Entry No. 92 at 15–16).  The plaintiffs also rely on evidence that workers in the three Northeast locations "would be assigned 'from one location to another'" and that equipment would sometimes be shared.  (Docket Entry No. 92 at 16–17 (quoting Docket Entry No. 92-5 at 28)).

The plaintiffs have not demonstrated "an inextricable operational connection" between or among the US Well Services locations.  *Meadows*, 866 F.3d at 311.  "Occasional transfers of employees and office equipment between the different sites" is not enough.  *Viator*, 109 F.3d at 1128 (quoting *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1281 (8th Cir. 1996)) (alteration adopted).  Employees and equipment must be "regularly shared as opposed to occasionally transferred." *Id.* (quoting *Rifkin*, 78 F.3d at 1281).  The regulations include an example of "an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another." *Id.* (quoting 20 C.F.R. § 639.3(i)(3)).  "[C]ommon management is relevant to whether multiple locations can be aggregated to form a single site of employment, but it is not, standing alone, sufficient." *Meadows*, 866 F.3d at 313.

The evidence shows that each location had its own staff and equipment.  (Docket Entry No. 91-2 at ¶ 5).  The plaintiffs have shown only that the Northeast locations would sometimes "rotate equipment from one location to another" "as things break down," and that workers would

sometimes work at Northeast locations other than their home base.  (Docket Entry No. 92-5 at 6).  This falls short of the standard.  *See Rifkin*, 78 F.3d at 1281; *Hooper v. Polychrome, Inc.*, 916 F. Supp. 1111, 1117 (D. Kan. 1996) ("[W]e do not believe that the use of isolated pieces of equipment . . . mandates a determination of 'single site' status.").

Each US Well Services location will be treated as a separate site of employment in analyzing whether US Well Services was required to give notice under the WARN Act.

It is undisputed that if each location is treated as its own single site of employment, only the Bryan, San Angelo, and Pleasanton locations laid off enough employees to trigger the WARN Act.  (Docket Entry No. 73 at 16–18; Docket Entry No. 91 at 26).  The workers laid off in the Houston, Jane Lew, Uhrichsville, and Williamsport locations did not suffer "the same injury" as the workers in Bryan, San Angelo, and Pleasanton—a "mass layoff" without the required notice.  *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012).  The class consists only of terminated workers at the Bryan, San Angelo, and Pleasanton locations.

### B.    Timeframe

The parties disagree about whether the class should include employees terminated within a 30-day period or a 90-day period, starting when the terminations began.  US Well Services argues that the proper timeframe is 30 days beginning on March 5, 2020, when the first terminations occurred.  (Docket Entry No. 91 at 28).  The plaintiffs argue that the proper timeframe is 90 days, from March 5, 2020, to June 3, 2020.  (Docket Entry No. 92 at 12).

US Well Services's argument for limiting the class to employees terminated within a 30-day period is based on the WARN Act's 30-day period for determining if and when a "mass layoff" has occurred.  § 2101(a)(3).  According to US Well Services, once enough employees are

terminated within a 30-day period for a "mass layoff," employees terminated after that period are not part of that mass layoff.  (Docket Entry No. 91 at 28–30).

The plaintiffs' argument that the class includes employees terminated within a 90-day period is based on § 2102(d) of the WARN Act, which, under certain circumstances, allows aggregation of employment losses within a 90-day period:

> For purposes of this section, in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.

§ 2102(d).

US Well Services does not argue that the terminations between March 5 and April 4 and the terminations between April 4 and June 3 were "the result of separate and distinct actions and causes."  Rather, it argues that the 90-day aggregation period does not apply because the threshold for a "mass layoff" was reached within 30 days after the first terminations.  (Docket Entry No. 91 at 29–30).

The court agrees with US Well Services.  The 90-day aggregation period applies only when multiple employment losses that aggregate to a "mass layoff" are each "less than the minimum number of employees specified in section 2101(a)(2) or (3) . . . ."  § 2102(d); *see also* 20 C.F.R. § 639.5(a)(1)(ii) ("Look ahead 90 days and behind 90 days to determine whether employment actions both taken and planned each of which separately is not of sufficient size to trigger WARN coverage will, in the aggregate for any 90-day period, reach the minimum numbers for a plant closing or a mass layoff and thus trigger the notice requirement.").  According to the Department of Labor, "[i]t is important to note that the 90-day aggregation provision applies only to separate

actions each of which is under the coverage threshold.  Thus, small plant closings or layoffs are not aggregated with covered plant closings or mass layoffs."  54 F.R. 16042-01, 16053 (Apr. 20, 1989).

The Department of Labor example on which plaintiffs rely is not to the contrary.  (Docket Entry No. 92 at 11–12).  In that example, the threshold for a mass layoff was not reached within a 30-day period.  *See* 54 F.R. 16042-01, 16053.[3]  Here, by contrast, Pleasanton, Bryan, and San Angelo each laid off more than 50 employees—at least 33% of the workforce—from March 5 to April 4.  These are mass layoffs.  (Docket Entry No. 91 at 28).  Terminations after April 4 cannot be rolled in with those mass layoffs.  *See* 54 F.R. 16042-01, 16053.

The class is limited to employees terminated between March 5, 2020, and April 4, 2020.

### C.    Exclusions

US Well Services argues that the class should exclude employees who: (1) were part-time; (2) were rehired within six months; (3) voluntarily departed; (4) were discharged for cause; or (5)

---

[3]  The example is:

> Day 1—Company has 180 employees;
>
> Day 2—Company terminates 30 employees (now 150 employees);
>
> Day 31—Company terminates 29 employees (now 121 employees);
>
> Day 60—Company terminates 6 employees (now 115 employees);
>
> Day 90—Company terminates 5 employees (now 110 employees).

The Department of Labor gave the following analysis:

> Assuming that no notice was given, the company is liable to all 70 employees because the mass layoff threshold has been reached through separate actions which did not occur for separate and distinct causes within a 90-day period.  All employees terminated within the 90-day period have suffered a mass layoff and all are entitled to 60 days' notice before the date of their termination.

54 F.R. 16042-01, 16053.

signed a release.  (Docket Entry No. 91 at 18, 30).  The plaintiffs agree to exclude only employees who voluntarily departed or were discharged for cause.  (Docket Entry No. 92 at 22–23).

A "mass layoff" does not occur under the WARN Act unless there is a sufficient "employment loss" at a single site of employment during a 30-day period.  § 2101(a)(3).  The Act defines "employment loss" as "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period."  *Id.* (a)(6).  This language does not exclude terminated part-time employees from the "employment loss" definition.  US Well Services does not identify the basis for excluding part-time employees from the class, but the basis for the argument appears to be the definition of "mass layoff" as "a reduction in force" resulting in a specified number and percentage of employment losses, "excluding any part-time employees." § 2101(a)(3)(B).  The plaintiffs argue that this definition merely excludes part-time employees from the calculation of whether a "mass layoff" has occurred and the notice requirement applies. (Docket Entry No. 92 at 19–20).

The court agrees with the plaintiffs.  Before a "mass layoff," an employer must give 60-days' notice "to each affected employee."  § 2102(a)(1).  The Department of Labor has clarified that part-time employees are "affected employees" who are due notice: "While part-time employees are not counted in determining whether plant closing or mass layoff thresholds are reached, such workers are due notice."  20 C.F.R. § 639.6(b).  A part-time employee who does not receive the required notice is an "aggrieved employee" with a remedy under the Act.  § 2104(a)(1), (7).  Part-time employees are included in the class.

The plaintiffs admit, as they must under the plain language of the Act, that employees who were laid off but rehired within six months must be excluded from the class.  (Docket Entry No.

92 at 21); *see* § 2101(a)(6).  The plaintiffs instead argue that there is a difference between being terminated and rehired and being laid off and rehired.  The plaintiffs assert that employees in the former category should be included in the class.  (Docket Entry No. 92 at 21–22).

This argument is unpersuasive.  An "employment loss" under the Act can be either "an employment termination" or "a layoff exceeding 6 months."  § 2101(a)(6).  An employee who was compelled by his or her employer to quit the employment, but who was rehired within 6 months, has not suffered an "employment loss."  It does not matter whether the employer told the employee that the employment action was a "termination" or a "layoff" at the time that employee was compelled to quit his employment.  To hold otherwise would elevate form over substance.

Finally, the parties disagree about whether it is proper at this stage to exclude from the class of plaintiff employees those who received a benefit from US Well Services for releasing their WARN Act claims.  (Docket Entry No. 91 at 32; Docket Entry No. 92 at 23).  US Well Services has not produced evidence of any release agreements.  On this record, the court cannot evaluate whether the purported release agreements are valid and enforceable.  *See Williams*, 23 F.3d at 937.  There is no basis on this record for the exclusion US Well Services proposes.

### D.      Rule 23(a) and (b)

US Well Services argues that the plaintiffs do not satisfy the commonality and typicality requirements of Rule 23(a).  (Docket Entry No. 91 at 18–19).  US Well Services also argues that the plaintiffs "cannot adequately represent the class they seek to certify because they were each laid off on March 18, 2020, and worked only at the USWS facilities in Bryan, Texas and San Angelo Texas."  (*Id.* at 17).  US Well Services asserts that the circumstances of the layoffs in each of the separate facilities were different enough that the plaintiffs cannot represent employees terminated from other facilities.  US Well Services notes that employees at each location

14

performed "work for different USWS customers under differing contracts," and that they received different "amount[s] of notice . . . from [] customers about the loss of work . . . ." (*Id.* at 19–20). The plaintiffs dispute that they worked only in Bryan and San Angelo, noting that Easom, although based in Bryan, also worked in Jane Lew and Williamsport. (Docket Entry No. 92 at 9).

The record supports finding that Rule 23(a)'s commonality and typicality requirements are satisfied for a class consisting of employees terminated at the San Angelo, Bryan, and Pleasanton locations Between March 5, 2020, and April 4, 2020. The court does not address US Well Services's arguments that the plaintiffs cannot represent employees terminated at these other locations because, as explained above, although the locations are separate sites, mass layoffs did not occur at these other locations.

There are questions of law and fact common to the class, including whether: (1) mass layoffs occurred; (2) US Well Services provided the required notice; (3) the layoffs were caused by business circumstances that were not reasonably foreseeable at the time notice would have been required; and (4) US Well Services acted in good faith. (Docket Entry No. 20 at 1–3). US Well Services has not established that the circumstances of the layoffs in Pleasanton were materially different from the circumstances of the layoffs in Bryan and San Angelo, such that the plaintiffs' claims would not be typical of the claims of a class that included workers terminated in the different locations. Rather, the evidence shows that US Well Services laid off employees in all Texas locations for the same reason: customer demand for fracking services declined, and US Well Services needed to cut costs. (Docket Entry Nos. 70-2, 70-3, 70-4, 70-5, 70-6).

Although US Well Services does not challenge the other Rule 23(a) requirements or the requirements of Rule 23(b), the court addresses them to fulfill its duty to conduct a "rigorous" and detailed class-certification analysis. *See Chavez*, 957 F.3d at 545.

15

The putative class is sufficiently numerous "that joinder of all members is impracticable." Fed R. Civ. P. 23(a)(1).  Over 200 employees were terminated between March 5, 2020, and April 4, 2020, in Bryan, San Angelo, and Pleasanton.  (*See* Docket Entry No. 91 at 28).

The record shows that the plaintiffs will fairly and adequately represent the class interests. Fed. R. Civ. P. 23(a)(4).  The plaintiffs' counsel is "qualified, experienced, and generally able to conduct the proposed litigation." *N. Am. Acceptance Corp. v. Arnall, Golden & Gregory*, 593 F.2d 642, 644 (5th Cir. 1979).  (*See* Docket Entry Nos. 73-15, 73-16, 73-17).  The plaintiffs are sufficiently knowledgeable about the circumstances of the terminations "to be capable of 'controlling' or 'prosecuting' the litigation." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129–30 (5th Cir. 2005) (quoting *Berger v. Compaq Comp. Corp.*, 257 F.3d 475, 482–83 (5th Cir. 2001)).  (Docket Entry Nos. 73-1, 73-2, 73-3).  There are no apparent conflicts between the interests of the plaintiffs and the class.  *See Feder*, 429 F.3d at 130.  (Docket Entry No. 73-1 at ¶ 5; Docket Entry No. 73-2 at ¶ 5; Docket Entry No. 73-3 at ¶ 5).

The plaintiffs have satisfied Rule 23(b)(3) because "the questions of law or fact common to class members predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The court has noted the questions of law and fact common to the class—primarily whether US Well Services provided sufficient notice to terminated employees and the validity of US Well Services's affirmative defenses.  These questions predominate over individualized questions.  The predominance of the common issues makes a class action more efficient than separate suits by individual employees against the same defendant employer to resolve the common issues.  The class members' individual damages are likely too small to make separate lawsuits economically feasible. *See Amchem Products, Inc. v. Windsor*,

521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (quoting reference omitted).  (Docket Entry No. 73-1 at ¶ 6; Docket Entry No. 73-2 at ¶ 6; Docket Entry No. 73-2 at ¶ 6).

## III.   Conclusion

The amended motion for class certification is granted.  (Docket Entry No. 73).  The court certifies a class consisting of:

> All US Well Services employees based out of the production facilities in Bryan, Texas, San Angelo, Texas, and Pleasanton, Texas, who were terminated between March 5, 2020, and April 4, 2020, excluding employees who: (1) were rehired by US Well Services within a six-month period from their date of termination, (2) voluntarily terminated their employment, or (3) were discharged for cause.

### Motions for Partial Summary Judgment

The plaintiffs move for summary judgment on three of US Well Services's affirmative defenses.  The first is that the 60-days' notice required by the WARN Act was not practicable because the mass layoff was "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." § 2102(b)(2)(A).  (Docket Entry No. 20 at 2).  The second is that, if US Well Services violated the WARN Act, it did so in good faith and with reasonable grounds to believe it was complying with the Act. § 2104(a)(4).  (Docket Entry No. 20 at 3).  The third is that no notice was required because the mass layoff was due to a natural disaster—COVID-19. § 2102(b)(2)(B).  (Docket Entry No. 20 at 2).  Summary judgment is denied as to the first and second affirmative defenses.  Summary judgment is granted as to the third affirmative defense because the Fifth Circuit has held that COVID-19 is not a natural disaster

within the meaning of the WARN Act.  (Docket Entry No. 65).[4]  The plaintiffs' motion for partial summary judgment on the affirmative defenses, (Docket Entry No. 70), is granted in part and denied in part; the motion for partial summary judgment on the good-faith defense, (Docket Entry No. 78), is denied.

## I.     The Legal Standards

### A.     Summary Judgment

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (per curiam) (quotation marks omitted); Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party."  *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020).  The moving party "bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact," *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (citation omitted), and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301–02 (5th Cir. 2020) (citation and quotation marks omitted). While the party moving for summary judgment must demonstrate the absence of a genuine and material factual dispute, it does not need to negate the elements of the nonmovant's case.  *Austin*

---

[4]  US Well Services has not asserted an affirmative defense under the "faltering company" exception to the WARN Act.  *See* 29 U.S.C. § 2102(b)(1).  To the extent plaintiffs request summary judgment on this defense, it is denied.  (Docket Entry No. 70 at 12).

*v. Kroger Tex., LP*, 864 F.3d 326, 335 (5th Cir. 2017) (per curiam) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)).  "[A] fact is 'material' if its resolution could affect the outcome of the action."  *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (citation and quotation marks omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014) (quotation marks omitted).

When the moving party has met its burden, "the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).  "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation and quotation marks omitted).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018), *cert. denied sub. nom. City of Fort Worth, Tex. v. Darden*, 139 S. Ct. 69 (2018).

### B.    The WARN Act Exceptions

If a plaintiff establishes a WARN Act violation, the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the Act's three exceptions: the "faltering company" exception; the "unforeseeable business circumstances" exception; or the "natural disaster" exception.  29 U.S.C. § 2102; 20 C.F.R. § 639.9; *In re TWL Corp.*, 712 F.3d

886, 897–98 (5th Cir. 2013).  An employer's liability may also be reduced if it demonstrates that its failure to give notice was in good faith.  § 2104(a)(4).

The WARN Act's exceptions are affirmative defenses.  The employer has the burden to prove that an exception applied to the layoffs.  *See* § 639.9; *see also Jurcev v. Cent. Comty. Hosp.*, 7 F.3d 618, 625 (7th Cir. 1993).

## II.    Analysis

### A.    Unforeseeable Business Circumstances

Section 2102(b)(2)(A), provides: "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  An employer relying on the unforeseeable-business-circumstances exception "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period."  § 2102(b)(3).

The plaintiffs argue that this defense fails as a matter of law because § 2102(b)(2)(A) applies only if the employer provided some notice less than 60 days, and US Well Services provided no notice at all.  (Docket Entry No. 70 at 11).  The plaintiffs argue that US Well Services was required to give notice to the affected employees or their representatives, but also that notice was due to certain government entities under § 2102(a)(2).  (*Id.* at 12, 15–16).  US Well Services responds that it did give notice to the affected employees, and that any "technical" deficiencies with the notice do not preclude its unforeseeable-business-circumstances defense.  (Docket Entry No. 71 at 12, 20–23).  US Well Services does not contend that it gave any notice to government entities under § 2102(a)(2).  Instead, it argues that the plaintiffs lack standing to challenge the lack of notice to those entities.  (*Id.* at 17–19).

The court finds factual disputes material to deciding whether the termination letters US Well Services sent plaintiffs on March 18, 2023—the very day they were fired—was "as much notice as is practicable." § 2102(b)(3).[5]  US Well Services has produced evidence that it faced an existential crisis from the cancellation of several of its contracts, beginning a short time before COVID and escalating as soon as COVID hit.  (Docket Entry No. 89-2 at 2–3).  This crisis left US Well Services scrambling to cut costs.  (*Id.*).  US Well Services initially responded by laying off 43 employees while continuing to evaluate the need for further layoffs.  (*Id.* at 5–7). Thirteen days later, it evidently determined that a mass layoff was immediately necessary.  (*Id.* at 8).  US Well Services began terminating employees with the following letter:

> This letter outlines the information you need to know in regards to your current termination of employment, effective immediately.  Your termination of employment is due to unforeseeable business circumstances resulting from a lack of available customer work caused by the significant drop in oil prices and the unexpected adverse impact that the Coronavirus has caused.
>
> . . .
>
> If you have any questions, please contact your immediate Supervisor or Human Resources via email at dboyd@uswellservices.com or by phone at 979-307-6383. On behalf of the entire USWS Management team, we want to thank you for your service at US Well Services.  We regret having to take this action and wish you the best.
>
> Sincerely,
>
> Donna Boyd
> District HR Administrator

(Docket Entry No. 70-2).

The plaintiffs' evidence casts some doubt on whether advance notice was impracticable, but the critical issue at this stage is whether the notice given was adequate.   The termination letters

---

[5]  The plaintiffs do not argue that notice cannot, as a matter of law, be on the same day as the termination. (Docket Entry No. 70 at 11) ("Notice is still required, even if the notice is literally on the same day as the termination or even after termination.").  And Department of Labor regulations provide that "notice after the fact" is sufficient "in some circumstances."  20 C.F.R. § 639.9.

clearly failed to strictly meet the requirements of § 2102(b)(3) and 20 C.F.R. § 639.7(d).  Section

2102(b)(3) requires "a brief statement of the basis for reducing the notification period."  Section

639.7(d) provides that notice to affected employees must contain:

> (1) A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect;
>
> (2) The expected date when the plant closing or mass layoff will commence and the expected date when the individual employee will be separated;
>
> (3) An indication whether or not bumping rights exist; [and]
>
> (4) The name and telephone number of a company official to contact for further information.

The plaintiffs argue that the letters US Well Services gave employees when they were laid

off were not notice under the WARN Act because they did not: (1) refer to the WARN Act; (2)

explain why the 60-day notice period was reduced; (3) state whether the terminations were

permanent or temporary; (4) state whether the terminations were part of a mass layoff; (5) provide

the expected date of the mass layoff; or (6) indicate whether bumping rights existed.[6]  (Docket

Entry No. 70 at 7–10).

The Fifth Circuit has rejected the suggestion that "defective notice is automatically to be

treated as though no notice had been provided at all."  *Carpenters Dist. Council of New Orleans

& Vicinity v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1287 n.19 (5th Cir. 1994).  The plaintiffs

apparently accept this principle but contend that the "overarching question" is whether the defects

prejudiced the affected employees.  (Docket Entry No. 72 at 9).  Assuming that this is the correct

standard, the record does not establish that the omissions were prejudicial as a matter of law.   The

---

[6] The WARN Act does not define "bumping rights."  The U.S. Office of Personnel Management defines "bumping" as "displacing an employee on a different competitive level who is in a lower tenure group, or in a lower subgroup within the released employee's own tenure group."  Office of Personnel Mgmt., *Summary of Reductions in Force Under OPM's Regulations*, https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force/#url=20.

record shows that the employees received other information besides the letters, information that must be considered in determining whether the WARN Act's notice requirement was met. *See Schmelzer v. Office of Compliance*, 155 F.3d 1364, 1369 (Fed. Cir. 1998); *Kalwaytis v. Preferred Meal Sys., Inc.*, 78 F.3d 117, 121–22 (3d Cir. 1996) ("Fairly read, the regulations require a practical and realistic appraisal of the information given to affected employees.  We therefore examine the correspondence sent to the employees to determine if it provided adequate notification of the mass layoffs.").

US Well Services made announcements to employees on March 6, 2020, and March 19, 2020.  (Docket Entry No. 89-2 at 5–8).  The March 6 announcement told employees that there had been 43 layoffs in Texas, that more layoffs were possible, and that the layoffs may or may not be temporary.  (*Id.* at 5–7).  The March 19 announcement and termination letters gave the reason for the layoffs: "the sharp decline in oil prices and challenging industry outlook resulting in fewer fleets in operation," (*id.* at 8), and "unforeseeable business circumstances resulting from a lack of available customer work caused by the significant drop in oil prices and the unexpected adverse impact that the Coronavirus has caused," (Docket Entry No. 70-2).  When an employer does not and cannot know when or if the reasons for the layoff will end, it cannot tell laid off employees if the layoff will be permanent or temporary.  US Well Service did not, and could not, know when oil prices would rise enough to restore adequate demand for fracking, or when the pandemic would either end or ways to reduce it would be found.

The evidence does not show that the employees were prejudiced by US Well Services's failure to refer specifically to the WARN Act, and the plaintiffs cite no authority that this is required.  The evidence does not show prejudice from the failure to provide a "brief statement of the basis for reducing the notification period."  § 2102(b)(3).  The employees had been told, on

23

March 6 and March 19, that the layoffs were required because of the double-whammy of low oil prices and COVID.   (Docket Entry No. 89-2 at 8; Docket Entry No. 70-2).  *See Schmelzer*, 155 F.3d at 1369–70 (finding no prejudice from the employer's failure to notify employees of something they already knew); *Saxion v. Titan-C-Mfg., Inc.*, 86 F.3d 553, 561 (6th Cir. 1996) (same).

There was also no prejudice from the failure to say that the layoffs were part of a "mass layoff" and to provide the expected date of the mass layoff.   The March 6 and March 19 announcements provided the plaintiffs the information that their terminations were part of a company-wide "workforce reduction" that began in early March.  (Docket Entry No. 89-2 at 5, 8). Finally, although US Well Services admits it did not include a statement about "bumping rights," the plaintiffs make no argument that this omission was prejudicial.  That makes sense; US Well Services did not have a bumping-rights system.  (Docket Entry No. 29-1 at ¶ 4).  *See Nagel v. Sykes Enterprises, Inc.*, 383 F. Supp. 2d 1180, 1198 (D.N.D. 2005) (finding no prejudice from the omission of information about bumping rights because the plaintiff had no bumping rights); *Marques v. Telles Ranch, Inc.*, 867 F. Supp. 1438, 1446 (N.D. Cal. 1994), *aff'd*, 131 F.3d 1331 (9th Cir. 1997) *and aff'd in part*, 133 F.3d 927 (9th Cir. 1997) (the omission of information about bumping rights was "moot[]" because the employer was ceasing operations).

Finally, the plaintiffs argue that US Well Services's failure to give notice to the state dislocated worker unit and local governments precludes it from relying on the unforeseeable-business-circumstances exception.  The plaintiffs argue that notice to the relevant state and local government agencies is required by § 2102(a)(2).  In addition, the plaintiffs cite 28 C.F.R. § 639.9 which provides that "[t]he employer bears the burden of proof that conditions for the exceptions [set forth in § 2102(b)] have been met.  If one of the exceptions is applicable, the employer must

24

give as much notice as is practicable to the union, non-represented employees, the State dislocated worker unit, and the unit of local government and this may, in some circumstances, be notice after the fact."  US Well Services responds that the plaintiffs have no private right of action or standing to challenge the lack of notice to the relevant government entities, relying on *Kalwaytis*, 78 F.3d at 120, and *Marques v. Telles Ranch, Inc.*, 131 F.3d 1331 (9th Cir. 1997).  (Docket Entry No. 71 at 17–19).

The court agrees with US Well Services that its failure to notify the state dislocated worker unit and local governments does not preclude its unforeseeable-business-circumstances defense. The plaintiffs are correct that the WARN Act clearly requires this notice "so that dislocated worker assistance can be promptly provided."  20 C.F.R. § 639.1.  However, the court does not agree with the plaintiffs that the "plain language" of the WARN Act or its implementing regulations preclude an employer who fails to notify government entities under § 2102(a)(2) from invoking the unforeseeable-business-circumstances defense.  Rather, the Warn Act's definition of "aggrieved employee" and the remedies set out in § 2104 support finding that the defense is available notwithstanding a failure to notify the governmental entities.  Section 2104 defines "aggrieved employee" as "an employee who has worked for the employer ordering the plant closing or mass layoff and who, as a result of the failure by the employer to comply with section 2102 of this title, did not receive timely notice either directly or through his or her representative as required by section 2102 of this title."  § 2104(a)(7).  An employee is "aggrieved" under the Act by the employer's failure to give the employee or the employee's representative notice, not by the employer's failure to notify the relevant government entities.  The requirement to notify the government entities is enforced through a separate mechanism: civil penalties pursued by the aggrieved "unit of local government."  § 2104(3), (5); *see also Marques*, 131 F.3d at 1336

("WARN does not provide a private right of action to enforce its requirement under § 2102(a)(2) that notice of a plant closing or mass layoff be given to state and local government."). The language of the Act and its implementing regulations do not support precluding an employer who failed to notify the government entities of a mass layoff from relying on the § 2102(b) exceptions in an action by "aggrieved employees."

The plaintiffs' motion for summary judgment that US Wells Service cannot assert the unforeseeable-business-circumstances defense is denied.

### B.      The Good Faith Affirmative Defense

29 U.S.C. § 2104(a)(4) provides:

> If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

The plaintiffs argue that because US Well Services has stated that it will not rely on the advice of counsel to support its affirmative defense under this subsection, it has no evidence of good faith. (Docket Entry No. 78 at 5–7). US Well Services responds that it need not rely on advice of counsel to establish the defense, and that it has produced evidence sufficient to raise a factual dispute as to good faith.[7] (Docket Entry No. 89 at 8–15). The court agrees with US Well Services.

An employer invoking the good-faith defense to a WARN Act claim must prove that it (1) subjectively intended to comply with the Act, and (2) had an objectively reasonable basis for believing that it was complying with the Act. *Carpenters Dist. Council of New Orleans & Vicinity*

---

[7] US Well Services also argues that the motion for partial summary judgment is procedurally improper because it should not be decided before class certification or liability. (Docket Entry No. 89 at 6–7). The first objection is moot because the court has resolved the motion for class certification. The court need not reach the second objection because it denies the motion for summary judgment on the merits.

*v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1287–88 (5th Cir. 1994); *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 836 (8th Cir. 2016); *Castro v. Chicago Housing Auth.*, 360 F.3d 721, 730 (7th Cir. 2004).

US Well Services has raised factual disputes as to whether it subjectively intended to, and with an objectively reasonable basis believed it had, acted in compliance with the WARN Act. US Well Services relies on the declaration of its president and chief executive officer at the time of the layoffs, Joel Broussard. Broussard stated that he, "[i]n anticipation of potential layoffs, [] reviewed the language of the WARN Act online and read that no notice was required if the layoffs were due to a natural disaster." (Docket Entry No. 89-2 at ¶ 6). Broussard believed "that the sudden and unprecedented collapse in the price of oil . . . was triggered by the rapidly escalating COVID-19 pandemic . . . ." (*Id.* at ¶ 3). He also believed that COVID-19 was a "natural disaster" within the meaning of the WARN Act. (*Id.* at ¶ 6). Under these circumstances, Broussard "believed that USWS was not required to give the standard 60-day notice under the WARN Act." (*Id.*).

The plaintiffs argue that Broussard's declaration is not evidence of good faith because it was "prepared for ongoing WARN Act litigation [and] reek[s] of self-service . . . ." (Docket Entry No. 90 at 4). But "evidence proffered by one side to . . . defeat a motion for summary judgment" is always "self-serving." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021) (alteration adopted). "'Self-serving affidavits' . . . may create fact issues even if not supported by the rest of the record," and "may not be discounted on that basis alone." *Id.* at 160–61 (quoting reference omitted). Broussard's affidavit satisfies Federal Rule of Civil Procedure 56(c)(4) and is competent evidence of US Well Services's state-of-mind at the time of the layoffs and the alleged WARN Act violation. There is evidence contradicting Broussard's affidavit, raising questions as

to his credibility, but that makes summary judgment less, not more, appropriate. *Id.* at 161 ("How much weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage.").

US Well Services's belief that the COVID-19 pandemic was a "natural disaster" under § 2102(b)(2)(B) was objectively reasonable for the reasons set out in the court's order denying the parties' cross-motions for summary judgment. (Docket Entry No. 38 at 12–20). The Fifth Circuit's contrary determination, (Docket Entry No. 65), shows that reasonable minds can differ on the question. *See Frymire v. Ampex Corp.*, 61 F.3d 757, 768 (10th Cir. 1995) (applying the good-faith exception when "reasonable minds could come to an entirely different conclusion" on whether employer's contiguous facilities were a single site of employment).

US Well Services's subjective intent to comply is also supported by evidence that it tried to keep employees informed of its decisions. *See id.* at 768 (evidence that the employer subjectively intended to comply with the Act "can include . . . general evidence that the company had its employees' welfare in mind."). Twelve days before US Well Services terminated the plaintiffs, it announced to all employees that it had "had to lay off 43 employees in Texas or about 6% of our field workforce this week." (Docket Entry No. 89-2 at 5). US Well Services explained that this was "primarily due to late cancellation of work . . . amid the continual market deterioration as well as some realignment of our workforce by geography." (*Id.*). The announcement concluded with the statement that "[w]e will continue to seek profitable work during these challenging times while closely watching our headcount . . . ." (*Id.*). A "Q&A" attached to the announcement noted the possibility of more layoffs. (*Id.* at 7). US Well Services made a second announcement on March 19, 2020, the day after plaintiffs were terminated. (*Id.* at 8). The announcement again cited "the sharp decline in oil prices and challenging industry outlook resulting in fewer fleets in

operation" as the reason for continuing to reduce "[f]ield and office workforce via both layoffs and furloughs where prudent." (*Id.*).  This is evidence that US Well Services subjectively intended to keep its employees informed as the WARN Act requires, evidence that precludes summary judgment.

Summary judgment precluding the good-faith defense is denied.

### C.      Natural Disaster

In its order denying the parties' cross-motions for summary judgment, the court determined that COVID-19 was a "natural disaster" under § 2102(b)(2)(B).  (Docket Entry No. 38).  The court then granted plaintiffs' motion for interlocutory appeal under 28 U.S.C. § 1292(b), (*id.*), and the Fifth Circuit reversed, holding that COVID-19 was not a natural disaster with the meaning of the exception, (Docket Entry No. 65).  The Fifth Circuit's holding entitles plaintiffs to summary judgment on US Well Services's affirmative defense under the natural-disaster exception.

## III.   Conclusion

The plaintiffs' motion for partial summary judgment on US Well Services's affirmative defenses is granted in part and denied in part.  (Docket Entry No. 70).  The motion is granted as to the natural-disaster defense and denied as to the unforeseeable-business-circumstances defense. The plaintiffs' motion for partial summary judgment on US Well Services's good-faith defense is denied.  (Docket Entry No. 78).


SIGNED on September 26, 2023, at Houston, Texas.


_Lee H. Rosenthal_

_____

Lee H. Rosenthal
United States District Judge